# EXBHIBIT A

David Sanford (appearance *Pro Hac Vice*)
dsanford@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1666 Connecticut Ave, NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5200
Facsimile: (202) 499-5199

Jill Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
Edward Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
655 W Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 677-4250

Jeremy Heisler (NY Bar No. 1653484, *Pro Hac Vice forthcoming*)
jheisler@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the America, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651

*Attorneys for Plaintiffs and the Classes*
[*Additional Attorneys Listed After Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DAWN KNEPPER, TRACY WARREN, ALICIA VOLTMER, JOCELYN CAMPANARO, and ANGELICA OCHOA, on behalf of themselves and all others similarly situated,<br><br>                                        Plaintiffs,<br><br>v.<br><br>OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C, CHARLES MATTHEW KEEN, & KIM FRANKLIN EBERT, RONALD CHAPMAN, JOSEPH CLEES, and JOSEPH BEACHBOARD.<br>                                        Defendants. | **Case No.: 3:18-CV-00303-WHO**<br><br>**SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Dawn Knepper, Tracy Warren, Alicia Voltmer, Jocelyn Campanaro, and Angelica Ochoa ("Plaintiffs" or "Class Representatives") are attorneys and former shareholders employed by Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree," or "the Firm").  On behalf of themselves and all similarly situated female shareholders at Ogletree, Plaintiffs allege systematic gender discrimination by Ogletree and its leadership as follows:

## I.    **INTRODUCTION**

1.    Defendant Ogletree is one of the largest defense-side labor and employment law firms in the country, employing nearly 700 attorneys in the United States.  Ogletree defends employers against individual and class action employment lawsuits, including discrimination actions.  Ogletree also advises employers on how to avoid discrimination suits.

2.    According to its website, Ogletree advises clients on compliance with federal and state employment laws in order "to provide a positive workplace…." For its own part, Ogletree claims to be "committed to diversity," which it says "makes us better—as lawyers and people."  It purports to "foster diversity and inclusion as an integral part of the firm's overall professional development efforts."  But this rhetoric is largely hollow.  In reality, the Firm has shirked its obligations under the law through its "do as I say not as I do" practices.  On information and belief, when a female shareholder asked the Managing Shareholder of the Firm, Defendant Matt Keen, about the Firm's response to gender discrimination complaints, he explained, "we're not real good at practicing what we preach."

3.    Ogletree's female shareholders face discrimination in pay, promotions, and other unequal opportunities in the terms and conditions of their employment.  Male shareholders are disproportionately over-represented at every level of the Firm's management and leadership structure.  Through formal policies and widespread practices, the Firm's male leadership interferes with, limits, or prevents female shareholders from receiving the appropriate credit for the business they bring to the Firm and their hard work in running complex and demanding cases day-to-day.  All the while, their male colleagues reap the professional and financial profits that women generate.  The Firm, dominated by male decision makers, also denies female shareholders the same business development and training opportunities provided to their male counterparts. Female shareholders are not selected for business pitches at the same rate as similarly situated, and in some cases less qualified, male attorneys. Through these practices, the Firm

systematically overlooks, devalues, or undermines female attorneys as business generators, which adversely impacts their pay and promotion.

4.     This is a nationwide action seeking class and collective relief for all current and former Ogletree shareholders across the country. Plaintiffs are female equity and non-equity shareholders from California, Texas, and Colorado formerly employed by Ogletree.  They bring this action as shareholders alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963, 29 U.S.C. §§ 206 *et seq.* ("EPA"), and related California statutes, as well as common law breach of contract and implied covenant of good faith and fair dealing, and breach of fiduciary duties.

5.     Plaintiffs bring these nationwide class and collective allegations against Ogletree, a South Carolina based firm with 48 offices across 28 states throughout the country, as well as five individual Defendants. Though the five individual Defendants work out of different Ogletree offices and reside in different states—Indiana, North Carolina, Texas, Arizona, and California—they have been vested with centralized authority and power to make decisions regarding compensation, promotion, credit allocation, and business development opportunities for Ogletree's female shareholders throughout the nation.

## II.     THE PARTIES

### A.  Plaintiff Dawn Knepper

6.     Plaintiff Dawn Knepper ("Plaintiff Knepper" or "Ms. Knepper" or "Class Representative") is a female attorney and was previously a non-equity shareholder in Ogletree's Orange County office.

7.     Plaintiff Knepper was employed by Ogletree from approximately June 2005 until February 2018.

### B.  Plaintiff Tracy Warren

8.     Plaintiff Tracy Warren ("Plaintiff Warren" or "Ms. Warren" or "Class Representative") is a female attorney and was previously an equity shareholder in Ogletree's San Diego offices.

9.     Plaintiff Warren was employed by Ogletree from approximately August 2013 until January 2018.

### C.  Plaintiff Alicia Voltmer

10.     Plaintiff Alicia Voltmer ("Plaintiff Voltmer" or "Ms. Voltmer" or "Class Representative")

is a female attorney and was previously a non-equity shareholder in Ogletree's Dallas, Texas office.

11.     Plaintiff Voltmer was employed by Ogletree from approximately 2003 until March 2016.

**D.  Plaintiff Jocelyn Campanaro**

12.     Plaintiff Jocelyn Campanaro ("Plaintiff Campanaro" or "Ms. Campanaro" or "Class Representative") is a female attorney and was previously a non-equity shareholder in Ogletree's Denver, Colorado office. Plaintiff Campanaro was employed by Ogletree from approximately 2010 until May 2015.

**E.  Plaintiff Angelica Ochoa**

13.     Plaintiff Angelica Ochoa ("Plaintiff Ochoa" or "Ms. Ochoa" or "Class Representative") is a female attorney and was previously anon-equity shareholder in Ogletree's Denver, Colorado office. Plaintiff Ochoa was employed by Ogletree from September 2010 until June 2015.

**F.  Defendant Ogletree**

14.     Defendant Ogletree is a law firm with approximately 48 offices nationwide, in approximately 28 states, including 7 in California.  Ogletree employs over 100 attorneys in California. Within the last 18 months alone, over one dozen California female shareholders or female "Of Counsel" attorneys have left Ogletree.

15.     During all times the respective plaintiffs were working for Ogletree, Ogletree was Plaintiffs' employer within the meaning of all applicable federal and state statutes.

**G.  Defendant Charles Matthew Keen**

16.     Defendant Charles Matthew Keen ("Defendant Keen" or "Mr. Keen") is a male attorney in Ogletree's Raleigh, North Carolina office and has been Ogletree's Managing Shareholder since approximately February 2016.

17.     Defendant Keen has been employed by Ogletree since approximately 1987 and has been a member of Ogletree's Board of Directors since approximately 2010.

**H.  Defendant Kim Franklin Ebert**

18.     Defendant Kim Franklin Ebert ("Defendant Ebert" or "Mr. Ebert") is a male attorney in Ogletree's Indianapolis, Indiana office and was Ogletree's Managing Shareholder from approximately 2010 until approximately February 2016.

19.     Defendant Ebert has been employed by Ogletree since approximately 2000 and was a member of Ogletree's Board of Directors from approximately 2006 until approximately February 2016.

**I.     Defendant Ronald Chapman**

20.     Defendant Ronald Chapman ("Defendant Chapman" or "Mr. Chapman") is a male attorney in Ogletree's Dallas, Texas office. Mr. Chapman is an equity shareholder. Mr. Chapman was a member of Ogletree's Board of Directors from approximately January 2012 until stepping down in 2018, shortly after this case was initially filed.

21.     Defendant Chapman has been employed by Ogletree since approximately 2000.

**J.     Defendant Joseph Clees**

22.     Defendant Joseph Clees ("Defendant Clees" or "Mr. Clees") is a male attorney in Ogletree's Phoenix, Arizona office. Mr. Clees is an equity shareholder. Mr. Clees was a member of Ogletree's Board of Directors from approximately January 2017 until stepping down in 2018, shortly after this case was initially filed.

23.     Defendant Clees has been employed by Ogletree since approximately 2005.

**K.     Defendant Joseph Beachboard**

24.     Joseph Beachboard ("Defendant Beachboard" or "Mr. Beachboard") is a male attorney in Ogletree's Torrance, California office.  Mr. Beachboard is currently one of Ogletree's Co-Managing Directors, and has oversight of all of Ogletree's California offices.

25.     Defendant Beachboard has been employed by Ogletree since approximately 2001.  Prior to becoming a member of Ogletree's Board of Directors and Managing Director in February 2016, Defendant Beachboard was a Client Services Shareholder.

**III.     JURISDICTION AND VENUE**

26.     The U.S. District Court for the Northern District of California has personal jurisdiction over Defendants because Ogletree has offices in California and does business in California, and many of the acts complained of and giving rise to the claims alleged herein occurred in California.

27.     This Court has subject matter jurisdiction over the claims under Title VII and the EPA pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).  These claims arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

28.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b), which allows an action to be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located," or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Venue is also proper pursuant to 42 U.S.C. § 2000e-5(f)(3) which allows the action to "be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed." Defendant Ogletree is deemed to reside in the Northern District pursuant to 28 U.S.C. § 1391(c), as Defendant Ogletree conducts substantial business in San Francisco, CA, including an office with approximately 29 attorneys and approximately 5 putative class members. Further, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, including through the actions of key decision makers within the Firm's San Francisco office who participated in the implementation and cultivation of Ogletree's discriminatory compensation, credit allocation, and business development policies and practices, and were leaders of Ogletree's Women's Task Force and Credit Guidelines Committee.

30.     Plaintiffs have exhausted their administrative remedies under Title VII. Plaintiffs Knepper and Warren each filed charges of gender discrimination individually and on behalf of all similarly situated female shareholders employed by Ogletree with the Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH"). Plaintiff Knepper duly filed her administrative charge before the EEOC and DFEH on December 21, 2017 and received her Notice of Right to Sue from the EEOC and DFEH on January 9, 2018. Plaintiff Knepper filed her Complaint in this Court within ninety days of the receipt of her EEOC Notice of Right to Sue and DFEH Notice of Right to Sue. Plaintiff Warren duly filed her administrative charge before the EEOC and DFEH on February 22, 2018 and received her Notice of Right to Sue from the EEOC on March 28, 2018 and from the DFEH on April 10, 2018.

**IV.     FACTUAL ALLEGATIONS**

31.     Plaintiffs bring this nationwide class and collective action on behalf of equity and non-

equity shareholders throughout the country who work, have worked, or will work for Ogletree. Ogletree's common policies and practices have been used to discriminate against women in every Ogletree office in the country. The allegations of each Plaintiff demonstrate Ogletree's pattern of misconduct, in which a small number of male shareholders working and residing in various states throughout the country exploited their oversized influence in the Firm to uniformly hold back the pay, promotion, credit allocation, and business development of female shareholders in every office of the Firm while promoting and advancing the interests of male shareholders.

32.     While Plaintiffs have exercised their right to bring this nationwide action in the Northern District of California, the effects of Ogletree's discriminatory conduct have been felt throughout the country. Similarly, the development of the Firm's common policies and practices of discrimination was an effort coordinated by Ogletree's male leadership, and implemented through the funneling of business opportunities, credits, and authority to male shareholders in each of the Firm's 48 offices.

33.     Of the 67 individuals listed in this Complaint responsible for, or witness to, Ogletree's discriminatory practices, 47 reside outside of the state of California. Of the 20 individuals that reside in California, 7 work or worked in Ogletree's San Francisco office, 5 in the Firm's Los Angeles office, 3 in the Orange County office, 1 in the Torrance office, and 4 in the Firm's San Diego office. Of the 5 Named Individual Plaintiffs, 3 are outside of California and 2 are in two different offices in California. Of the 5 Named Individual Defendants, 1 works in California and 4 work outside of the state. And the Firm, Defendant Ogletree, has its main office in South Carolina.

**A. Ogletree's Male-Dominated Leadership**

34.     Men dominate Ogletree's leadership and management.  Women hold only two of nine seats on Ogletree's Board of Directors and two of six Firm Officer positions; one of these two officer positions was added as recently as December 2017.  Compensation decisions at Ogletree are centrally controlled by its Compensation Committee, which is comprised predominantly of male members from various Ogletree offices throughout the country. Defendant Clees has been a member of the Ogletree Compensation Committee, and Defendant Chapman heavily influences compensation decisions.  The Compensation Committee decides the proposed compensation for all shareholders with minimal transparency.  All shareholder compensation is then voted on by Ogletree's equity shareholders, approximately 80% of

whom are men.

35.     Ogletree discriminates against women by permitting its predominantly male leadership to overtly favor men in pay, promotions, and other opportunities regardless of their qualifications and to otherwise discriminate against women.  Women hold approximately 20% of equity shareholder positions, and approximately 43% of non-equity shareholder positions.  Ogletree leadership fosters or condones a Firm culture that marginalizes, demeans, and undervalues women.

36.     On information and belief, the overrepresentation of men in Ogletree's leadership is both the source and product of continuing systemic discrimination against female shareholders.

37.      Ogletree's leadership is aware of the Firm's inequitable pay, promotion, job assignment, and other practices, but have taken no meaningful steps to remedy the root causes of the disparity. Ogletree is aware of the demographics of its workforce, including the underrepresentation of women in different levels and functions.

38.     Ogletree, one of the nation's largest employment law firms, regularly advises companies on how to comply with pay equity laws and to avoid, investigate, and remedy sexual harassment and discrimination claims.  Ogletree has been aware of its own misconduct for years, but the Firm has failed to rectify the discrimination and has actively sought to avoid the changes necessary to comply with the law.

39.     Ogletree discriminates against Plaintiffs and female shareholders with respect to compensation and promotions through the use of common policies and procedures.

**B.  Ogletree's Equity and Non-Equity Shareholder Compensation Policies**

40.     Ogletree's shareholders are divided into two groups: equity shareholders and non-equity shareholders.  On information and belief, Ogletree's Shareholder Agreement refers to all equity and non-equity shareholders who work for Ogletree in the United States as "employees."  Ogletree also states that all equity and non-equity shareholders' compensation is based on salary.

41.     The Firm uses the equity and non-equity tiers to distribute compensation.  These tiers allow predominately male attorneys to rely on arbitrary, subjective criteria to deny female shareholders promotions, equity status, pay, and compensation commensurate with their skill, experience, and contributions to the Firm.

42.     In order to be brought into the Firm at, or promoted to, shareholder level, attorneys must be recommended by Ogletree's predominantly male Board of Directors and local shareholders, then receive 75% of Ogletree's equity shareholders' votes.  Ogletree's equity shareholders are approximately 80% men.

43.     This male-dominated system makes it extremely difficult for female non-equity shareholders to be promoted and paid at the same levels as equity shareholders, although they perform substantially similar work.  Indeed, Ogletree's equity and non-equity positions are identical except for the pay and power the Firm gives them.

44.     Ogletree's Equity and Non-Equity Shareholders policy explains that, among equity and non-equity shareholders, "Basically the only differences are the method of compensation (floating based on firm profits for Equity vs. level for Non-Equity) and the fact that Equity shareholders vote on firm-wide decisions."  Equity and non-equity shareholders perform substantially similar work, but they are compensated differently.  The policy also states that "Expectations for both Equity and Non-Equity shareholders are the same with regard to technical and professional qualifications, experience, personal effort, managing and developing associates and staff, and contributions to the Firm as a whole."  However, Ogletree pays its predominantly-male equity shareholders monthly profit-sharing distributions, which can increase their target compensation by approximately up to 40%.

45.     Ogletree routinely refuses to promote qualified female non-equity shareholders to equity shareholder status, even when they generate business that meets or exceeds the criteria and expectations for equity shareholders.  At the same time, the Firm has eased business generation requirements in order to promote favored male attorneys to equity status. These policies disparately impact Ogletree's female non-equity shareholders.

**C.  Ogletree's Discriminatory Credit Allocation and Compensation Policies**

46.     Compensation decisions at Ogletree are centrally controlled by the Firm's Compensation Committee, which until recently had no more than one woman among its five members.  The 2018 Compensation Committee, for the first time, has two women on it. From 2013 to 2018, only a single woman sat on the Compensation Committee—before that, the Compensation Committee was comprised solely of men.

47.     In the compensation-setting process, Ogletree's shareholders receive credit for their work in five main categories: originating credits, managing credits, responsible credits, working credits, and billable hours.  Ogletree's Origination Credit Principles policy states that, "The originating, managing, responsible and working attorney statistics should be utilized as a source of objective information for the Compensation Committee to make *subjective* judgments about shareholder compensation.  *A formula is strongly disfavored.*" (emphases added).  This subjectivity allows the Firm's male leadership to control all compensation at the Firm and results in discrimination against female attorneys.  On average, Ogletree paid its male shareholders approximately $110,000 more than its female shareholders, in 2017 target compensation and discretionary bonuses alone.

48.     Ogletree defines an *originating attorney* as, "The attorney(s) bringing the client to the Firm for legal representation. In some cases, origination credit for a matter may be divided among several attorneys."  In practice, whichever attorney establishes the Firm's initial relationship with a potential client is thereafter considered the originating attorney for all of that client's business over the entire course of the client's relationship with the Firm. The originating attorney has total discretion to allocate origination credits in perpetuity. Only once an attorney seeks redress through the appeals process can the Firm's Managing Shareholder overturn the originating attorney's decision. In practice, the Firm's Managing Shareholder rubber stamps the allocations made by predominantly male originating attorneys.  Male attorneys, who disproportionately control decision-making authority, disproportionately assign origination credits to other male attorneys.  This allows male attorneys to receive an inordinate number of origination credits and allocate other credits to male attorneys even when female attorneys bring the relevant business to the Firm.  The Firm's discriminatory practices have caused a substantial gender-based disparity in origination credits throughout the Firm—between 2014 and 2016, the average amount of origination credits for male shareholders was nearly *double* that of female shareholders.

49.     Ogletree defines the *managing attorney* as, "The attorney responsible for overall management of the work, and relationship with the Firm, pertaining to a particular client.  This may include billing responsibilities."  According to this policy, managing attorneys are generally the attorneys in charge of communicating with clients and managing the clients' expectations and the work that is done to meet them.

50.     Ogletree weighs origination and, to a lesser extent, managing credits heavily in making compensation decisions, while responsible attorney and working credits have very little impact on compensation.

51.     By Firm practice, originating attorneys have been given the discretion to distribute origination, managing, responsible, and working credits in an arbitrary, subjective, or biased manner.  The Firm allows originating attorneys to choose which attorneys will share origination credits and which will receive managing credits on that matter.  Originating and managing attorneys then direct responsible and working attorneys to do the actual work on a matter. As a result, predominantly male managing and originating shareholders receive a disproportionate amount of the meaningful credit and compensation.

52.     Ogletree defines the *responsible attorney* as, "The attorney responsible for coordination management, strategic planning, staffing and overall success in the Firm's handling of a *particular matter*." (emphasis added).

53.     The operative distinction between a managing attorney, who receives managing credit, and a responsible attorney, who receives responsible credit, is that the managing attorney purportedly manages the *client relationship* while the responsible attorney is responsible for the overall success of the *matter*.

54.     Ogletree defines a *working attorney* as, "the attorney who is working on the case." Billable hours, responsible credits, and working credits are the most objective metrics that are considered in compensation decisions, but have the least impact on compensation. Consequently, the compensation rubric is stacked in a way that favors male attorneys.

55.     Female attorneys are disproportionately assigned to be responsible or working attorneys, as opposed to originating or managing attorneys. This is the case even when female attorneys handle all of the tasks that are supposed to be completed by managing attorneys, and for which managing attorneys receive credit, including client contact, performing or managing the bulk of the actual work, and handling other aspects of a matter.  Indeed, female responsible or working attorneys are also frequently charged with billing and collection or preparing status reports for originating and managing attorneys who are unfamiliar with that matter, so those attorneys can communicate knowledgeably with the client.

56.     After the proposed compensation recommendations were announced at the end of January 2017, but before the numbers were approved by the equity shareholders, a large number of female

shareholders met to discuss pay equity and raised the issue to Ogletree Deakins' Women's Initiative ("ODWIN").  When female shareholders proposed asking that that the Board of Directors conduct a pay equity audit, the head of ODWIN explained that there was nothing she could do and that the Board thought the female shareholders from California who had been complaining were "crazy."  Nevertheless, multiple female shareholders continued to complain about compensation and provide examples regarding the unfair allocation of credits. In response, the Firm announced a process to appeal origination disputes—creating the façade that aggrieved shareholders could contest an originating attorney's allocations.  On information and belief, while setting up this appeal process, Defendant Chapman, the highest paid male shareholder in the Firm – who benefits enormously from the discriminatory practices – announced to the other newly-appointed members of the credit appeal process, "We need to make it really hard to use because we don't want people to use it."  Ogletree's old boys' club has created and maintained a blatantly discriminatory system in order to underpay women and make recourse inaccessible or impossible.

### D.  Ogletree's Discriminatory Promotion Policies

57.     Ogletree's promotion policies and practices have created a glaring gender disparity in seniority at the Firm.  Because the Firm does not promote women at rates remotely equal to those of similarly situated men, women represent a progressively lower percentage of each tier of the Firm as title and compensation rise.

58.     For example, while women represent approximately 58% of Ogletree's associates, only approximately 131, or 32%, of Ogletree's approximately 400 shareholders are women. Of Ogletree's approximately 213 non-equity shareholders, only approximately 92, or 43%, are women.  Of Ogletree's approximately 187 equity shareholders, only approximately 39, or 20%, are women.

59.     In order to maintain control over the Firm and shareholder compensation, Ogletree's male-dominated leadership maintains moving targets for non-equity shareholders pursuing promotion to equity status.

60.     Ogletree's Equity and Non-Equity Shareholders policy sets forth the criteria for promotion to equity shareholder status: $750,000 in origination credits, $750,000 in management credits, $500,000 in working credits, at least 1,800 billed hours per year, and at least 200 "Firm hours."  The Firm frequently requires non-equity female shareholders to meet these thresholds for three consecutive years prior to

1 promotion.

2     61.    In contrast, there are numerous examples in which Ogletree has promoted men who have

3 failed to meet these criteria. In 2017 alone, Kevin Bland (Orange County, CA), Greg Cheng (San

4 Francisco, CA), William Duda (Columbia, SC), Bernhard Mueller (Columbia, SC) and Scott Kelly

5 (Birmingham, AL) were promoted to equity shareholder without meeting the promotion criteria for three

6 consecutive years.  Ogletree maintained Keith Watts' equity shareholder status despite Mr. Watts not

7 sustaining the criteria for three consecutive years.

8     62.    One flagrant example of such selective promotion is Los Angeles male equity shareholder

9 Evan Moses, whom Defendant Kim Ebert, the Managing Shareholder of the Firm at the time, conceded

10 in an open partnership meeting did not come close to meeting the criteria. Nevertheless, the Firm made an

11 exception because of his (grossly inflated) managing numbers.  Male equity shareholders Keith Watts and

12 Vincent Verde were promoted under similar circumstances.

13     63.    In contrast, Ogletree promoted only one woman to the equity tier for 2017, while promoting

14 seven men to the equity tier for the same year.  This female shareholder had met every criterion for three

15 years, a standard the Firm did not require of men.

16     64.    The Firm's discriminatory credit allocation system makes meeting the origination criteria

17 for promotion very difficult for female non-equity shareholders to achieve, thereby creating a strong

18 barrier to women's advancement within the Firm.

19     65.    In contrast, the Firm's old boys' club distributes origination credit so that male

20 shareholders are able to meet the credit requirements without doing the work.  The Firm also enables

21 Board members who seek origination credit for a matter to determine what attorneys achieve what portion

22 of origination credits.  Likewise, the Firm eases these requirements for favored male attorneys who,

23 despite receiving disproportionately high credit allocations, have still failed to meet these origination

24 thresholds.

25     66.    This system discriminates against and disparately impacts women by denying them

26 promotions and promoting them less often and more slowly than equally or less qualified men.  This

27 impact is apparent in the dwindling proportion of women at each successive level of Ogletree's hierarchy.

28     67.    Both Defendants Chapman and Clees billed less than one thousand hours per year each of

the last three years.  They are able to single handedly go on pitches (even pitches for clients already secured by female shareholders) without accountability for billed hours.  Despite not bringing in the business on these pitches, both Defendants Chapman and Clees lay claim to these clients, expect origination when a female shareholder is successful in landing the client, and expect to delegate their larger pie of origination credit while giving women the minority share.  Women who contest this male dominated origination credit delegation are further ostracized and marginalized.

### E.  Ogletree's Discriminatory Business Development and Job Assignment Practices

68.    Female shareholders throughout the Firm are required to assume administrative duties such as office management, paralegal supervision and training, and event planning. These administrative, or "housekeeping," duties take substantial amounts of time from female shareholders, while male shareholders are freed from these tasks.  Instead, the Firm permits male attorneys to devote their time to case work and business development efforts, which Ogletree values highly and substantially rewards, particularly through compensation.

69.    The Firm also requires female shareholders to perform the bulk of the actual legal work on its cases as the "responsible" or "working" attorneys, including client communications, legal research, developing case strategies, managing work, writing legal documents, and the countless granular tasks involved with litigation.  "Responsible" and "working" credits, however, do not meaningfully affect shareholders' compensation, which is driven by origination and managing credits.

70.    Thus, while female shareholders are disproportionately consumed with casework and administrative tasks that do not affect their compensation, they are prevented from engaging in business development activities.  In contrast, their male colleagues are afforded the time and availability to pursue business development efforts and are rewarded for doing so.

71.    As female shareholders draft briefs, supervise younger lawyers and non-lawyer staff, and handle a broad range of client demands, the Firm selects male shareholders for pitch meetings, conferences, and other business development opportunities that enable those male shareholders to reap origination credit, management credit, and other compensation that is disproportionate to their contributions.

72.    The result is that female shareholders at Ogletree primarily receive responsible and

working credit for their work, while male shareholders disproportionately receive origination and managing credit. Because Ogletree places exponentially more value on origination and managing credit in its compensation-setting process, the Firm is able to systematically and discriminatorily pay female shareholders less despite their additional duties.

73. The Firm is also well aware of the disparate impact of its inequitable assignment of administrative roles to female shareholders. Ogletree has discriminatorily tasked female shareholders, including Ms. Knepper, Ms. Warren, Ms. Voltmer, Ms. Campanaro, and Ms. Ochoa with handling time-consuming administrative duties, which substantially decreases the amount of time they have to conduct billable work and grow their business.

74. In contrast, male shareholders rarely handle administrative tasks, while Ogletree actively provides them with business development opportunities from which women are excluded, such as pitches, conferences, awards ceremonies, networking events, and other occasions for professional growth. When male attorneys meet potential clients, the male attorneys frequently demand origination credits despite not bringing the business into Ogletree. If a female attorney later brings the business from that client to Ogletree, the male hierarchy, abusing their power, frequently takes origination credits, often times deciding a discriminatorily low percentage of credit will be allocated to the female attorney. When female shareholders complain about the allocation of origination credits, the Firm's male managing shareholder frequently supports the male shareholder taking the greater percentage or all of the origination credits, to the female shareholder's disadvantage.

## V.   **PLAINTIFFS**

75. Plaintiffs are female attorneys who were employed as equity or non-equity shareholders in Ogletree's offices throughout the country.

### A.  **Plaintiff Dawn Knepper**

76. Plaintiff Knepper worked in Ogletree's Orange County office.

77. Ms. Knepper received her B.A. from the University of Texas at Austin in 1996. She received her J.D. *with honors* from Golden Gate University School of Law in 2000, the same year she was admitted to the California State Bar. After law school, Ms. Knepper served as a Staff Attorney for the United States Court of Appeals for the Ninth Circuit.

78.     Ms. Knepper joined Ogletree's San Antonio office on June 1, 2005.  Effective January 1, 2012, Ms. Knepper moved to Ogletree's Orange County Office and became its only female shareholder.

79.     As soon as Ms. Knepper arrived in the Orange County office, she began experiencing disparate treatment and hostility from the office's entirely male leadership – most notably from Keith Watts, the Orange County Office's managing shareholder.

80.     Ms. Knepper soon learned she was being significantly underpaid compared to male shareholders, leading her to complain to the Compensation Committee about the gender-based compensation disparities in her office as early as the end of 2012.

81.     Ogletree refused to rectify the issues Ms. Knepper raised, and from 2012 to 2018, underpaid, underdeveloped, and undervalued her.

82.     Despite this, Ms. Knepper excelled in her job duties at Ogletree. She was recognized as a Super Lawyers Rising Star every year from 2010 to 2013 and as a Southern California Super Lawyer every year since, and is Preeminent AV rated by Martindale-Hubbell.  She was a frequent speaker at Firm and non-Firm events and workshops and regularly contributed to the Firm blogs.  Ms. Knepper chaired the planning and preparations for the Women's In-House Counsel Institute workshops in 2016 and 2017, a significant event for the office but a non-billable one for Ms. Knepper.

83.     Recognizing her expertise across a range of different practice groups, Ogletree appointed Ms. Knepper as Co-Chair of its cross-practice Sports Entertainment Practice Group, managing attorneys in the practice group throughout Ogletree's offices nationwide.  Ogletree also selected Ms. Knepper to oversee the Orange County paralegals.

84.     Despite her excellent performance, Ogletree continually underpaid Ms. Knepper and refused to promote her.

85.     Ms. Knepper complained consistently about these issues since 2012, but Ogletree's only response has been to retaliate against her for doing so, leaving her no recourse but to take legal action.

86.     Ogletree's mistreatment of Ms. Knepper is typical of its mistreatment of women throughout the Firm and exemplifies the Firm's discriminatory policies and practices.

87.     Indeed, in April 2017, following complaints from several female shareholders, including Ms. Knepper, the Firm created a "task force" ostensibly to study issues related to advancement and

recognition of women in the Firm.  This task force was comprised of shareholders from various Ogletree offices throughout the nation and solicited input from female shareholders throughout the Firm.  ODWIN even encouraged women to reach out to task force committee members.  However, similar to Ogletree's credit appeals process, this task force was entirely ineffective in addressing the Firm's discrimination, and the Firm made no real efforts to address the discrimination.

### i.   Ogletree Discriminated Against Ms. Knepper in Pay

88.     Ms. Knepper performed at equal or higher levels than her male comparators but was paid less.

89.     When Ms. Knepper transferred to the Orange County office in 2012, she requested to be paid at least equally to Matt Effland, a male shareholder of similar seniority who had recently moved from Indiana to Los Angeles.  In 2011, Ms. Knepper earned higher credits than Mr. Effland in every single category, including approximately over $100,000 higher originations and 100 more billable hours than Mr. Effland.

90.     However, Ogletree set Ms. Knepper's salary and bonus at approximately $100,000 less than Mr. Effland's in 2012, making Ms. Knepper the lowest paid full-time shareholder in California by approximately $60,000.

91.     Ms. Knepper complained about the disparity to multiple members of Ogletree's Board of Directors and Compensation Committee, but Ogletree responded by increasing her pay by only $10,000, to a level equal to what an associate with *four years less experience* would have made in the Orange County market.

92.     Despite this, in 2012 Ms. Knepper outperformed many of the 27 predominantly male attorneys in Ogletree's $300,000 pay band – substantially higher than she earned – in every compensation credit category, including having higher origination credits than approximately five male attorneys, higher managing credits than approximately 13, higher responsible credits than approximately 20, and higher working credits than approximately 15.  In 2012, Ms. Knepper billed approximately 2,100 hours; for reference, the billable hours goal for promotion to equity status is 1,800 hours.

93.     Ms. Knepper presented all of this information to the Compensation Committee in 2012 and requested that Ogletree pay her a salary commensurate with her value and performance in 2013.  Instead,

Ogletree made the decision to pay Ms. Knepper approximately $50,000 less than she requested.

94.   Nevertheless, Ms. Knepper maintained her high performance.  In 2013, of the 32 Ogletree attorneys who were paid in the $300,000 band, Ms. Knepper had higher origination and managing credits than 13, higher responsible credits than 24, and higher working credits than 27. Ms. Knepper had higher origination and working credits than Managing Shareholder Keith Watts, as well as approximately 472 more billable hours, yet Ogletree paid Mr. Watts approximately $125,000 more.

95.   In 2014, Ms. Knepper made the Compensation Committee aware of how significantly they were underpaying her and requested the same salary as she had requested the previous year, which would have placed her at the bottom of the pay band.  Willfully ignoring this glaring disparity, Ogletree refused to change her salary at all and instead continued to pay her approximately $50,000 less than she requested.

96.   Ogletree continued to pay Ms. Knepper approximately $125,000 less than Mr. Watts in 2014, a year in which she had significantly higher responsible and working credits, as well as approximately 1,341 more billable hours than Mr. Watts.  For the remainder of Ms. Knepper's tenure at Ogletree, Mr. Watts was held to a lower standard than Ms. Knepper and many other female shareholders. For example, in 2016, Mr. Watts accrued only approximately *64 total billable hours*.

97.   In 2016, Ms. Knepper earned approximately $671,000 more origination credits and 661 more billable hours than Kevin Reese, a male San Francisco non-equity shareholder.  However, Ogletree paid Mr. Reese approximately $45,000 more than Ms. Knepper that year.  Ms. Knepper also earned more of every type of credit than another male San Francisco shareholder, including approximately $467,000 more origination credits, approximately $35,000 more managing credits, approximately $312,000 more responsible credits, approximately $97,000 more working credits, and approximately 1,004 more billable hours.  However, Ogletree paid that male non-equity shareholder approximately $120,000 more than Ms. Knepper in 2016 and approximately $60,000 more in 2017.  Similarly, Ms. Knepper earned approximately $477,000 more origination credits than male San Francisco non-equity shareholder Michael Westheimer in 2016.  However, Ogletree paid Mr. Westheimer approximately $20,000 more in 2016 and $10,000 more in 2017.

98.   The Firm finally agreed to pay Ms. Knepper a higher salary for the year 2017, after she almost tripled her originations from 2015, though her pay was still well under that of her male peers with

similar originations and other credits.

99.     Ms. Knepper repeatedly complained about the gender-based pay discrimination to which Ogletree subjected her.  Ms. Knepper raised her underpayment in *every* shareholder compensation interview and submitted follow-up appeals as well, including a formal appeal of her 2018 compensation submitted to the Compensation Committee.  Her complaints fell on deaf ears.

100.     Similarly, in 2017, the Firm circulated a survey as part of an application to be recognized among the Orange County Business Journal Best Places to Work.  In her response to a survey question asking what the Firm could do to improve, Ms. Knepper explicitly requested a pay equity audit.  Mr. Watts never followed up on this pay equity complaint.

ii.     **Ogletree Discriminated Against Ms. Knepper in Business Development Opportunities**

101.     In addition to underpaying Ms. Knepper and other women relative to male shareholders with substantially similar credits, Ogletree consistently denied Ms. Knepper opportunities to earn credits in the first place.

102.     In her over 12 years with Ogletree, *Ms. Knepper was never invited on a business pitch to a prospective client*.  Mr. Watts purposefully kept Ms. Knepper out of business development opportunities and made it difficult for her to pursue her own opportunities throughout her time in Orange County.

103.     After receiving no significant business development support from Mr. Watts in her first year in the Orange County office, Ms. Knepper emailed Mr. Watts requesting business opportunities.  Mr. Watts took over a month to respond and said only that he would keep her in mind.

104.     Before she came to California, Ms. Knepper managed to become the only non-equity shareholder on Ogletree's Association of Corporate Counsel ("ACC") national team to attend its annual conference.  The ACC is one of the most important business development opportunities available to Ogletree shareholders.  Despite Ms. Knepper's work to elevate Ogletree's standing in the ACC and integrate her clients into it, Ogletree excluded Ms. Knepper from ACC events.  For example, in 2017, Ms. Knepper requested to speak at an ACC SoCal event, but Mr. Watts denied her the opportunity to even attend the event.  Furthermore, while at the 2017 ACC National Conference in Washington, D.C., Ms. Knepper requested to attend the dinner for ACC SoCal attendees but another male shareholder from

Ogletree denied her the opportunity.  Only three shareholders, all of whom were male, were allowed to attend on behalf of the Firm; two of them were not even from Southern California.  Female San Francisco equity shareholder Danielle Ochs was present when Ogletree denied Ms. Knepper's request to attend the ACC dinner and Ms. Ochs and Ms. Knepper discussed how in practice, Ogletree only allowed men to attend events like this.

105.    Each year Ogletree holds an "In-House Counsel Exclusive" seminar which frequently draws over 800 attendees from around the country and world.  Despite having many of her own clients in attendance, Ms. Knepper was never allowed to speak at the event.

106.    In September 2016, Ms. Knepper arranged an opportunity to speak with her client at this in-house seminar.  Ms. Knepper proposed they both join the same panel discussion.  However, Ogletree did not allow her to even attend the event.  After learning that Ms. Knepper would not be speaking, her client still requested that she arrange to attend the conference.  Ms. Knepper was denied because Ogletree claimed there were not sufficient hotel rooms, despite her offer to be flexible in accommodations.  Consequently, the Firm denied Ms. Knepper the opportunity to network with hundreds of potential clients while other predominantly male attorneys networked with Ms. Knepper's client.

107.    In February 2017, Ms. Knepper received an email notifying her that the Anti-Defamation League would honor her client's in-house counsel.  Holding her in high-esteem, the client named Ms. Knepper as a confidante whom he admires.  In response, Ms. Knepper asked the Firm to sponsor the award with a $1,500 donation that would also boost her and Ogletree's presence within the Anti-Defamation League.  Mr. Watts never responded to Ms. Knepper's request.

108.    By contrast, Mr. Watts routinely approved similar requests from male shareholders for costlier, low-profile events.  For example, Mr. Watts approved male-shareholder Michael Sexton's request to sponsor an event with the Orange Catholic Foundation, even though it was unbudgeted.

109.    In June 2017, Ms. Knepper requested permission to nominate one of her biggest clients for an Orange County Business Journal Award.  Mr. Watts did not respond.  After Ms. Knepper followed up with Mr. Watts in July 2017, he told her that her client would have to endure an interview process akin to being put up for shareholder before he would approve their nomination.  In contrast, Vince Verde, a male shareholder, asked Mr. Watts on July 24, 2017 to nominate his client for the same award.  Mr. Watts

responded within thirty minutes and told Mr. Verde, "Certainly nominate him and I would be happy to meet him."

110.   Not only did Ogletree routinely deny Ms. Knepper business development opportunities, the Firm stonewalled or denied her efforts to develop business with the Orange County Business Journal In-House Counsel Awards, and multiple ACC Galas and ACC Conferences—and these are just a few examples. In contrast, male shareholders have received funding and support for their development opportunities and are frequently invited to benefit from opportunities they did not create, whereas Ms. Knepper had to generate all of her own business development opportunities.

### iii.   Ogletree Discriminated Against Ms. Knepper in Credit Allocation

111.   In addition to stifling Ms. Knepper's business development opportunities, Ogletree decreased Ms. Knepper's compensation for the business she independently brought to the Firm by allowing male shareholders to receive credit for Ms. Knepper's work.  Ogletree's leadership and policies enabled male shareholders to allocate origination credits to themselves for Ms. Knepper's work and the business she generated for the firm. These credit allocation practices deprived Ms. Knepper of credits and compensation for her work and served to disfavor female shareholders generally.

112.   For example, in February 2014, Ms. Knepper gave a presentation to the Laguna Beach Chamber of Commerce. During that presentation, she had a productive conversation with an insurance broker.  On April 10, 2014, the broker referred a client to Ms. Knepper for representation on an impending high stakes sexual harassment lawsuit—Ms. Knepper generated this business without involvement from any Ogletree shareholder. Ms. Knepper arranged a pitch meeting with the business owners. Within three weeks, she successfully generated this client's business for the firm.  On April 28, 2014, the client emailed Ms. Knepper to request her services specifically, rather than inquiring about Ogletree generally.  Later that day, Ms. Knepper received an email from Anthony Byergo—a male shareholder in Seattle, WA who wanted to receive 50% of the originating credit.  Even though Ms. Knepper independently generated this matter without support from the Firm or another shareholder, Mr. Byergo claimed he had an unrelated previous relationship with the client's insurance company.  Ms. Knepper appealed Mr. Byergo's allocation, but the Firm forced her to yield to Mr. Kim Ebert, the Firm's then-managing shareholder and final arbiter of credit allocations. Mr. Ebert assigned Mr. Byergo 40% of the origination credit for a matter

that he did not contribute to originating and performed no work on whatsoever, while Ms. Knepper managed 100% of the matter.

113.    This is but one example of Ogletree's credit allocation policies, which provide male shareholders with credits at the cost of the female shareholders who actually do the work.  Ogletree then uses the resulting credit disparity as pretext to compensate and promote female shareholders such as Ms. Knepper at lower rates than the male shareholders who receive credit for female shareholders' work.

114.    Ogletree assigned Ms. Knepper to flat-rate cases that arbitrarily limited the credits she earned, regardless of her performance.  For example, in 2016, Ron Chapman arranged for a flat-rate client fee on one of Ms. Knepper's cases. Under this agreement, Ms. Knepper was required to handle an entire case, including discovery and arbitration, but could only bill $100,000.   The case accumulated approximately over $400,000 in fees and required Ms. Knepper to write off hundreds of hours of her time that could have been used to accumulate credits on other matters or develop her book of business. This directly impacted Ms. Knepper's efficiency rating, which is evaluated by the Compensation Committee, as well as the fact that she is judged on dollars collected, not billed.

115.    Ogletree also assigns a disproportionate amount of Employment Practices Liability Insurance ("EPLI") cases to female shareholders. EPLI cases frequently come with pre-negotiated billing rates that are lower than shareholders' normal rates.  This pattern and practice artificially deflates female shareholders' compensation credits by decreasing the value placed on their work.

116.    Ms. Knepper complained to the Firm's Compensation Committee about the disproportionate amount of EPLI work with which she had been tasked and the effect it had on her compensation, but Ogletree did not rectify the pay disparity.

117.    Male attorneys at Ogletree have made clear that when new clients come to the Firm through an initial EPLI contact, the origination credits for the attorney with the insurance company relationship will be reduced and the origination credits for the attorney with the client relationship will increase.  The standard formula is that origination credits will be allocated 100% to the insurance attorney during the first case, 75% in the second case, 50% in the third case, and 0% by the fourth case.  Female attorneys, however, are expected to give 100% of the origination credits to the insurance attorney no matter how much business they are able to generate for the client who happens to have the insurance policy – even on

matters that are not covered by insurance.

### iv.   Ogletree Discriminated Against Ms. Knepper by Denying Her Promotion

118.   Ms. Knepper performed at equal or higher levels than male equity shareholders from at least 2013 to 2018.  From 2016 onwards, Ms. Knepper requested to be promoted to equity shareholder.

119.   Ogletree's male leadership denied her promotion by applying subjective and discriminatory standards.

120.   For example, in 2012, Managing Shareholder Keith Watts had approximately $457,000 of originations, approximately $300,000 less than the Firm standard for promotion to equity shareholder.  Mr. Watts also billed approximately 1,601 hours, approximately 200 under the Firm standard.  By contrast, Ms. Knepper had higher origination credits that year, substantially similar responsible credits, higher working credits, and approximately 500 more billable hours in 2012.  Despite this, Ogletree promoted Mr. Watts over Ms. Knepper to equity shareholder in 2013, even though Ms. Knepper vastly outperformed Mr. Watts.  Ogletree then paid Mr. Watts approximately $125,000 more than Ms. Knepper in 2013 target compensation alone, before equity profit-sharing distributions.

121.   Ms. Knepper continued to outperform Mr. Watts.  In 2013, Ms. Knepper had approximately $368,000 more originations credits than Mr. Watts, approximately $73,000 more working credits, and approximately 472 more billable hours.

122.   As a further example, in 2012, Evan Moses, a shareholder in the Los Angeles office, earned less than half of the $750,000 of originations that were required for promotion to equity shareholder.  Regardless, Ogletree promoted Mr. Moses to equity shareholder status.  Even with the discriminatory support of the Firm's predominantly-male leadership, Mr. Moses continued to fall below the origination requirement in 2013 and 2014.  However, in 2017 Ogletree paid Mr. Moses approximately $235,000 more than Ms. Knepper in target compensation and bonuses.  Including equity profit-sharing distributions, Mr. Moses' total compensation, on information and belief, was approximately over $400,000 more than Ms. Knepper's.

123.   Ms. Knepper met every single credit requirement for promotion to equity shareholder in 2016, with approximately $797,000 of originating credits ($750,000 standard), approximately $767,000 of managing credits ($750,000 standard), approximately $584,000 of working credits ($500,000 standard),

and approximately 1,800 billable hours (1,800 standard).

124.   On November 8, 2016, Ms. Knepper emailed Ogletree's managing shareholder, Matt Keen, and notified him that she was on track to meet all of the criteria and wanted to pursue promotion to equity shareholder status.

125.   Ogletree had no excuse not to promote Ms. Knepper.  Ogletree declined to promote Ms. Knepper or even address the topic in her compensation review, later relying on the new, pretextual three-year requirement.  This ostensible three-year requirement is one of the Firm's moving-target criteria that predominately male equity shareholders apply to deny female shareholders pay and promotions. But the Firm does not consistently apply the same criteria to male shareholders. Under this purported rule, female attorneys are denied promotions unless they have satisfied the credit-allocation thresholds for each of the three prior years. The Firm's written policy only requires attorneys to meet their credit allocations for the single year prior to promotion.

126.   In 2017, Ogletree promoted Kevin Bland to equity shareholder, based on his 2016 credit allocations and ignored that Mr. Bland only satisfied the reported standards for one of the three relevant years.  In 2017, Ogletree paid Mr. Bland a salary that exceeded what it paid Ms. Knepper by approximately $60,000.  Including equity profit-sharing distributions, Mr. Bland's total compensation exceeded Ms. Knepper's by approximately over $210,000.

### v.   Ogletree Retaliated Against Ms. Knepper for Engaging in Protected Activity

127.   Ms. Knepper complained about and resisted Ogletree's discriminatory policies and harassment from 2012 to 2018.

128.   In response to Ms. Knepper's complaints, Mr. Watts and others denied Ms. Knepper compensation, credits, business development, and other important facets of employment disproportionately afforded to male shareholders.

129.   Mr. Watts routinely refused to fund Ms. Knepper's business development initiatives and rejected Ms. Knepper's expense requests without cause, while he funded and supported male shareholders without hesitation.

130.   Ms. Knepper complained about Mr. Watts' retaliatory behavior to Joe Beachboard, the Firm's Co-Managing Director, both via email and a direct phone call in March 2017.  Ms. Knepper had

previously submitted information to Mr. Beachboard in October 2016, alerting him to concerning behavior by Mr. Watts.  Mr. Beachboard failed to follow up with Ms. Knepper in any way.  In July 2017, Mr. Watts sent an email to all of the Orange County shareholders that was hostile to Ms. Knepper.  Ms. Knepper complained to him directly and at Ms. Knepper's request, the Firm launched an investigation.  As part of this investigation, Ms. Knepper again reported the discrimination, harassment, retaliation, and hostile work environment to the Firm's leadership.  Shortly after the investigation commenced, Mr. Verde became the Office Managing Shareholder of the Orange County office.  Four months after the investigation commenced, the Firm responded by refusing to acknowledge its wrongdoing and dismissing Ms. Knepper's complaints.

### vi.   Ogletree Subjected Ms. Knepper to a Hostile Work Environment

131.   Ogletree's predominantly male leadership consistently demeaned and disrespected Ms. Knepper and other female equity and non-equity shareholders on account of their gender.

132.   Mr. Watts, whose office was previously comprised exclusively of male shareholders, resisted even meeting Ms. Knepper regarding her potential move to his office.  Within months of arriving in the Orange County office, Mr. Watts and Vince Verde, both co-managing shareholders at the time, pulled Ms. Knepper into Mr. Watts' office and told her she had become a polarizing figure in the office.

133.   On October 7, 2016, without any warning or explanation, Mr. Watts announced to the whole office that "a creepy killer clown has been seen in the ladies' restroom… repeat … a creepy killer clown has been seen in the ladies' restroom," via an intercom on all of the phones in the Orange County office.  This inappropriate behavior is representative of the work environment that Ogletree has fostered in the Orange County office.  Ms. Knepper forwarded documentation of this incident to Joe Beachboard on October 21, 2016, along with one of Mr. Watts' emails castigating the entire office for their lack of interest in one of his intra-office social events and a number of other examples of Mr. Watts' inappropriate behavior.  Mr. Beachboard never responded to Ms. Knepper's request to discuss them.  Ms. Knepper repeated her complaints regarding Mr. Watts to Mr. Beachboard, both via email and a direct phone call in March 2017.  Mr. Beachboard failed to follow up with Ms. Knepper in any way.

134.   Mr. Bland made numerous inappropriate comments of a sexual nature. Mr. Bland made a joke about two dogs "fucking" during the interview of a young female associate candidate and likewise

made a joke during the interview of a male attorney that his wife "must be tolerant of his needs," because he has a lot of children.

135.    Mr. Bland also made a comment to the female Office Manager of the Orange County office during a shareholder meeting that she had a "friend with benefits," greatly embarrassing her and everyone else in the room.

136.    Ogletree has fostered hostile work environments in its offices around the country.  For example, on information and belief, the San Francisco office management, including male San Francisco Managing Shareholder Thomas McInerney and male San Francisco equity shareholder Douglas Farmer propagated Ogletree's hostile work environment in their office.  Specifically, on information and belief, Mr. McInerney refused to approve one female non-equity shareholders' transfer to the Arizona office, based on the pretext that there was not enough class action work in Arizona.  In direct contradiction to this pretext, Defendant Clees was located in Arizona and he routinely funneled class action work to male shareholders throughout the country, such as Evan Moses.  Shortly thereafter, this female non-equity shareholder left Ogletree.  Furthermore, a female San Francisco non-equity shareholder, who served as Ogletree's General Counsel, also left the Firm entirely after enduring the hostile work environment in its San Francisco office for four years.  Additionally, despite Mr. McInerney's own discrimination against female shareholders, he was appointed to Ogletree's Women's Task Force.

137.    After nearly thirteen years of excellent performance for Ogletree, in the face of egregious discrimination and retaliation about which Ms. Knepper continuously complained, the hostile work environment at Ogletree became intolerable and Ms. Knepper joined another firm in February 2018.

**B.  Plaintiff Tracy Warren**

138.    Plaintiff Warren worked as an equity shareholder in Ogletree's San Diego La Jolla office, then relocated to Regus office space in downtown San Diego.

139.    Ms. Warren received her B.A., *magna cum laude*, from the College of New Jersey in 1987 where she was an Academic and Athletic All American on an NCAA national championship team.  She earned her Masters of Journalism., *cum laude*, from Temple University in 1989.  Ms. Warren then began a career in sports broadcasting, which included broadcasting at the Olympic summer games in Sydney, Australia for NBC Sports. She also won an Emmy for her feature "Marketing Michael Jordan."  Ms.

Warren received her J.D. from the University of Notre Dame School of Law in 1999 and was admitted to the New Jersey State Bar in 1999, the Maryland State Bar in 2000, and the California State Bar in 2003.

140.    Since law school, Ms. Warren has worked exclusively in employment law at national and regional firms.  Prior to joining Ogletree, Ms. Warren worked at Seltzer Caplan McMahon Vitek in San Diego for 7 years, and became a shareholder.

141.    In August 2013, after gaining fourteen years of employment law experience, Ms. Warren brought her strong reputation to Ogletree as the only female equity shareholder in the San Diego office. As part of her practice at Ogletree, Ms. Warren conducted workplace investigations and counseled businesses on matters involving sexual harassment, discrimination, and fraud.  She also led numerous webinars and employment presentations locally and nationally, an accomplishment achieved through her own business development efforts.

### i.   **Ogletree Fostered a Hostile Work Environment**

142.    Ogletree opened its San Diego office in January 2013 with Spencer Skeen as its Managing Shareholder.  On information and belief, at least one female associate accused Mr. Skeen of sexual harassment at a prior San Diego law firm in which Mr. Skeen worked.  Another former Ogletree associate based in San Diego issued a demand letter complaining of Mr. Skeen's sexual harassment and threatened litigation.  The Firm's Board of Directors never apprised its equity shareholders about this threatened litigation.  In addition, on information and belief, the Firm paid for Mr. Skeen's defense in the sexual harassment matter.

143.    On information and belief, Mr. Skeen used as his defense counsel a San Diego attorney with whom he previously worked.  On information and belief, Ogletree, concerned for further negative publicity, settled the associate's sexual harassment case in a further effort to bury Mr. Skeen's unlawful conduct.   On information and belief, that former Ogletree associate was also required to sign a confidentiality agreement as part of the settlement.

144.    Numerous female Ogletree shareholders expressed concern about Mr. Skeen's negative reputation, harassment, belittling of women, and his harmful effect on Ogletree's female employees.

145.    Despite this, Ogletree hired Mr. Skeen and authorized him to start the Ogletree San Diego office with three men and soon thereafter hire another male associate.  Ogletree's old boys' club funneled

Mr. Skeen business and he demanded that San Diego associates work on his cases rather than on the cases of female shareholders.  Defendant Chapman was instrumental in sending Mr. Skeen disproportionate amounts of business to inflate his numbers.

146.    Mr. Skeen also used the power Ogletree gave him to commit billing fraud by billing his own time for tasks that associates performed.  For example, then-Ogletree associate Tim Johnson worked closely with Mr. Skeen.   In certain time entries, Mr. Johnson or another associate actually performed work for which Mr. Skeen billed Ogletree clients at his own higher rate.  In this way, Ogletree was able to collect more money than was actually earned and female shareholders were disadvantaged relative to Mr. Skeen.

147.    Moreover, since joining the Firm, Mr. Skeen has discriminated against attorneys on the basis of their gender.  Mr. Skeen had a pattern and practice of paying female associates as if they were a class behind their actual law school graduation year.  One female associate complained that she wanted to be paid equal to the salary of her actual class.  Mr. Skeen indicated she could not be paid more than a younger male associate – an associate who was a class year *behind* the female associate.  On information and belief, Ogletree's Board of Directors, including Defendants Ebert, Keen, Chapman, Clees, and Beachboard, were complicit in this pay inequity.

148.    On information and belief, Mr. Skeen's mismanagement of the San Diego office and Ogletree's failure to respond appropriately to the complaints of women made known to the Firm's general counsel caused at least six female attorneys to leave the San Diego office, with some choosing to leave the Firm entirely.  One female shareholder who joined the San Diego office made it a condition of her employment that she not report to Mr. Skeen due to Mr. Skeen's reputation for gender harassment and bias in the legal community.  The female shareholder reported Mr. Skeen's conduct directly to Defendant Beachboard.  The female shareholder also reported that Mr. Skeen's reputation in San Diego was costing the Firm business because several female general counsel would not conduct business with Skeen.  Despite these facts, Ogletree continued to retain Mr. Skeen, defend him, and increase his compensation.

149.    On May 11, 2015, Mr. Skeen and then-associate Tim Johnson were sued by Tim Anders for malicious prosecution in San Diego Superior Court, North County, Case No. 37-2015-00015583-CU-PN-NC under the case type "professional negligence."   That case remains pending as of this filing.

Ogletree never demanded Mr. Skeen's resignation as a result of the ongoing litigation.  In fact, Ogletree has worked to defend Mr. Skeen and, on information and belief, pay for his defense.

150.    In contrast, Ms. Warren joined Ogletree with 14 years of experience throughout nearly all facets of employment defense law. She joined with a strong reputation, which enabled her to independently bring national business to the Firm.

151.    Despite this, the Firm discriminated against Ms. Warren in pay, business development, and credit allocations due to her gender.  During her entire tenure at Ogletree, *Ms. Warren was never invited on a pitch for a new Firm client*.

152.    Ms. Warren was always a vocal advocate of pay equity as well as equitable distribution of origination credits for women.  Ms. Warren openly contested origination credits and compensation decisions at Ogletree on multiple occasions.  Each and every time she contested the unfair credit allocations to the lone decider of the origination credits, the Firm's male Managing Shareholder, he awarded the majority share of credits to men, rather than to Ms. Warren.

**ii.    Ogletree Willfully Ignored Complaints of Discrimination and Harassment**

153.    In 2015, soon after Mr. Skeen was sued for malicious prosecution, Ogletree associates complained about Mr. Skeen's behavior.  After receiving complaints from several individuals regarding Mr. Skeen's discrimination, sexual harassment, and billing fraud, Ms. Warren reported these matters to the Firm's General Counsel, Chris Mixon, and then-Managing Shareholder, Kim Ebert.  Many women complained they were afraid Mr. Skeen or the Firm would retaliate against them.

154.    Contrary to the employment counsel it provides its client when conducting investigations, Ogletree used only in-house General Counsel Chris Mixon to interview witnesses and conduct the investigation, rather than hiring outside counsel to investigate the complaints against Mr. Skeen.  Ogletree has provided presentations to its clients advising against using in-house counsel to conduct investigations and explaining the risks of doing so.  One female shareholder in the San Diego office who specialized in investigations questioned why a national employment law firm like Ogletree would use its in-house counsel Chris Mixon to investigate the San Diego complaints, against standard practice and its own advice to its clients.

155.    Prior to the start of Mr. Mixon's investigation, Ms. Warren provided the Firm with a

document that included details provided by six female Ogletree attorneys (three shareholders and three associates) and a former female associate in the San Diego office.  The document detailed Mr. Skeen's discrimination, harassment, and fraudulent conduct. For example, one female associate reported Mr. Skeen inappropriately touched her leg, propositioned her, and would breathe on the back of her neck while she worked.  Another female Ogletree employee had confided in an Ogletree associate that Mr. Skeen would routinely look at her breasts or buttocks while she worked for him.  She began wearing more pants and button up tops rather than dresses to avoid his leering.

156.    On June 26, 2015, Ms. Warren emailed Mr. Mixon the document, noting "while many of these issues on their face are egregious ethical and/or legal issues, we also realize that the compilation is of serious liability concern to the firm, its culture and the females who comprise the San Diego office." Ms. Warren also provided Mr. Mixon a list of individuals who had additional information, including Mr. Skeen's secretary.  On information and belief, Mr. Mixon never interviewed Mr. Skeen's secretary.

157.    Mr. Mixon interviewed several individuals in the San Diego office by himself in a conference room.  A male shareholder who participated in the investigation, and supported the female attorneys' recounting of facts and events regarding Mr. Skeen's harassing conduct, later stated he felt his confirming Mr. Skeen's discrimination and inequities at Ogletree was dismissed by Mr. Mixon during the investigation.

158.    Mr. Mixon discussed Mr. Skeen's billing practices with several attorneys.  In fact, a male associate who observed Mr. Johnson's interview explained Mr. Skeen's and Mr. Johnson's fraudulent billing practices to Mr. Mixon.  Afterward, the male associate reported that Mr. Mixon's line of investigation questioning followed a narrative that he believed Mr. Mixon wanted to tell on behalf of the Firm.  Mr. Mixon even suggested responses to his line of questioning, which led the male associate to believe the investigation was not intended to objectively gather facts.  Instead, he believed the Firm was complicit in the coverup.

159.    Other facts provided to Mr. Mixon by Ms. Warren's June 26, 2015 email to Mr. Mixon include, *inter alia*, that Mr. Skeen:

a.   "Referred to female associates as 'shiny new toys' when they were hired and said he was only hiring attractive female athletes;"

b.   Said "The guys are kicking the girls asses with respect to numbers;"

c.   "Threatens to stop giving female associates work if they don't acquiesce to his demands and stop working for female shareholders;"

d.   "Does not like when female associates work for [Ms. Warren] or [another female shareholder] and/or contribute to their 'book.' When he finds out, he proceeds to bury the female associate with his work so that she cannot complete the assignment for [Ms. Warren] or [the other female shareholder];"

e.   "told [a female shareholder] 'when you talk to [clients], tell them you are relying on what I said, because they won't listen to you because you are a woman;'"

f.   Joked about whether "the handling attorneys on [a case involving exotic dancers] conducted 'on site inspections,' insinuating it would have been nice to have that case. When [another shareholder] attempted to change the subject because it was clearly inappropriate, [Mr. Skeen] pushed back and said something to the effect of 'We're employment lawyers, this is what we do. We can get away with this.' The conversation then proceeded to talking about how strippers are basically all whores and the best way to take care of them is to 'knock them off.' Then they talked about the best way to kill a stripper/whore;"

g.   "Forces female associates to work and not bill their time;"

h.   "Has told staff not to report harassment or intraoffice issues to HR;"

i.   Stated "that he would not support firm policies such as reduced hours schedules because 'you never know when she's actually working and so she would not be accountable.' [. . .] he inserted the word 'she';" and

j.   Fostered a work environment in which "[a male shareholder] told one female associate that not billing for her time is 'an unspoken rule.'"

160.   Mr. Mixon and the Ogletree Board of Directors willfully ignored the information and facts presented by at least eight Ogletree attorneys, and decided, without the benefit of outside counsel, that Mr. Skeen's conduct did not amount to sexual harassment, and determined that Mr. Skeen and Mr. Johnson did not commit billing fraud.  Mr. Keen, together with the Ogletree Board of Directors, were complicit in the coverup of Skeen and Johnson's fraudulent conduct as well as Skeen's sexual harassment.

161.   Following the internal Ogletree investigation, a female associate obtained counsel in preparation to file a sexual harassment complaint against Mr. Skeen and Ogletree.   Another female associate, disturbed by Mr. Mixon's investigation, left the Firm to join a competing employment law firm. Ogletree mandated that the female associate sign a release agreement upon her departure in exchange for confidentiality and money.   Another female shareholder who specialized in workplace investigations, and who contributed to the document of complaints against Mr. Skeen, also resigned from Ogletree in the months following Mr. Mixon's investigation.   She had made Defendant Beachboard aware of Mr. Skeen's unlawful conduct and the office's low morale as a result of Ogletree's Board of Directors continuing to marginalize women and empower Mr. Skeen.

### iii.   Ogletree Expelled Ms. Warren from the Office in Retaliation for Engaging in Protected Activity

162.   In its first wave of retaliation against Ms. Warren, after she raised staff and attorneys' complaints against Mr. Skeen to Ogletree's management, then-Managing Shareholder, Defendant Ebert, in consultation with the male-dominated Board of Directors, retaliatorily expelled Ms. Warren from Ogletree's La Jolla office.

163.   On July 14, 2015, Defendant Ebert emailed Ms. Warren "Now that the investigation by Chris Mixon has concluded, I'd like to have a call with you." On July 31, 2015, Defendant Ebert told Ms. Warren she was being moved to another building away from Ogletree's La Jolla office.   On August 3, 2015, Defendant Ebert ordered Ms. Warren to report to a downtown San Diego Regus space, a temporary office space provider.   Ms. Warren told Defendant Ebert that the Firm's retaliatory conduct after she reported Mr. Skeen's ongoing sexual harassment and fraud was unlawful.

164.   When Ms. Warren arrived at her downtown San Diego Regus office, her computer and phone were not working, the air conditioner malfunctioned, and nearby construction impeded necessary calls to clients and webinar presentations.   Another female associate, who had also complained about Mr. Skeen's behavior to Ogletree management, was similarly exiled to the Regus space in downtown San Diego.   In addition, Mr. Skeen's former secretary who had also raised complaints about Mr. Skeen, was soon forced to join Ms. Warren in the Regus downtown office space.   The Ogletree employees at the Regus space were not given offices situated together, printers frequently did not work, and the attorneys

had to rent space for client meetings in a Regus conference room.  Ms. Warren requested Ogletree move the team to a better office, but the Firm refused.

165.    The Firm ordered Ms. Warren to report to the Managing Shareholder of Ogletree's Orange County office, Keith Watts, who was also responsible for discrimination, harassment, and retaliation against Plaintiff Knepper and numerous other women.   Ogletree also excluded Ms. Warren from participating in San Diego client seminars – despite the fact that many of Ms. Warren's clients were based in San Diego.  As a result of Ms. Warren's isolation from the San Diego La Jolla office, she had difficulty obtaining associate assistance in the San Diego office.

166.    Meanwhile, Mr. Skeen remained the San Diego Managing Shareholder with all the position's privileges and the office's associates at his disposal.  At the start of 2016, following the 2015 complaints about Mr. Skeen's harassment, discrimination, and billing fraud, Ogletree awarded Mr. Skeen an approximately $50,000 raise.

167.    Defendant Ebert, the then-Managing Shareholder who implemented the Board's decision to isolate Ms. Warren to the Regus space after she complained about Mr. Skeen, also participated in Ms. Warren's 2016 compensation call.  Ms. Warren did not receive a raise in 2016.

168.    In 2017, Ogletree awarded Mr. Skeen another pay increase and a bonus, such that he was paid approximately over $160,000 more than Ms. Warren in 2017.

169.    On January 30, 2017, Ms. Warren requested a conversation with members of Ogletree's Compensation Committee to appeal her compensation.  Ms. Warren spoke with then-Board Member Defendant Clees and followed up with an email to another Board Member.  Both Defendant Clees and the other Board Member were also on the Firm's Compensation Committee.

170.    That same day, Ms. Warren followed up in an email to Defendant Clees and the other Board Member writing: "Joe and I looked at the compensation charts at the shareholder meeting together on Saturday.  We went through at least 12 individuals whose 3 year totals were less than mine yet they were all paid more.  Most of them were men. Considering pay equity law in CA as well as my performance and others similarly situated, I should have received at least an additional $25 to 50K in my increase. Others also received a discretionary bonus in CA, yet, I who surpassed my billable hours by over 100 hours and did not receive a bonus. Others who oversee an office received a bonus, I did not. As you, Matt, Joe are

aware, I am now in downtown San Diego (in Regus space) in charge of 2 other attorneys and a practice assistant." Ogletree refused to increase Ms. Warren's compensation despite her reporting these disparities in her pay.

171.    In early 2016, a San Diego male associate who supported the female attorneys' complaints about Mr. Skeen, including by verifying Mr. Skeen's errant billing practices, lodged his own internal complaint. The male associate complained that Mr. Skeen engaged in whistleblower retaliation after the male associate supported the women's allegations against Mr. Skeen. The male associate also complained that Mr. Skeen tried to replace him by advertising for the male associate's position during his FMLA leave. When the male associate returned from protected leave, Mr. Skeen relegated him to minimal work.

172.    Again, Ogletree failed to take action against Mr. Skeen, permitting him to stay in the San Diego Managing Shareholder position. In April 2016, the Ogletree Board permitted the complaining male associate to move to Regus space in downtown San Diego to join Ms. Warren and the other associate who spoke up against Mr. Skeen.

173.    In January 2017, at Ogletree's shareholder retreat, Ms. Warren held a meeting for women to openly discuss the pay inequity among male and female Ogletree attorneys. Women from several Ogletree offices throughout the country attended and openly spoke about the disparity in Ogletree's male and female attorney compensation and credit origination. The suggestion was made that ODWIN, a designated Ogletree female attorney group, take information back to the Firm's Board or Directors to try to improve the compensation system, especially as it relates to compensating female attorneys. On information and belief, Ogletree's Board became aware Ms. Warren held this meeting and advocated openly for equal pay for women. In response, Ogletree further targeted Ms. Warren for retaliation.

174.    In February 2017, as part of Ms. Warren's ongoing conversation about the gender pay disparities at the Firm, Ms. Warren emailed Keith Watts, who was the Orange County Managing Shareholder at the time. Ms. Warren specifically put Mr. Watts on notice of the California Fair Pay Act's requirements that companies pay employees equally for "substantially similar work, when viewed as a composite of skill, effort, and responsibility;" that comparators do not have to work at the same establishment; that legitimate factors must account for entire pay differences; and that companies explicitly state that retaliation against employees seeking to enforce the law is illegal.

175.   Ms. Warren requested that Mr. Watts disclose "the legitimate factors Ogletree relied on to account for pay differences for shareholders. . . (men vs women in [California])." Mr. Watts responded by promising to confer with a Board member to address Ogletree's compensation pay disparity. Mr. Watts never followed up on this pay equity complaint.

176.   Ogletree's mistreatment of Ms. Warren is typical of its mistreatment of women throughout the Firm and exemplifies the Firm's discriminatory policies and practices.

### iv.   Ogletree Discriminated Against Ms. Warren in Pay

177.   Ms. Warren performed at equal or higher levels than her male comparators, but Ogletree paid her less.

178.   Despite Ogletree's discrimination and retaliation, Ms. Warren excelled as a shareholder and built a book of business worth approximately $2,000,000. Ms. Warren achieved this without the support that the Firm's old boys' club provides to male shareholders. Despite Ms. Warren's high performance, Ogletree consistently paid her less than male shareholders who performed at comparable or lower levels.

179.   Ms. Warren joined Ogletree in August 2013. By the end of 2014, Ms. Warren had already earned approximately $1,129,000 in origination credits, largely through her own independent efforts and connections. In contrast, at the end of 2014, Evan Moses, a male equity shareholder in the Los Angeles office, earned approximately $573,000 in origination credits—approximately half that of Ms. Warren. Mr. Moses, like Mr. Skeen, had been discriminatorily shoulder-tapped to receive origination credits from the Firm's old boys' club – Defendant Chapman, Howard Daniel, and Tom Deer in particular. Despite Ms. Warren earning approximately $550,000 more origination credits than Mr. Moses in 2014, Ogletree paid Mr. Moses approximately $150,000 more than Ms. Warren in 2014 and approximately $100,000 more in 2015, not including equity shareholder profit distributions.

180.   Ms. Warren's experience was not unique. On information and belief, Ogletree consistently overcompensated male shareholders, including Mr. Moses, as compared to female equity shareholders with similar or superior collected origination credits.

181.   Ogletree's three highest-paid shareholders, each paid between approximately $1,800,000 and $4,350,000 annually, are Defendant Chapman, Defendant Clees, and Charles Baldwin, none of whom

has billed even 1,000 hours in the past four years.  Ms. Warren billed significantly more hours than each of these three male equity shareholders in every full year she was at Ogletree, yet the Firm paid her considerably less.

182.    In January 2016, Defendant Keen appointed Defendant Beachboard as the Firm's Co-Managing Director.  Defendant Beachboard previously worked in Ogletree's client services department.  Ms. Warren earned significantly more compensation credits than Defendant Beachboard in *every category* in *every full year* she was at Ogletree, as depicted in the chart below.

| **2014** | Origination Credit | Managing Credit | Responsible Credit | Working Credit | Billable Hours | Compensation (Target+Bonus) |
|---|---|---|---|---|---|---|
| Ms. Warren | $1,129,000 | $1,133,000 | $945,000 | $667,000 | 1,660 | $325,000 |
| Mr. Beachboard | $391,000 | $106,000 | $108,000 | $49,000 | 104 | $600,000 |
| Difference | **+$738,000** | **+$1,027,000** | **+$837,000** | **+$618,000** | **+1,556** | **-$275,000** |
| **2015** | Origination Credit | Managing Credit | Responsible Credit | Working Credit | Billable Hours | Compensation (Target+Bonus) |
| Ms. Warren | $682,000 | $655,000 | $706,000 | $495,000 | 1,474 | $375,000 |
| Mr. Beachboard | $425,000 | $157,000 | $138,000 | $49,000 | 143 | $700,000 |
| Difference | **+$257,000** | **+$498,000** | **+$568,000** | **+$446,000** | **+1,331** | **-$325,000** |
| **2016** | Origination Credit | Managing Credit | Responsible Credit | Working Credit | Billable Hours | Compensation (Target+Bonus) |
| Ms. Warren | $1,278,000 | $1,270,000 | $1,276,000 | $669,000 | 1,758 | $375,000 |
| Mr. Beachboard | $708,000 | $247,000 | $153,000 | $57,000 | 167 | $700,000 |
| Difference | **+$570,000** | **+$1,023,000** | **+$1,123,000** | **+$612,000** | **+1,591** | **-$325,000** |

183.    From 2014 to 2016, Ms. Warren and other female equity shareholders complained to Firm leadership about the Firm's inequity in pay, opportunities, and origination credit allocation to male shareholders like Mr. Moses and Mr. Skeen, to the exclusion of equally qualified female shareholders who do substantially similar work.   On information and belief, Ogletree's Director of Professional Development and Inclusion has known of this pay disparity since at least 2014, yet has not addressed the persistent pay disparity between male and female shareholders at the Firm.

184.    On information and belief, members of Ogletree's Board of Directors, including Defendants Chapman, Clees, and Beachboard have been on notice of the Firm's discriminatory pay disparity since at least 2015, including the overcompensation of male equity partners such as Mr. Moses and Mr. Skeen.  Defendant Beachboard oversees the San Francisco office in particular, in which only two female shareholders remain, as previous female shareholders have left due to pay inequity. Despite this, Defendant Chapman, Clees, and Beachboard and the other Board members failed to rectify the Firm's pay

disparities.

### v.   Ogletree Discriminated Against Ms. Warren in Business Development Opportunities

185.   In addition to underpaying Ms. Warren and other female shareholders relative to male shareholders with substantially-similar credits, Ogletree consistently denied Ms. Warren and other female shareholders opportunities to earn credits in the first place.

186.   For instance, on information and belief, male members of Ogletree's Board of Directors knowingly colluded with male shareholders throughout the Firm to ensure that control of the lucrative California Class Action Practice Group remains in the hands of a small group of male shareholders who control the vast majority of class action business opportunities, including the allocation of valuable origination and managing credits on such class action business. This male dominance happened despite several equally qualified women shareholders who handled class action defense of employment matters. When class action female shareholders complained that they were doing the majority of work on cases but not receiving the same origination credits as the male shareholders (or any origination credits at all), the women were told they had to perform the work and to be "team players."  On information and belief, the architects of this discriminatory business model include Defendants Chapman, Beachboard, and Clees, as well as Los Angeles shareholder Evan Moses and San Diego shareholder Spencer Skeen, each of whom have financially profited from this discriminatory conduct.

187.   Ms. Warren and other female shareholders had to create their own opportunities for business development by marketing themselves and building their own books of business.  In contrast, on information and belief, Mr. Moses' and Mr. Skeen's books of business consist of clients with class action work funneled to them by Defendants Chapman, Beachboard, and Clees, and other male shareholders around the Firm as part of the Firm's discriminatory business model.

188.   In furtherance of this discriminatory scheme, Ogletree appointed Mr. Moses as chair of the California Class Action Practice Group, while Defendants Chapman, Beachboard, and Clees, continued to funnel millions of dollars of lucrative class action business development opportunities to Mr. Moses, Mr. Skeen and other male shareholders. This funneling of business from and to male shareholders excluded female shareholders, such as Ms. Warren, who did substantially similar work and who were

equally or more qualified than Mr. Moses and Mr. Skeen.

189.    Ogletree's discriminatory practice of channeling opportunities to Mr. Moses, Mr. Skeen, and other male shareholders to the exclusion of female shareholders resulted in credit allocations disproportionately skewed in the favor of men.   This in turn resulted in disproportionately higher compensation for Mr. Moses, Mr. Skeen and other male shareholders as compared to female shareholders who did substantially similar work. This was true even when female shareholders earned higher origination credits than the male shareholders bolstered by artificially inflated credits.   For example, Defendants Chapman, Beachboard, and Clees frequently demanded that female non-equity shareholders perform class action work for male shareholders' clients, without receiving the same credits or compensation as Mr. Moses, Mr. Skeen or other male shareholders.   On information and belief, Ogletree knowingly operates discriminatory schemes that similarly overcompensate male shareholders throughout the country.

190.    On information and belief, male leadership such as Defendant Chapman have had notice of the dysfunction of the Class Action Practice Group and the funneling of opportunities to him at the expense of equally qualified female shareholders since at least 2016.   The Firm was complicit and tacitly endorsed this unlawful business model, and subjected its female shareholders to continued discriminatory practices.

191.    Throughout Ms. Warren's time in the San Diego office, Mr. Skeen and Ogletree also discriminated against her and other female attorneys in business development opportunities.

192.    Ms. Warren is a former sports broadcaster and provides counsel to several national sports groups.   Ogletree never invited Ms. Warren to attend meetings of the Association of Corporate Counsel's sports groups because that development opportunity is controlled by the Firm's old boys' club.

**vi.    Ogletree Discriminated Against Ms. Warren in Credit Allocations**

193.    In addition to stifling Ms. Warren's business development opportunities, Ogletree gave male shareholders credit for her work.   Ms. Warren has strong personal and professional relationships with leadership at many large companies, relationships which she utilized to bring these clients to Ogletree.   However, Ogletree's old boys' club appointed male shareholders as originating attorneys on these matters because the male shareholders claimed to have had some minor contact with one of the

client's employees.

194.    For numerous cases on which Ms. Warren worked, Ogletree's leadership and policies enabled male shareholders to allocate origination and managing credits to themselves for work performed by Ms. Warren. These discriminatory credit allocations decreased Ms. Warren's compensation.

195.    Ms. Warren is personal friends with the deputy general counsel for one of her clients.  In July 2017, Ms. Warren met with the deputy general counsel and helped secure a new matter for Ogletree. Ms. Warren personally traveled across country to visit with the deputy general counsel and discuss the matter.  Ms. Warren provided the deputy general counsel's feedback to two attorneys in the Firm so they could best service the client.  A male shareholder, who did not travel to visit with the client, claimed the client was his and that Ms. Warren should not have even spoken to his client.  The male shareholder allocated Ms. Warren only 10% of the originations for the new matter.  Ms. Warren appealed this allocation; however, Defendant Keen, the Firm's Managing Shareholder, barely adjusted the original allocation, assigning only 25% of the origination credits to Ms. Warren for the matter which she was 100% responsible for originating.

196.    Additionally, the San Francisco office managing shareholder, Tom McInerney battled Ms. Warren for credit for all new matters for one of her California based clients.  Ms. Warren continued to grow the business for the client, opening several new matters.  Mr. McInerney had never met the company's General Counsel nor the human resources director of the company.  He did not do any work on new matters.  However, he refused to relinquish credit for Ms. Warren.  As a result, Mr. McInerney maintained his originating credits on all new matters Ms. Warren opened for the client, which negatively influenced her compensation.

### vii.    Ogletree Terminated Ms. Warren from the Firm in Retaliation

197.    In late November 2017, Ms. Warren had a call with Defendant Beachboard to determine "what the Ogletree board was going to do with the downtown San Diego office."  Mr. Beachboard asked Ms. Warren if "she was going to stay at the firm."  He also told her Ogletree does not want two San Diego offices and that Ogletree's Regus office was not a "dot on the map."  On information and belief, Ogletree was hoping their discriminatory acts would force Ms. Warren to leave the Firm.

198.    In December 2017, Ms. Warren participated in her compensation call with Managing

1    Shareholder Defendant Keen and another female shareholder.  Mr. Keen confirmed that Ms. Warren "had

2    her best year yet."  During the 11 minute call to discuss her entire 2017 success, Ms. Warren discussed

3    increasing her focus on pay equity and indicated that other female attorneys in the San Diego and Orange

4    County offices were also very interested in pay equity.

5    199.    Throughout Ms. Warren's time at Ogletree, she pushed the Firm to pay its female attorneys

6    equitably and supported women at the Firm to work together for parity and pay equity.  Ms. Warren

7    complained about and resisted Ogletree's discriminatory policies and harassment since at least 2014.

8    Throughout her time at Ogletree, she vocally pushed the Firm to pay its attorneys equitably and

9    encouraged women to continue to communicate about the pay equity, discrimination, and harassment

10   issues.  In retaliation, the Firm has discriminated against her in pay, business development opportunities,

11   and credit allocations.

12   200.    Since Ms. Warren held the pay equity meeting in her hotel room at the 2017 Shareholders'

13   Retreat, approximately 12 female shareholders have raised pay equity complaints with Ogletree.  Almost

14   all of the women who raised complaints were in attendance at the pay equity meeting held in Ms. Warren's

15   hotel room.

16   201.    On January 12, 2018, Ms. Knepper filed this class action lawsuit.  Ogletree had been on

17   notice for months of the many additional gender discrimination complaints lodged by approximately 12

18   women.  However, Defendant Beachboard issued "Firm talking points," whereby shareholders were to

19   respond to a script if asked about the lawsuit.  The script included mis-information that the lawsuit was

20   limited to a single non-equity female shareholder, Ms. Knepper, when Ogletree in fact knew many more

21   female attorneys had complained about pay equity issues in the year leading up to the lawsuit.

22   202.    On January 22, 2018, despite Ms. Warren's success and the public lawsuit regarding

23   Ogletree's pay inequity, Ogletree set Ms. Warren's compensation at approximately $130,000 less than

24   similarly situated male shareholders.  Ogletree indicated that it considers the past three years' origination

25   credits in awarding compensation – including the year Ms. Warren was moved to Regus space.

26   203.    Ms. Warren planned to appeal her compensation the next day, but did not receive the

27   opportunity.

28   204.    In 2016, at Ogletree's Labor and Employment Counsel Exclusive, designed specifically

for clients, Ogletree prepared and presented a similar series entitled: "Workplace Investigations: Lessons Learned From the Real Deal." ("Ogletree 2016 Workplace Investigations White Paper"). The Ogletree 2016 Workplace Investigations White Paper contained many of the same points of emphasis as a subsequent 2017 white paper. However, the Ogletree 2016 Workplace Investigations White Paper contained an "Investigation Checklist" providing a road map on how to conduct investigations. Included among the checklist key components are interviewing the complainant, the accused, and witnesses, including colleagues or others with information.

205.   In March 2017, Ogletree prepared a white paper entitled "Becoming a California Super Sleuth, Investigations Through an Expert Lens" ("Conducting Investigations White Paper") as part of its recommended practices for conducting workplace investigations. Ogletree made the Conducting Investigations White Paper available to clients through its "2017 Navigating California Employment Law" series held from March 1, 2017 through March 4, 2017. Ogletree put forward a presentation for clients based in large part on the Conducting Investigations White Paper.

206.   In Ogletree's Conducting Investigations White Paper, Ogletree touted that "workplace investigations should assist employers with ensuring that their working environments are 'fair and safe for all employees.'" The Conducting Investigations White Paper discusses (1) selecting the right investigator; (2) avoiding reliance on a biased decision maker; (3) and sham investigations. Citing case law, it noted that "in a typical sham investigation, persons conducting the investigation, fabricate, ignore or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses.)"

207.   Despite all of these representations, Ogletree failed to practice what it preached—again.

208.   Less than a week before the Ogletree January 2018 retreat held in Dallas— the day Ms. Warren intended to appeal her 2018 compensation—Ogletree manufactured another agenda involving Ms. Warren. Ogletree authorized its General Counsel Chris Mixon to conduct yet another sham investigation, this time regarding one of Ms. Warren's clients. Mr. Mixon never spoke with Ms. Warren as part of the purported investigation, never provided Ms. Warren notice or an opportunity to be heard, and never inquired into context of information or intent behind the subject of Ogletree's investigation. Mr. Mixon never spoke with Ms. Warren's practice assistants, clients, or associates as part of the investigation.

209.    On information and belief, Ogletree wanted to terminate Ms. Warren, one of its most vocal proponents of pay equity and pay transparency in the Firm, in retaliation for her advocacy on behalf of Ogletree's female shareholders, before she could join this lawsuit.

210.    Mr. Mixon launched an internal investigation regarding one of Ms. Warren's clients whose former President and COO threatened litigation against the client after being fired.  The client's fired President and COO reached out to Ms. Warren, who informed the former President and COO directly that she could not represent her due to ethical restraints.  Ms. Warren was clear; she represented the company, not the former President and COO.

211.    Despite Ms. Warren's statements, the former President and COO sent Ms. Warren information about herself, her success as President and COO of the company, and her complaints with the company.  The former President and COO also informed Ms. Warren of her intention to sue her former employer, Ms. Warren's client.  Ms. Warren advised the former President and COO of her ethical obligation as an attorney to inform her client of this threat of litigation, and cautioned that anything said or provided to Ms. Warren would be transmitted to the company's board.  Ms. Warren recommended that the former President and COO of the Company seek separate counsel and Ms. Warren, in fact, recommended certain counsel, which the former President and COO, in fact, secured.

212.    Ms. Warren notified the client's board of directors via letter of her analysis and the risk of litigation.  Ms. Warren's letter explained the circumstances of the former President and COO's termination, including that she had been fired by one of the company's attorneys, as well as an analysis of the liability the company faced due to this termination.  Two of the client's board members acknowledged Ms. Warren's letter, and Ms. Warren continued to follow up with the client via email after her letter.

213.    The attorney that fired the former President and COO, whom Ms. Warren mentioned in her letter to the client, was disgruntled by Ms. Warren's analysis and the liability he caused the company, and threatened litigation against Ogletree in retaliation.  Sensitive to the delicate nature of client relations, Ms. Warren informed her practice assistant and associate that any time billed on this matter was to be shifted to the national client and then written off once the *pro formas* arrived.

214.    Despite this, Mr. Mixon, on a mission to oust Ms. Warren before she could attend the 2018

Shareholder Retreat, appeal her 2018 compensation, or join this lawsuit, advanced this circumstance as a pretext to terminate Ms. Warren in retaliation for her protected activity.

215. Accordingly, Mr. Mixon, with ratification by Defendant Matt Keen, terminated Ms. Warren in retaliation for her pay equity and gender rights advocacy. Mr. Mixon never asked Ms. Warren about the time billing for this unique matter, nor did he wait for the routine end-of-month billing corrections, when Ms. Warren would have the opportunity to make corrections to her *pro formas*. Mr. Mixon never reached out to speak with the client or former President and COO as part of the investigation.

216. On January 23, 2018, without ever obtaining information from Ms. Warren, Defendant Keen sent an email to all equity shareholders that intentionally and negligently misrepresented information regarding Ms. Warren's client and its former President and COO in an effort to provide pretext for Ogletree's decision terminate her. Defendant Keen omitted material facts and failed to speak with Ms. Warren prior to the email. The Firm's investigation and email to all equity shareholders were an attempt to silence Ms. Warren's advocacy for pay equity and gender equity at Ogletree.

217. After Ms. Warren's years of exemplary work—overcoming the Firm's continuous discrimination and misconduct—the Firm's retaliation against Ms. Warren for her work to end pay disparities and bring the Firm into compliance with the law left her with no choice but to accept an offer of employment elsewhere. Ms. Warren joined another firm in February 2018.

218. In contrast, Mr. Skeen is a defendant in an active three-year litigation for professional negligence and has been accused of sexual harassment, billing fraud, discrimination, retaliation, and inequities in the San Diego office, leading to the departure of over a dozen attorneys and staff. However, Mr. Skeen remains the highest paid attorney in the San Diego office because Ogletree's old boys' club sanctions, defends, and continues to support his misconduct.

**C. Plaintiff Alicia Voltmer**

219. Plaintiff Voltmer is a former non-equity shareholder who worked in Ogletree's Dallas, Texas office.

220. Ms. Voltmer received her Bachelor of Arts degree in 1991 and her Master of Arts in Liberal Studies in 1992, both from Southern Methodist University, and graduated from California Western School of Law in 1996. Ms. Voltmer is Board Certified in Labor and Employment Law by the Texas Board of

Legal Specialization and is AV Preeminent Peer Review Rated by Martindale-Hubbell.   She was recognized as a Rising Star in Texas by Super Lawyers for five straight years from 2004-2009. Ms. Voltmer joined Ogletree's Dallas office as an associate in 2003 and became a non-equity shareholder in 2006.  Ms. Voltmer also served as a mentor to numerous male and female attorneys.

221.     During her tenure in the Dallas office, Ms. Voltmer experienced a blatant boys' club atmosphere, toxic to female attorneys, led by Defendant Chapman and Bryant McFall, the male Dallas Office Managing Shareholder.  Mr. McFall, whose father opened what is now Ogletree's Dallas office, became the Managing Shareholder of the Dallas office upon his father's retirement and was the only managing shareholder of the office during Ms. Voltmer's entire tenure as a non-equity shareholder, despite the fact that other Ogletree offices had rotating managing shareholders.  Mr. McFall referred to his leadership over the office as the "Reign of Terror" or the "ROT."

222.     During Ms. Voltmer's thirteen-year tenure in Ogletree's Dallas office, the office had only one female equity shareholder, who on several occasions confided in Ms. Voltmer that she had been treated poorly and unfairly by Defendant Chapman and Mr. McFall.

223.     Nevertheless, Ms. Voltmer was consistently a top performer in the Dallas office and considered a "go-to" attorney to handle work from other offices.  Notwithstanding her high level of performance and success, Ogletree paid Ms. Voltmer less than male shareholders whose work was substantially equal or inferior to hers, and in many different ways undermined her achievements and prevented her from reaching equity status.

224.     Mr. McFall waited until immediately before Ms. Voltmer was to be put up for a non-equity shareholder position to give her his first and only performance review.  When she asked why he had not provided her with a review during her first year of work, Mr. McFall responded, "***because you intimidate me***."

225.     At an Ogletree client happy hour organized by Mr. Chapman, male shareholder Frank Davis expressed his surprise and contempt at Ms. Voltmer's ability to network with a group of male clients by commenting with words to the effect of, "you must have slept with them."

226.     Mr. McFall expressed a hostile attitude toward a young female associate who asked for a reduced hour work schedule after the birth of her first child, and initially said he would not allow the

accommodation.  Regarding another female who had taken maternity leave, Mr. McFall commented, "she needs to get her ass back."  Other female non-equity shareholders repeatedly expressed their fears to Ms. Voltmer that if they complained or raised issues about the hostile and toxic office environment, either Mr. McFall or Mr. Chapman would retaliate against them.

227.    Ms. Voltmer came to Ogletree from her previous firm with the expectation of fair treatment and equitable compensation. Upon realizing this was not the case in Ogletree's Dallas office, Ms. Voltmer complained to numerous members of Ogletree's Board of Directors and equity shareholders, including Defendant Chapman, about Ogletree's discriminatory conduct.

228.    Raising complaints, however, was not welcomed by Ogletree. Defendant Chapman even removed both visitor chairs from his office and made a statement to the effect that he removed them because he did not want a former female shareholder "coming in and wasting [his] time with her complaints."  Ms. Voltmer also raised complaints to male equity shareholders in Ogletree's Houston, Atlanta, and Charleston offices; however, the boys' club environment was never rectified, and in fact, worsened.

229.    After Ms. Voltmer suggested to a female associate that she should contact Human Resources to discuss arrangements to care for a gravely ill parent, which Mr. McFall apparently refused to explore with or grant for the associate, Mr. McFall stood in Ms. Voltmer's office doorway and in a raised voice said words to the effect of, "how stupid can you be?  What were you thinking?"  He then accused Ms. Voltmer of giving the associate "legal advice."

### i.    Ogletree Discriminated Against Ms. Voltmer in Pay

230.    Ms. Voltmer consistently performed at higher levels than male shareholders whom Ogletree paid more.  When she asked an equity shareholder about Ogletree's compensation process, the equity shareholder commented the entire process was a sham and that the Firm typically ranks shareholders according to leadership's preferences.

231.    This statement was borne out by Ms. Voltmer's compensation at Ogletree.  For example, between 2013 and 2015, Ms. Voltmer earned approximately $167,000 more origination credits, $371,000 more responsible credits, $69,000 more working credits, and 819 more billable hours on average than Robert Jones, a male non-equity shareholder in Ogletree's San Francisco office.  Despite Ms. Voltmer

consistently outperforming Mr. Jones, Ogletree paid Mr. Jones approximately $63,000 more than Ms. Voltmer in target compensation and bonus on average.

232.     Ogletree also paid Ms. Voltmer significantly less than San Francisco non-equity shareholder Kevin Reese, whom she consistently outperformed.  Ms. Voltmer earned more origination credits than Mr. Reese in every year between 2013 and 2015, by an average of approximately $182,000. Ms. Voltmer also earned more credits than Mr. Reese in *every category* in 2013, including approximately $189,000 more originating credits, $456,000 more managing credits, $278,000 more responsible credits, $247,000 more working credits, and 454 more billable hours.  Despite this, Ogletree paid Mr. Reese more than Ms. Voltmer each corresponding year.

233.     Similarly, Ms. Voltmer earned more managing credits than non-equity shareholder Kevin Bland in every year between 2012 and 2015, by an average of approximately $127,000.  Ms. Voltmer also earned more responsible credits than Mr. Bland in every year from 2012 to 2014, by an average of $130,000.   However, Ogletree paid Mr. Bland $50,000 more than Ms. Voltmer in 2016, in target compensation and bonus alone, then promoted him to equity shareholder the following year.

234.     When Ms. Voltmer complained to the Compensation Committee about her compensation, they told her she had reached the "maximum" salary she could make as a non-equity shareholder, and that they would not increase her salary until she became an equity shareholder.  This ceiling does not exist for Ogletree's male non-equity shareholders. For example, Ogletree paid male Dallas non-equity shareholder Adam Dougherty as much as approximately $25,000 more than Ms. Voltmer's highest target compensation. They also paid a male non-equity shareholder in Pittsburgh approximately $600,000 more in target compensation than Ms. Voltmer ever received in target compensation.

235.     On several occasions during her Compensation Committee meetings Ms. Voltmer asked if someone could provide her with the criteria for awarding bonuses but the Compensation Committee never provided her with anything.  One year when she was not awarded a bonus, she was told in a voice mail message words to the effect of, "you earned a bonus last year and that should be sufficient for this year." Ogletree's discrimination in bonuses against Ms. Voltmer is representative of the Firm's discrimination in bonuses against women throughout the Firm.  In 2016, the average bonus for male shareholders was approximately $10,000 more than that of female shareholders and the largest male shareholder's bonus

was approximately $115,000 higher than the largest female shareholder's bonus.

### ii.   Ogletree Discriminated Against Ms. Voltmer in Business Development

236.     Ogletree, Defendant Chapman, and Mr. McFall also discriminated against Ms. Voltmer in business development opportunities.  In her thirteen years in the Dallas office, Ms. Voltmer was never invited by any male equity shareholder in the office to attend a single pitch, even though she had, entirely on her own, brought in a significant client that Mr. McFall later told her he was "taking" from her. Additionally, Mr. McFall told Ms. Voltmer that she would need to prepare a business proposal to justify business development expenses, and when she confronted him about his approval of a male equity shareholder's request for business development funds for his church, apparently without the need for a similar business plan, Mr. McFall became irate and confrontational, and accused Ms. Voltmer of being "out to get" other shareholders.   Ms. Voltmer attempted to discuss the business development discrimination with Defendant Chapman, who told her to "drop it."

237.     In addition to denying Ms. Voltmer equitable business development opportunities or access to resources that men received, when Ms. Voltmer did develop her own book of business she was denied credit. On several occasions, Ms. Voltmer appealed the Firm's discriminatory credit allocations to Defendant Ebert, who denied each and every one of her appeals. At one point, Defendant Ebert even scolded Ms. Voltmer for appealing the credit allocation, and told her she was being "petty."   Because of Ogletree's and Defendant Ebert's discriminatory credit allocation, Ms. Voltmer was not adequately compensated for at least three significant client matters for which she deserved credit.

238.     Ms. Voltmer also performed significant work for the benefit of the firm, such as redrafting lateral candidate pitch material, updating content for the Firm's website, and preparing material for the Firm's internal knowledge management database, for which she was never recognized or compensated. This work reduced the amount of time she was available to work on her billable matters and business development. Similarly, Mr. McFall named a female shareholder the "Administrative Partner" and made her the liaison between himself and the staff because he did not want to have to manage people, despite being the Managing Shareholder of the Dallas office.

### iii.   Ogletree Discriminated Against Ms. Voltmer in Promotion

239.     Ms. Voltmer performed at levels substantially equal or superior to multiple male equity

shareholders. However, Ogletree and Mr. McFall denied her promotion to equity shareholder based on pretextual subjective criteria. Like Ms. Knepper, Defendant Chapman held Ms. Voltmer to a three-year standard for promotion. The Firm claimed she would need to establish criteria for three years before she would be eligible for equity shareholder. Male shareholders, however, were often eligible for promotion to equity shareholder after only one year meeting the requisite criteria, as is the expectation outlined in Ogletree's written policy.

240.     Despite the Firm's best efforts, Ms. Voltmer met every single standard for promotion in every year between 2012 and 2015, except for one—origination credit, which she had appealed on multiple occasions. For example, Ms. Voltmer earned approximately $1,021,000 managing credits, approximately $908,000 responsible credits, approximately $617,000 working credits, and 1,920 billable hours in 2014. That year, she also earned approximately $586,000 origination credits, which is approximately $261,000 more than Evan Moses earned the year before he was promoted to equity shareholder. Ms. Voltmer also billed an average of nearly 1,000 hours more than equity shareholder Keith Watts. Despite this, Ogletree refused to promote Ms. Voltmer in 2015 or in 2016 after she earned approximately $489,000 origination credits and met every other standard in 2015. Thus, Ms. Voltmer worked at levels substantially equal to those of equity shareholders but was denied equity shareholder profit-distributions, and her pay was kept discriminatorily low.

### iv.     Ogletree Retaliated Against Ms. Voltmer for Engaging in Protected Activities

241.     Ms. Voltmer reported the Firm's discriminatory pay, business development resources, and credit allocations to numerous Ogletree equity shareholders. In response, the Firm willfully ignored her complaints, refused to rectify its unlawful conduct, and continued to discriminate against her.

242.     In 2016—exasperated from years of mistreatment and underpayment—Ms. Voltmer told the only female equity shareholder in the Dallas office that something needed to be done about the office's toxic environment. The female equity shareholder responded that she was afraid Defendant Chapman and Mr. McFall would retaliate against her if she reported these issues or attempted to change the office, so there was nothing she could do. With no further recourse, Ms. Voltmer left the Firm in March 2016. Ms. Voltmer is among four female Dallas non-equity shareholders who left Ogletree due to the boys' club and for fear of retaliation if they reported its issues. Shortly after Ms. Voltmer left Ogletree's Dallas office,

five of the female associates Ms. Voltmer had mentored, including all of the female minority associates, also resigned.

### D.   Plaintiff Jocelyn Campanaro

243.   Plaintiff Campanaro is a former non-equity shareholder who worked in Ogletree's Denver, Colorado office.

244.   Ms. Campanaro received her Bachelor of Arts degree in 1996 from the University of Maryland and earned her *Juris Doctor* from Georgetown University in 2002.

245.   Ms. Campanaro was admitted to the New York and Washington, D.C. Bars in 2003 and to the Colorado State Bar in 2004.  After gaining 6 years of experience as an attorney at firms such as Hogan & Hartson LLP (now Hogan Lovells) and Holland & Hart LLP, Ms. Campanaro joined Ogletree's Denver office in 2010.  She became a non-equity shareholder in January 2013.

246.   Like many of Ogletree's offices, the Denver office was dominated by its own boys' club. The male shareholders with whom Ms. Campanaro worked used infantilizing gendered nicknames to undermine Ms. Campanaro's contributions. For example, John Combs, non-equity shareholder in the Denver office, and Chris Thomas, equity shareholder and head of Denver's immigration practice group, frequently referred to Ms. Campanaro as "princess" because of her reduced hours work schedule, among other sexist comments.  Andrew Merrills, an equity shareholder in Ogletree's Raleigh, North Carolina office and head of the national immigration practice group, referred to Ms. Campanaro as "Pretty Woman" or "PW" in emails.

### i.   Ogletree Discriminated Against Ms. Campanaro in Pay

247.   At Ogletree, Ms. Campanaro was supposed to be on a reduced hours work schedule, meaning she would work 75% of the full-time hours requirement, and would receive a pro-rated salary of 75% of what she would otherwise earn.  In practice, however, Ms. Campanaro consistently outperformed full-time male shareholders in billable hours, yet still earned a fraction of the compensation.

248.   For example, Ms. Campanaro earned more origination credits than Mr. Combs every year between 2012 and 2014, by an average of approximately $300,000.  In 2014, Ms. Campanaro earned more in nearly every category of credit than Mr. Combs, including earning approximately $526,000 more origination credits, $223,000 more responsible credits, and $79,000 more working credits.  Despite this,

Ogletree paid Mr. Combs more than Ms. Campanaro every year from 2013 to 2015, by an average of approximately $27,000.

249.    Similarly, Ms. Campanaro earned more origination credits than non-equity shareholder Johnnie James every year between 2012 and 2014, by an average of approximately $149,000.  Ms. Campanaro also earned more origination, responsible, and working credits than Mr. James in 2014. However, Ogletree paid Mr. James an average of approximately $93,000 more than Ms. Campanaro between 2013 and 2015.

250.    Ms. Campanaro also earned more origination and responsible credits than a male San Francisco non-equity shareholder in 2013 and 2014, earning an average of approximately $257,000 more origination credits and an average of approximately $348,000 more managing credits.  However, Ogletree paid him an average of approximately $152,000 more than Ms. Campanaro between 2013 and 2015.

251.    Furthermore, Ms. Campanaro earned more origination credits than male San Francisco non-equity shareholder Kevin Reese between 2013 and 2014, by an average of approximately $280,000. Ms. Campanaro also earned more managing, responsible, and working credits than Mr. Reese in 2013. Despite this, Ogletree paid Mr. Reese an average of approximately $118,000 more than Ms. Campanaro between 2013 and 2015.

**ii.    Ogletree Discriminated Against Ms. Campanaro in Business Development**

252.    Women in the Denver office were rarely offered mentoring or assistance of any type. Mr. Thomas was funneled all of the work opportunities in the office from male shareholders in other offices. He would then dole out tasks to members of his boys' club, while keeping the majority of the credits for himself. As a woman, Ms. Campanaro was largely excluded from this distribution, meaning she was required to build her own book of business without the aid of Mr. Thomas or male rainmakers outside the Denver office.

**iii.    Ogletree Discriminated Against Ms. Campanaro in Credit Allocations**

253.    Ogletree's discriminatory system of credit allocation allowed Mr. Thomas to horde a disproportionate amount of credits for work in the Denver office, only giving away credit allocations when forced to do so.  Ms. Campanaro, as well as another female shareholder in the Denver office, regularly worked on matters as the managing attorney, and acted as the exclusive client contact, yet were allocated

only a fraction of the credits they should have received.

254.    Ms. Campanaro brought a significant amount of business with her when she joined Ogletree in 2010. However, Mr. Thomas would take the majority of the credit for that business, despite Ms. Campanaro's work. Mr. Thomas also altered the origination credit distribution that Ms. Campanaro had maintained at her previous firm. For example, when she brought a large client portfolio to Ogletree, and suggested a 50/50 split on the origination credit to Mr. Thomas, as had been the split at her previous firm, he was so irate that he insisted on a 70/30 split in his favor. When Ms. Campanaro complained about this distribution, Mr. Thomas asserted that origination credit meant more at Ogletree than it had at Ms. Campanaro's previous firm.

255.    Ms. Campanaro complained to Andrew Merrills, head of the national immigration practice group, about Mr. Thomas' patently discriminatory credit allocation. Mr. Merrills willfully ignored these complaints, and responded that it was not his role to try to control Mr. Thomas' behavior or decisions.

#### iv.    Ogletree Discriminated Against Ms. Campanaro in Promotions

256.    In 2011, Ms. Campanaro should have been considered for promotion to non-equity shareholder, but was deferred for a year due to her reduced hours work schedule. In 2012, Ms. Campanaro once again came up for promotion to non-equity shareholder.  However, Ogletree decided to defer Ms. Campanaro's promotion for the second year in a row, claiming it was once again due to her reduced hours work schedule. Instead, without explanation, Ogletree favored Mr. Combs' bid for promotion, whom Ms. Campanaro consistently outperformed. This choice was based exclusively on gender.

257.    Despite having a reduced work schedule, and reduced pay, Ms. Campanaro consistently outperformed Mr. Combs.  For example, Ms. Campanaro outperformed Mr. Combs in multiple categories in 2011, including earning approximately $139,000 more origination credits and approximately $54,000 more responsible credits.  In 2012, even after Ogletree promoted Mr. Combs to shareholder over her, Ms. Campanaro earned approximately $131,000 more origination credits than Mr. Combs.

258.    When Ms. Campanaro complained about this discrimination, Defendant Ebert told her that there were "too many people" up for promotion. Further he asked her "how would [Mr. Combs] feel" if Ms. Campanaro was promoted before him, noting that it would not be fair to deny Mr. Combs the partnership.  Unsurprisingly, Ogletree promoted Mr. Combs to non-equity shareholder in 2012, and denied

Ms. Campanaro's promotion. Ms. Campanaro had to wait until 2013 to be promoted to non-equity shareholder.

259.    The Denver office's work environment was so hostile that Ms. Campanaro reported it to then-Managing Shareholder Defendant Ebert and Ogletree's General Counsel, Chris Mixon.  Ogletree used its own attorneys to conduct an internal investigation into the Denver office's discrimination, but Ms. Campanaro is unaware of any action taken in response to Mr. Thomas' or Mr. Combs' discriminatory credit and resource allocation, and hostility towards women. Ms. Campanaro followed up directly with the attorneys conducting the investigation and asked what the conclusions and results of the investigation were. She never received a response.

260.    As discussed, Ms. Campanaro also complained about the discrimination and hostile work environment in Ogletree's Denver office to Mr. Merrills, the head of the national immigration practice, but Mr. Merrills refused to do anything.

261.    Realizing Ogletree's systemic policy of favoring male shareholders to the detriment of female shareholders would prevent Ms. Campanaro from any further progress any in the Firm, Ms. Campanaro left Ogletree in May 2015 due to the Firm's, and the Denver office's, entrenched hostile work environment and discrimination against women.

### E.  Plaintiff Angelica Ochoa

262.    Plaintiff Ochoa is a former non-equity shareholder who worked in Ogletree's Denver, Colorado office.

263.    Ms. Ochoa received her Bachelor of Arts degree in 1995 from the University of Texas at El Paso and earned her *Juris Doctor* from the University of Michigan in 2001. Ms. Ochoa was admitted to the Colorado State Bar in 2001. Ms. Ochoa joined Ogletree's Denver office as a non-equity shareholder in September 2010.

264.    During her time in the Denver office, Ms. Ochoa experienced a toxic boys' club environment. Because she had a reduced hours work schedule, meaning she only worked 75% of the time, John Combs, a non-equity shareholder in the office, and Chris Thomas, an equity shareholder and head of the Denver office's immigration practice, repeatedly referred to her as a "princess." However, despite working reduced hours, Ms. Ochoa still performed at levels similar to Mr. Combs, yet Ms. Ochoa was

paid 75% of what she would have been otherwise, such that by 2015, Mr. Combs' target compensation was approximately $60,000 higher than Ms. Ochoa's. When Ms. Ochoa learned that she was being criticized for her work schedule, she sat down with Mr. Combs and Mr. Thomas, to discuss Mr. Combs' hostility.

265. In this meeting, John Combs expressed anger and frustration at the fact that Ms. Ochoa worked a reduced hours schedule, and therefore did not have to come into the office on Fridays. He told Mr. Thomas that he felt this particular fact was "unfair." Although Ms. Ochoa was able to outmaneuver this boys' club environment initially, it soon affected her pay and reputation at the Firm.

266. Ms. Ochoa complained to numerous members of Ogletree, including Steve Moore, head of the Denver office, about the Firm's discriminatory conduct. In response, Ogletree conducted an investigation using its own attorneys. Ms. Ochoa is not aware of the results of the investigation, as they were never shared with her.

### i. Ogletree Discriminated Against Ms. Ochoa in Pay

267. Although Ms. Ochoa and John Combs performed at substantially similar levels doing substantially similar work, Ogletree consistently paid Mr. Combs more than Ms. Ochoa.

268. In 2012, Ms. Ochoa had won every single one of her cases. Despite this success, her salary was cut by $20,000 the following year, in 2013. In contrast, Mr. Combs' salary was raised by $20,000. After her salary was cut, Ms. Ochoa spoke with Kim Ebert to try to understand the reasoning behind the cut. Mr. Ebert had no substantive response, but questioned Ms. Ochoa about her work schedule, including what time she arrived at the office and what time she left, despite no rule regulating arrival and departure times. While Ms. Ochoa was initially confused, she later learned Mr. Combs had complained about her compensation being too high in his interview with the Compensation Committee that year. He argued that, given her reduced work schedule, she should earn even less. Despite the fact she already earned less based on her part-time status, Ogletree's Compensation Committee then took $20,000 from Ms. Ochoa and gave it to Mr. Combs as a raise.

269. When Ms. Ochoa discovered what had happened, she complained to Mr. Thomas, and he called a meeting for himself, Ms. Ochoa, and Mr. Combs. In this meeting, Ms. Ochoa protested against such blatantly discriminatory conduct. She noted that she had already taken a 25% pay cut in order to have

a reduced work schedule, and that there was no reason she should be penalized with an additional decrease in salary. Despite Ms. Ochoa's complaints, the decision was not reversed.

270.    Further, in 2014, Ms. Ochoa requested a raise or a bonus, as she had brought in an additional $100,000 for the Firm through her work, and had suffered the unfair pay cut the previous year. However, Ms. Ochoa was informed that she would not receive any increase in salary or bonus.

271.    Ms. Ochoa complained to David Powell, an equity shareholder in the Denver office, and Mr. Thomas about the lack of pay equity at Ogletree, and identified several other nonequity partners who were paid more than Ms. Ochoa for substantially similar work. Mr. Powell and Mr. Thomas said they would take that information to the Firm leadership, but nothing changed.

### ii.    Ogletree Discriminated Against Ms. Ochoa in Business Development

272.    Ogletree's discrimination against Ms. Ochoa in pay, and the harassment she experienced from Mr. Combs, further impacted her business development at the Firm.

273.    Ogletree conducted an investigation into the conflict between Mr. Combs and Ms. Ochoa in 2013, and while Ms. Ochoa is not aware of any action that was taken against Mr. Combs, she was punished. In response to Mr. Combs' complaints, Ogletree's Leadership required that Ms. Ochoa meet with the head of the immigration practice, equity shareholder Andrew Merrills, once a month for a year, to discuss her business development plans.

274.    Although Ms. Ochoa had an excellent success rate on her cases, this punishment made her appear incompetent, reduced her opportunities for further business development, and caused her severe reputational damage at Ogletree and beyond.

275.    Ms. Ochoa cites the punishment she received, and the damage that resulted, as one of the primary reasons she left Ogletree in May 2015.

### iii.    Ogletree Discriminated Against Ms. Ochoa in Credit Allocations

276.    In the Denver office, Ogletree's boys' club environment allowed Mr. Thomas to horde most of the credit for the immigration practice without any repercussions, as it funneled first through him. Ms. Ochoa worked on numerous cases where Mr. Thomas took all of the credit, despite the work she contributed.

277.    For example, although Ms. Ochoa managed several of Mr. Thomas' clients' businesses

singlehandedly, Mr. Thomas received almost all of the management credit, due to the unjust system for credit allocation in the Denver office. In order to receive any credit at all, Ms. Ochoa had to argue with Mr. Thomas, and accept what he was willing to give. Because Mr. Thomas was the ultimate authority on credit allocation in the office, and Mr. Merrills, the head of the immigration practice nationwide, refused to intervene, Ms. Ochoa was discriminatorily denied many of the credits she was due.

## VI.    CLASS ACTION AND COLLECTIVE ACTION ALLEGATIONS

### A. CLASS AND COLLECTIVE DEFINITIONS

278.    Class Representatives seek to maintain claims on their own behalf and on behalf of Classes of similarly situated female equity and non-equity shareholders employed by Ogletree.

279.    The proposed Rule 23 "Nationwide Class" consists of all female equity and non-equity shareholders who are, have been, or will be employed by Ogletree in the United States at any time on or after October 22, 2016.

280.    The proposed "Fiduciary Duty Subclass" consists of all female equity and non-equity shareholders who are, have been, or will be employed by Ogletree in the United States at any time on or after August 18, 2013.

281.    The proposed "Equity Shareholder Subclass" consists of all female equity shareholders who are, have been, or will be employed by Ogletree in the United States at any time on or after August 18, 2013.

282.    The proposed Fair Employment and Housing Act Subclass "FEHA Subclass" means female equity and non-equity shareholders employed by Ogletree in California at any time on or after August 18, 2016.

283.    The proposed California Equal Pay Act Subclass, "CEPA Subclass" means female equity and non-equity shareholders employed by Ogletree in California at any time on or after August 18, 2014.

284.    The proposed Unfair Competition Law Subclass, "UCL Subclass" means female equity and non-equity shareholders employed by Ogletree in California at any time on or after August 18, 2013.

285.    Members of the "EPA Collective Action" means women employed as equity and non-equity shareholders at Ogletree in the United States at any time on or after August 18, 2014 who opt into this action under 29 U.S.C. §216(b).  Ms. Knepper opted into this action to become a Collective Action

Plaintiff on February 20, 2018.  Ms. Campanaro opted into this action to become a Collective Action Plaintiff on February 20, 2018.  Ms. Voltmer opted into this action to become a Collective Action Plaintiff on February 22, 2018.  Ms. Ochoa opted into this action to become a Collective Action Plaintiff on February 23, 2018.

286.    Class Representatives and the employees whom they seek to represent have been subjected to systemic disparate treatment in pay and promotion at Ogletree based on their gender.  Further, Ogletree's centralized pay and promotion policies and practices have caused a gender-based disparate impact on Class Representatives and the classes they seek to represent.

287.    Because of the Firm's systemic pattern and practice of gender discrimination in pay and promotion, Class Representatives and the Classes that they seek to represent have been adversely affected and have experienced harm, including the loss of compensation, employment benefits, and promotional opportunities, as well as physical and emotional pain and suffering.

288.    Class Representatives seek to maintain claims on their own behalf and on behalf of the foregoing Classes of similarly situated female equity and non-equity shareholders.  Plaintiff Knepper seeks to represent members of the Nationwide Class, Fiduciary Duty Subclass, FEHA Subclass, CEPA Subclass, UCL Subclass, and EPA Collective Action.  Plaintiff Warren seeks to represent members of the Nationwide Class, Fiduciary Duty Subclass, Equity Shareholder Subclass, FEHA Subclass, CEPA Subclass, UCL Subclass, and EPA Collective Action.  Plaintiff Voltmer seeks to represent members of the Fiduciary Duty Subclass and EPA Collective Action.  Plaintiff Campanaro seeks to represent members of the Fiduciary Duty Subclass and EPA Collective Action.  Plaintiff Ochoa seeks to represent members of the Fiduciary Duty Subclass and EPA Collective Action.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

**B.  CLASS ALLEGATIONS**

**a.  OGLETREE ENGAGED IN A COMMON POLICY, PATTERN, AND PRACTICE OF DISCRIMINATION AGAINST THE CLASSES**

289.    Plaintiffs re-allege and incorporate by reference allegations from previous paragraphs of the Complaint alleging class-based discrimination against female equity and non-equity shareholders.

290.    Ogletree has subjected female equity and non-equity shareholders to a pattern and practice

of systemic unlawful disparate treatment and unlawful disparate impact discrimination comprised of (a) paying female equity and non-equity shareholders less than their male counterparts; and (b) denying female equity and non-equity shareholders promotion and advancement opportunities, resulting in their relegation to lower compensation levels.

291.    These problems affecting pay and promotion are systemic and Firm-wide. They stem from the Firm's common employment policies, practices, and procedures, including Ogletree's credit allocation, compensation, job assignment, and promotion policies, practices, and procedures. Such policies, practices, and procedures are not valid, job-related, or justified by business necessity and all suffer from: a lack of transparency; inadequate quality standards and controls; insufficient implementation metrics; and inadequate opportunities for redress or challenge.  As a result, female equity and non-equity shareholders are compensated and promoted within a system that is insufficiently designed or implemented to consistently, reliably, or equitably manage or reward employees.

292.    It is Ogletree's standard operating procedure to discriminate against female equity and non-equity shareholders. Ogletree's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to female equity and non-equity shareholders throughout the Firm, occurring as a pattern and practice throughout all office locations and practice groups.

293.    These problems affecting pay and promotion also stem from centralized decision-making by the Firm's compact and predominantly male senior leadership team, which maintains centralized control over employees' terms and conditions of employment and is responsible for formulating, reviewing, and approving the acts, policies, and practices that result in the systemic unlawful disparate treatment and unlawful disparate impact on female equity and non-equity shareholders in pay, promotion, and assignments.

### b.  EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS

294.    Certification of the foregoing Classes of female equity and non-equity shareholders is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the respective Classes.

295.    The individual claims of the respective Class Representatives require resolution of the

common questions concerning whether the Firm has engaged in a systemic pattern and/or practice of gender discrimination against female equity and non-equity shareholders in pay and promotion and/or whether its facially neutral policies have an adverse effect on the Classes' pay and promotion.  The respective Classes seek remedies to eliminate the adverse effects of such discrimination in pay and promotion.

296.    Each Class Representative has standing to seek such relief because of the adverse effects that such discrimination has had on her individually and on similarly situated female equity and non-equity shareholders generally.  Ogletree caused their injuries through its discriminatory policies, practices, and procedures, and through the disparate impact its policies, practices, and procedures have on female equity and non-equity shareholders.

297.    To gain such relief for themselves, as well as for the respective Class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.

298.    Unless the proposed Classes are certified, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Certification of the proposed Classes is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Classes, and the Defendants.

### c.  NUMEROSITY AND IMPRACTICABILITY OF JOINDER

299.    The Classes that the Class Representatives seek to represent are too numerous to make joinder practicable.  The members of the proposed Classes are diffused throughout California and the country.  Fear of retaliation is also likely to undermine the possibility of joinder.

### d.  COMMON QUESTIONS OF LAW AND FACT

300.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their claims and those of the Classes that they seek to represent.

301.    The common questions of law include: (a) whether Ogletree has engaged in unlawful, systemic gender discrimination in its work assignment, credit allocation, business development,

promotion, and compensation policies, practices, and procedures; (b) whether the failure to institute adequate standards, quality controls, implementation metrics, or oversight in work assignment, credit allocation, business development, promotion, and compensation policies, practices, and procedures violates Title VII, the FEHA, or the CEPA; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII, the FEHA, or the CEPA; (d) whether Ogletree's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII, the FEHA, or the CEPA; (e) whether Ogletree is liable for a continuing systemic violation of Title VII, the FEHA, or the CEPA; (f) a determination of the proper standards for proving a pattern or practice of discrimination by the Firm against its female equity and non-equity shareholders, and under the disparate treatment theory of liability for equity and non-equity shareholders;  (g) a determination of the proper standard for proving that Ogletree's facially neutral employment practices had a disparate impact on each Class; (h) whether Defendants owed a fiduciary duty to Plaintiffs and class members; and (i) whether such duty included an obligation to refrain from discrimination and maintaining discriminatory systems.

302.    The common questions of fact include whether the Firm has, through its policies, practices, and procedures: (a) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) used that compensation system to compensate female equity and non-equity shareholders less than similarly-situated male shareholders; (c) systemically, intentionally, or knowingly compensated female equity and non-equity shareholders less than similarly-situated male shareholders; (d) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (e) used that promotion system to preclude or delay the promotion of female equity and non-equity shareholders into higher positions; (f) systematically, intentionally, or knowingly precluded or delayed the selection and promotion of female equity and non-equity shareholders into higher equity status; (g) systematically, intentionally, knowingly, or deliberately sowed an indifference to evidence of discrimination in pay, promotion, and assignments or otherwise minimized, ignored, or mishandled evidence of or complaints of gender discrimination in pay, promotion, and assignment; and (h) otherwise discriminated against female equity and non-equity shareholders in the terms and conditions

of employment. The common questions of fact also include the role of Defendants Keen and Ebert in, and their responsibility for, the actions described in the foregoing subparts (a) through (h).

303.   The employment policies, practices, and procedures to which the Class Representatives and the respective Classes are subjected were and are set by the Firm's Board of Directors and apply universally to all Class members nationwide.  These employment policies, practices, and procedures are not unique or limited to any function or business unit; rather, they apply to all offices and practice groups and thus affect Class Representatives and the respective Classes in the same ways regardless of the office location or practice group in which they work.

### e.  THE TYPICALITY OF CLAIMS AND RELIEF SOUGHT

304.   The claims of the Class Representatives are typical of the claims of the respective Classes.

305.   Gender discrimination in pay and promotion affects the Class Representatives and all Class members in the same or similar ways throughout the Firm.  Class Representatives and similarly situated female equity and non-equity shareholders were paid less than similarly situated male shareholders for equal work and were denied promotion and advancement opportunities in favor of similarly situated male shareholders.

306.   The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the Class members in this case.

307.   Class Representatives seek the following relief for their individual claims and for those of the members of the proposed Class: (a) a declaratory judgment that Defendant Ogletree has engaged in systemic gender discrimination against the Class by (1) paying female equity and non-equity shareholders less than their male counterparts; and (2) denying female equity and non-equity shareholders promotion and advancement opportunities in favor of male shareholders; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effectuates a restructuring of the Firm's promotion, compensation, and discipline policies, practices, and procedures; (d) back pay, front pay, and other equitable remedies necessary to make the female equity and non-equity shareholders whole from Ogletree's discrimination; (e) punitive and nominal damages to prevent and deter Ogletree from engaging in similar discriminatory practices in the future; (f) compensatory damages; and (g) attorneys' fees, costs, and expenses.

### f.   ADEQUACY OF REPRESENTATION

308.     The Class Representatives' interests are co-extensive with those of the respective Classes that they seek to represent in this case.   The Class Representatives seek to remedy Ogletree's discriminatory employment policies, practices, and procedures so that female equity and non-equity shareholders will not receive disparate pay and differential treatment.

309.     The respective Class Representatives are willing and able to represent the proposed Classes fairly and vigorously as they pursue their similar individual claims in this action.

310.     Class Representatives have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of counsel to litigate competently the Class claims at issue in this case satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### g.   REQUIREMENTS OF RULE 23(b)(2)

311.     Ogletree has acted on grounds generally applicable to the Class Representatives and the Classes by adopting and following systemic policies, practices, and procedures that affect all Class Members.

312.     Ogletree has acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Classes. Ogletree's systemic conduct justifies the requested injunctive and declaratory relief with respect to the Classes as a whole.

313.     Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case.  Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Ogletree's systematic gender discrimination.  In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies for individual losses caused by Ogletree's discriminatory conduct.

314.     Certification of Plaintiffs' claims for injunctive relief is thus appropriate.

### h.   REQUIREMENTS OF RULE 23(b)(3)

315.     The common issues of fact and law affecting the claims of the respective Class Representatives and proposed Class members, including, but not limited to, the common issues previously

identified herein, predominate over any issues affecting only individual claims.  These common issues include whether the Firm has engaged in gender discrimination against female equity and non-equity shareholders by (a) paying female equity and non-equity shareholders less than their male counterparts; and (b) denying female equity and non-equity shareholders promotion and advancement opportunities in favor of male shareholders.

316.   A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and members of the respective Classes.

317.   The cost of proving the patterns and practices of discrimination by Defendants makes it impracticable for the Class Representatives and members of the respective Classes to prosecute their claims individually.

318.   By virtue of the pattern and practice of discrimination at Ogletree, the Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, compensatory damages, and nominal and punitive damages.

### i.   CLASS TREATMENT OF PARTICULAR ISSUES UNDER RULE 23(c)(4)

319.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

### C.  COLLECTIVE ACTION ALLEGATIONS (EPA)

320.   The Firm has engaged in systematic gender discrimination against its female equity and non-equity shareholders.   The Firm has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures.

321.   Plaintiffs re-allege and incorporate by reference each and every allegation in the previous paragraphs alleging common policies, practices, and procedures resulting in unequal pay earned by female shareholders at Ogletree.

322.   Plaintiffs (or "Collective Action Plaintiffs") bring collective claims alleging violations of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all members of the EPA Collective Action.

323.   The EPA Collective Action Plaintiffs seek to represent all female equity and non-equity

shareholders described above who were paid less than male shareholders for doing similar work.  The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

324.    Questions of law and fact common to the EPA Collective Action Plaintiffs and the EPA Collective as a whole include, but are not limited to, the following:

(a)    Whether Ogletree unlawfully failed and continues to fail to compensate female equity and non-equity shareholders at a level commensurate with similarly-situated male shareholders;

(b)    Whether Ogletree's policy, practice, or procedure of failing to compensate female equity and non-equity shareholders at a level commensurate with comparable male shareholders violates applicable provisions of the EPA; and

(c)    Whether Ogletree's failure to compensate female equity and non-equity shareholders at a level commensurate with comparable male shareholders was willful within the meaning of the EPA.

325.    Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs, because their claims are similar to the claims of the EPA Collective.

326.    The EPA Collective Action Plaintiffs and members of the EPA Collective (a) are similarly situated; and (b) are subject to Ogletree's common compensation policies, practices, and procedures resulting in unequal pay based on sex by failing to compensate female equity and non-equity shareholders at a level commensurate with male shareholders who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

**D.  PRIVATE ATTORNEYS GENERAL ACT ("PAGA") ALLEGATIONS**

327.    Ogletree has violated Plaintiff Knepper's and current and former female attorneys' rights under the California Labor Code, including the California Equal Pay Act, Section 1197.5.

328.    Plaintiff Knepper seeks to represent and to recover civil penalties on behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys, who worked in California at any time on or after a date one year prior to the filing of Plaintiff Knepper's Labor and Workforce Development Agency Notice.

329.    Plaintiff Knepper has exhausted administrative remedies.  In accordance with Labor Code

Section 2699.3, Ms. Knepper gave written notice to the California Labor and Workforce Development Agency and Defendant Ogletree of the Labor Code violations alleged herein on January 12, 2018.  Plaintiff Knepper did not receive written notification from the LWDA of the State's intention to investigate the allegations set forth in her January 12, 2018 notice. Plaintiff Knepper did not receive written notice of cure by Ogletree.

330.    These violations are continuing and ongoing.  On behalf of herself and other Similarly Aggrieved Current and Former Female Attorneys, Plaintiff seeks civil penalties for Ogletree's violations of the California Labor Code, including, without limitation, Sections 204, 204c, 204.2, 221, 223, 226, 98.6, 1102.5, and 1197.5.

331.    "Similarly Aggrieved Current and Former Female Attorneys" means female equity and non-equity shareholders who worked in California for Ogletree, or any of their current and former subsidiaries and affiliated entities, at any time on or after a date one year prior to the filing of Plaintiff's Labor and Workforce Development Agency Notice.

**VII.    COUNTS**

**CLASS AND COLLECTIVE ACTION COUNTS**

**COUNT 1**

**GENDER DISCRIMINATION – PAY**

**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.)**

**(On Behalf of Plaintiff Knepper and Plaintiff Warren, in their Individual and Representative Capacities, and the Nationwide Class against Ogletree)**

332.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

333.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the Class.

334.    Ogletree has discriminated against the Plaintiffs and the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate

1    impact on them.

2        335.    Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or

3    practice of discrimination against Plaintiffs and the Class by, among other things: maintaining a

4    discriminatory system of determining salaries and other compensation incentives; maintaining

5    discriminatory credit allocation system; discrimination in assignments; maintaining a discriminatory

6    system for promotions; and other forms of discrimination.

7        336.    These foregoing common policies, practices, and/or procedures have produced an

8    unjustified disparate impact on Plaintiffs and the members of the Class with respect to the terms and

9    conditions of their employment.

10       337.    Ogletree has treated Plaintiffs and the Class differently from and less preferentially than

11   similarly-situated male shareholders with respect to starting compensation and raises in ways constituting

12   disparate treatment and disparate impact discrimination.

13       338.    Ogletree has failed to prevent, to respond to, to investigate adequately, and/or to

14   appropriately resolve this gender discrimination.

15       339.    Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless,

16   oppressive, and conducted in callous disregard of the rights of the Class Representatives and all members

17   of the Class, entitling the Class Representatives and all members of the class to punitive damages.

18       340.    As a result of Ogletree's conduct alleged in this Complaint, the Class Representatives and

19   the members of the Class have suffered and continue to suffer harm, including but not limited to, lost

20   earnings and other financial loss, as well as non-economic damages.

21       341.    By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted

22   throughout the employment of the Class Representatives and the members of the Class, the continuing

23   violations doctrine applies to all violations alleged herein.

24       342.    By reason of Ogletree's discrimination, the Class Representatives and the members of the

25   Class are entitled to all legal and equitable remedies available for violations of Title VII, including

26   reinstatement and an award of compensatory and punitive damages.  Attorneys' fees and costs should be

27   awarded under 42 U.S.C. § 2000e-5(k).

28                                      **COUNT 2**

**GENDER DISCRIMINATION – PROMOTIONS**

**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)**

**(On Behalf of Plaintiff Knepper and Plaintiff Warren, in their Individual and Representative Capacities, and the Nationwide Class against Ogletree)**

343.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

344.   This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the Class.

345.   Ogletree has discriminated against the Plaintiffs and the Class in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

346.   Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or practice of discrimination against Plaintiffs and the Class by, among other things: maintaining discriminatory credit allocation systems; discrimination in assignments; maintaining a discriminatory system for promotions; and other forms of discrimination.

347.   These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on Plaintiffs and the members of the Class with respect to the terms and conditions of their employment.

348.   As a result of this disparate treatment and disparate impact discrimination, Ogletree has treated Plaintiffs and the Class differently from and less preferentially than similarly-situated male shareholders with respect to promotions.

349.   Ogletree has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

350.   Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and all members of the Class, entitling the Class Representatives and all members of the class to punitive damages.

351.    As a result of Ogletree's conduct alleged in this Complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

352.    By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the members of the Class, the continuing violations doctrine applies to all violations alleged herein.

353.    By reason of Ogletree's discrimination, the Class Representatives and the members of the Class are entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of compensatory and punitive damages.  Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## **COUNT 3**

### **DENIAL OF EQUAL PAY FOR EQUAL WORK**

**(The Fair Labor Standards Act of 1938, *as amended by* The Equal Pay Act, 29 U.S.C. § 206, *et seq.*)**

**(On Behalf of Plaintiff Knepper, Plaintiff Warren, Plaintiff Voltmer, Plaintiff Campanaro, and Plaintiff Ochoa in their Individual and Representative Capacities against Ogletree)**

354.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

355.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and Collective Action Plaintiffs.

356.    Ogletree has discriminated against the Class Representatives and Collective Action Plaintiffs in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the Equal Pay Act of 1963 ("EPA").  Ogletree has paid Class Representatives and Collective Action Plaintiffs less than similarly-situated male colleagues performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

357.    Ogletree has subjected the Class Representatives and the Collective Action Plaintiffs to common discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives, which results in shareholders performing the same tasks receiving different

compensation; and other forms of discrimination affecting pay.

358.   The differential in pay between male and female shareholders was not due to seniority, merit, quantity, or quality of production, but was due to gender.

359.   Ogletree has caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA.   Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).   Because Ogletree has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

360.   As a result of Ogletree's conduct alleged in this Complaint, Class Representatives and all Collective Action Plaintiffs have suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

361.   By reason of Ogletree's discrimination, Class Representatives and all Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).   Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

## COUNT 4

### GENDER DISCRIMINATION – PAY AND PROMOTIONS

**(California Fair Employment and Housing Act, Cal. Gov. Code § 12940, *et seq.*)**

**(On Behalf of Plaintiff Knepper and Plaintiff Warren, in their Individual and Representative Capacities, and the FEHA Subclass against Ogletree)**

362.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

363.   This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the FEHA Subclass.

364.   Ogletree has discriminated against Plaintiffs and the FEHA Subclass in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov't Code § 12940, *et seq.*, by subjecting them to different treatment because and on the basis of their gender, including by engaging in

intentional disparate treatment and by maintaining uniform policies and practices that have an adverse, disparate impact on them.

365.     Ogletree has engaged in an intentional, company-wide and systemic policy, pattern, and/or practice of discrimination against Plaintiffs and the FEHA Subclass by, among other things: maintaining a discriminatory system of determining salaries and other compensation incentives; discrimination in assignments; maintaining a discriminatory system of credit allocation; maintaining a discriminatory system for promotions; and other forms of discrimination.

366.     These foregoing common policies, practices, and/or procedures have produced an unjustified disparate impact on Plaintiffs and the members of the FEHA Subclass with respect to the terms and conditions of their employment.

367.     As a result of this disparate treatment and disparate impact discrimination, Ogletree has treated Plaintiffs and FEHA Subclass differently from and less preferentially than similarly-situated male shareholders with respect to compensation, raises, job assignments, and promotions.

368.     Ogletree has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

369.     Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and all members of the FEHA Subclass, entitling the Class Representatives and all members of the FEHA Subclass to punitive damages.

370.     As a result of Ogletree's conduct alleged in this Complaint, the Class Representatives and the members of the FEHA Subclass have suffered and continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

371.     By reason of the continuous nature of Ogletree's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the members of the FEHA Subclass, the continuing violations doctrine applies to all violations alleged herein.

372.     By reason of Ogletree's discrimination, the Class Representatives and the members of the FEHA Subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

373.     Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

**COUNT 5**

**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**

**(California Equal Pay Act, as amended by The California Fair Pay Act, Cal. § 1197.5, *et seq*.;**

**California Equal Pay Act, Cal. Lab § 1197.5 (West 2015) (amended 2015))**

**(On Behalf of Plaintiff Knepper and Plaintiff Warren, in their Individual and Representative**

**Capacities, and the CEPA Subclass against Ogletree)**

374.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

375.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the CEPA Subclass.

376.    Ogletree has discriminated against the Plaintiffs and all members of the CEPA Subclass in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq*. Ogletree has paid Class Representatives and members of the CEPA Subclass less than similarly-situated male shareholders in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

377.    Ogletree has discriminated against the Plaintiffs and all members of the CEPA Subclass in violation of the California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*.  Ogletree has paid Class Representatives and members of the CEPA Subclass less than similarly-situated male shareholders performing substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

378.    Ogletree has subjected the Class Representatives and the members of the CEPA Subclass to common discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives; a discriminatory system for promotions, which results in shareholders performing the same tasks receiving different compensation; and other forms of discrimination affecting pay.

379.    The differential in pay between male and female shareholders was not due to seniority, merit, the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender.  In the alternative, to the extent that Ogletree relied upon one or

more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

380.    Ogletree caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex.  Moreover, the foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*.  Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h) (West 2015) (amended 2015), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

381.    As a result of Ogletree's conduct alleged in this Complaint and/or Ogletree's willful, knowing, and intentional discrimination, the Plaintiffs have suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

382.    The Plaintiffs and the CEPA Subclass are therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

383.    Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

## COUNT 6

**UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE**

**California Business and Professions Code § 17200 *et seq.***

**(On Behalf of Plaintiff Knepper and Plaintiff Warren, in their Individual and Representative Capacities, and the UCL Subclass against Ogletree)**

384.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

385.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the UCL Subclass.

386.    Ogletree is a "person" as defined under California Business & Professions Code § 17021.

387.    Ogletree's willful failure to pay female equity and non-equity shareholders equally and to

otherwise offer female equity and non-equity shareholders equal employment opportunities as alleged above, constitutes unlawful, unfair, and/or fraudulent activity prohibited by California Business and Professions Code §17200.  As a result of their unlawful, unfair, and/or fraudulent acts, Ogletree reaped and continue to reap unfair benefits and illegal profits at the expense of Plaintiffs and the UCL Subclass. Ogletree should be enjoined from this activity.

388.    Accordingly, Plaintiffs and the UCL Subclass members are entitled to restitution with interest and other equitable relief, pursuant to Cal. Bus. & Prof. Code §17203.

## COUNT 7

### BREACH OF FIDUCIARY DUTY - DISCRIMINATION

**(On Behalf of the Class Representatives, in their Individual and Representative Capacities, and the Fiduciary Duty Subclass against Defendants Ogletree, Charles Matthew Keen, Kim Franklin Ebert, Ronald Chapman, Joseph Clees, and Joseph Beachboard)**

389.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

390.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the Fiduciary Duty Subclass.

391.    Defendants owe a fiduciary duty to Plaintiffs and to each member of the Fiduciary Duty Subclass based on Plaintiffs and the members of the Fiduciary Duty Subclass' relationship to Defendants as shareholders of the Firm.

392.    Defendants have and have had a duty to deal fairly, honestly, and openly with Plaintiffs and the members of the Fiduciary Duty Subclass.  Without limiting the generality of the foregoing, this includes a duty not to discriminate on the basis of sex or retaliate against Plaintiffs and the members of the Fiduciary Duty Subclass.

393.    Defendants breached their fiduciary duty by failing to treat the members of the Fiduciary Duty Subclass equitably and instead discriminating against them on the basis of their gender, including by maintaining a discriminatory system of determining salaries and other compensation incentives; discrimination in assignments; maintaining a discriminatory system of credit allocation; maintaining a discriminatory system for promotions; and other forms of discrimination.

394.     Members of the Fiduciary Duty Subclass suffered substantial damages as a result of Defendants' breach of their fiduciary duties.

<u>**COUNT 8**</u>

**BREACH OF FIDUCIARY DUTY**

**(On Behalf of Plaintiff Warren and the Equity Shareholder Subclass against Defendants Ogletree, Charles Matthew Keen, Kim Franklin Ebert, Ronald Chapman, Joseph Clees, and Joseph Beachboard)**

395.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

396.     A fiduciary relationship existed between the members of the Equity Shareholder Subclass, as Class A shareholders of the Firm, and Defendants Keen, Ebert, Chapman, Clees, and Beachboard ("Individual Defendants"). This fiduciary relationship is based on Individual Defendants' status as members of the Firm's Executive Committee and Board of Directors, who owe fiduciary duties of care, loyalty, and good faith to all Class A shareholders of the corporation.

397.     Defendants Keen and Ebert held the position of Managing Shareholder and were members of Ogletree's Executive Committee during the class period. Defendant Beachboard held the position of Managing Director and was a member of Ogletree's Executive Committee during the class period. All Individual Defendants were members of the Board of Directors during the relevant class period.

398.     The Individual Defendants had a duty to ensure the Firm's compliance with the law. As alleged above, each Individual Defendant had notice of the allegations of unlawful conduct, including allegations of sexual harassment, discrimination, and retaliation made by female attorneys in the Firm, as well as allegations of fraudulent and unlawful conduct of shareholder Spencer Skeen.

399.     The Individual Defendants breached their fiduciary duty to the Equity Shareholder Subclass by failing to adequately investigate, and actively ignoring, the allegations of unlawful conduct made against the Firm's male shareholders.

400.     The Individual Defendants further breached their fiduciary duty to the Equity Shareholder Subclass by failing to disclose material financial information, including information related to shareholder compensation and credit allocation, to them.

401.   Further, the Individual Defendants had a duty to deal with the Equity Shareholder Subclass in an open an honest manner, refrain from discrimination and retaliation, and manage the Firm in a way that maximized the Firm's value for all equity shareholders, not just male equity shareholders.

402.   The Individual Defendants were complicit in the creation and promotion of the Firm's unlawful and discriminatory compensation and credit allocation system, which breached their fiduciary duties. The Individual Defendants mismanaged the Firm by taking actions to entrench themselves and male equity shareholders in the Firm, and misled equity shareholders through the intentional, bad faith cover-up of fraudulent and unlawful behavior of male shareholder Spencer Skeen, to the risk and detriment of the Firm.

403.   The members of the Equity Shareholder Subclass were injured as a result of Individual Defendants' breaches of their fiduciary duties, including, but not limited to, through a loss of compensation and other benefits, reputational harm to themselves and the Firm, and loss of profitable shareholders who otherwise would have stayed with Ogletree and maximized the Firm's profits if not for Individual Defendants' discrimination, retaliation, mismanagement, and cover-up of unlawful and fraudulent behavior.

## COUNT 9

### BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(On Behalf of Plaintiff Warren and the Equity Shareholder Subclass against Defendants Ogletree, Charles Matthew Keen, Kim Franklin Ebert, Ronald Chapman, Joseph Clees, and Joseph Beachboard)**

404.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

405.   Ogletree issues a Shareholder Management Agreement to each equity shareholder, which Ogletree contends is a binding contractual agreement. To the extent it is found that the Shareholder Management Agreement is a binding contractual agreement, implied within the Shareholder Management Agreement, and every contractual arrangement, is the covenant of good faith and fair dealing.

406.   It was an implicit and material term of Ogletree's Shareholder Management Agreement

that Ogletree's Managing Shareholders, Managing Directors, and Board Members would adhere to their basic ethical obligations, including that they would not otherwise discriminate against shareholders on the basis of gender or retaliate against them.

407.    Under the terms of the Firm's Shareholder Management Agreement, Ogletree's Compensation Committee, including the Managing Shareholder, determined the final compensation recommendations for Ogletree's shareholders. It is an implied term of Ogletree's Shareholder Management Agreement that the Managing Shareholder and Compensation Committee will not make compensation determinations in a manner that is discriminatory or retaliatory.

408.    Under the terms of the Firm's Shareholder Management Agreement, the Executive Committee, made up of the Firm's Managing Shareholder and Managing Directors, shall be responsible for and oversee the Firm's business and professional operations. It is an implied term of the Shareholder Management Agreement that the Executive Committee will not manage the Firm in a manner that promotes discrimination, inequality, and retaliation on the basis of sex.

409.    Because the obligation not to discriminate or retaliate was embedded in the parties' contract, Ogletree and the Individual Defendants are contractually liable for engaging in such conduct against Ms. Warren and the members of the Equity Shareholder Subclass.

410.    Ms. Warren and the Equity Shareholder Subclass have been damaged by Defendants' breach of contractual obligations, including the covenant of good faith and fair dealing, in an amount to be determined at trial.

## REPRESENTATIVE PRIVATE ATTORNEY GENERAL ACT CLAIMS

## COUNT 10

### CLAIMS UNDER THE PRIVATE ATTORNEYS GENERAL ACT OF 2004

### (Cal. Lab. Code §2698 *et seq.*)

**(On Behalf of Plaintiff Knepper, in her Individual and Representative Capacities, and the Similarly Aggrieved Current and Former Female Attorneys against Ogletree)**

411.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

412.    Plaintiffs are aggrieved employees. Plaintiff Knepper brings this claim on behalf of herself

1  and other Similarly Aggrieved Current and Former Female Attorneys.

2       413.    The California Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698,

3  *et seq.*, gives any employee aggrieved by an employer's violation of the Labor Code the right to file an

4  action on behalf of Similarly Aggrieved Current and Former Female Attorneys for the civil penalties

5  established by Section 2698 and/or other Labor Code sections.

6       414.    Plaintiff Knepper, on behalf of herself and other Similarly Aggrieved Current and Former

7  Female Attorneys, seeks civil penalties for Ogletree's violations of the California Labor Code, including,

8  without limitation, the following: (a) being deprived of equal pay, in violation of the California Equal Pay

9  Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq.*, and California Equal Pay Act, as

10 amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5 *et seq*; (b) retaliation in violation of Cal.

11 Lab. Code §§ 98.6, 1102.5, and 1197.5(k); (c) untimely payment in violation of Cal. Lab. Code §§ 204,

12 204c, and 204.2; and (d) inaccurate wage statements in violation of Cal. Lab. Code § 226.  These violations

13 were willful and intentional.

14      415.    Accordingly, Plaintiff Knepper is entitled to collect civil penalties on behalf of herself and

15 other Similarly Aggrieved Current and Former Female Attorneys against Ogletree as allowed under Cal.

16 Lab. Code § 2699(a) and (f) and costs and attorneys' fees under Cal. Lab. Code. § 2699(g).

17                           **INDIVIDUAL COUNTS**

18                              **COUNT 11**

19                              **RETALIATION**

20 **(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f), *et seq*.; California Fair**

21              **Employment and Housing Act, Cal. Gov. Code § 12940, *et seq*.)**

22         **(On Behalf of Plaintiff Knepper and Plaintiff Warren against Ogletree)**

23      416.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the

24 previous paragraphs of this Complaint as though fully set forth herein.

25      417.    Plaintiffs engaged in protected activity that included, but is not limited to, complaining to

26 Ogletree about gender discrimination in compensation and promotion.  They complained to members of

27 the Firm on numerous occasions.

28      418.    Ogletree engaged in adverse employment actions against Plaintiffs for engaging in

protected activities.  These adverse employment actions have included subjecting them to unfavorable terms and conditions of employment, including denials of promotion and subjection to a hostile work environment, as well as the termination of Ms. Warren.  The adverse employment actions have materially and adversely affected Plaintiffs' overall terms and conditions of employment.

419.    Ogletree's retaliatory acts against Plaintiffs were a direct and proximate result of their protected activities.

420.    A reasonable employee would find Ogletree's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

421.    Ogletree's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Plaintiffs, entitling them to punitive damages.

422.    As a result of Ogletree's conduct alleged in this complaint, Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

423.    Plaintiffs are each entitled to all legal and equitable remedies available for violations of Title VII and the FEHA, including an award of punitive damages.

424.    Attorney's fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 12

### RETALIATION

**(Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3); California Equal Pay Act, as amended by The California Fair Pay Act, Cal. § 1197.5, *et seq.*; California Equal Pay Act, Cal. Lab § 1197.5 (West 2015) (amended 2015))**

**(On behalf of Each Plaintiff against Ogletree)**

425.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

426.    Plaintiffs engaged in protected activity under the Equal Pay Act by complaining to Ogletree about gender discrimination in compensation.

427.    Ogletree engaged in adverse employment actions against Plaintiffs for engaging in protected activities.  These adverse employment actions have included subjecting them to unfavorable

terms and conditions of employment, including denials of promotion and subjection to a hostile work environment, as well as the termination of Ms. Warren.  The adverse employment actions have materially and adversely affected Plaintiffs' overall terms and conditions of employment.

428.    Ogletree's retaliatory acts against Plaintiffs were a direct and proximate result of their protected activities.

429.    A reasonable employee would find Ogletree's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

430.    As a result of Ogletree's conduct alleged in this complaint, Plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

431.    Under 29 U.S.C. § 216(b), Plaintiff Knepper, Plaintiff Warren, Plaintiff Voltmer, Plaintiff Campanaro, and Plaintiff Ochoa are entitled to liquidated damages and other relief.

432.    Under the CEPA, Plaintiff Knepper and Plaintiff Warren are entitled to liquidated damages and other relief.

433.    Attorneys' fees and costs should be awarded under 29 U.S.C. § 216(b) and the CEPA.

## VIII.    <u>PRAYER FOR RELIEF ON INDIVIDUAL, CLASS ACTION, AND COLLECTIVE ACTION CLAIMS</u>

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, the EPA Collective Action, and the PAGA Representative Action, pray that this Court:

A.    Certify the claims in Counts 1, 2, and 4 through 9 as a class action maintainable under Federal Rules of Civil Procedure Rule 23(a), (b)(2) and/or (b)(3), or certify particular issues within those claims as class issues under Rule 23(c)(4), on behalf of the proposed Classes; designate the proposed Class Representatives as representatives; and designate Plaintiffs' counsel of record as Class Counsel for each Class;

B.    Certify the claims in Count 3 as a collective action under the EPA on behalf of the Collective Action Representatives and the EPA Collective Action; promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Collective Action, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual

Consent to Join forms pursuant to 29 U.S.C. § 216(b); and toll the statute of limitations on the claims of all members of the Collective Action from the date the original Complaint was filed until the Collective Action members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

C.      Declare and adjudge that Ogletree's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of the respective Plaintiffs, Members of the Classes, and Members of the EPA Collective Action;

D.      Issue a permanent injunction against Ogletree and Ogletree's partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Plaintiffs, Members of the Classes, Members of the EPA Collective Action, and those similarly situated as secured by Title VII and the Equal Pay Act, and order such injunctive relief as will prevent Ogletree from continuing their discriminatory practices and from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

E.      Order Ogletree to adjust the wage rates and benefits for Members of the Classes, and Members of the EPA Collective Action to the level that they would be enjoying but for Ogletree's discriminatory policies, practices, and/or procedures;

F.      Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action, in an amount not less than $200,000,000;

G.      Award nominal, liquidated, and compensatory damages to Plaintiffs and Members of the Classes, in an amount not less than $200,000,000;

H.      Award punitive damages to Plaintiffs and Members of the Classes, in an amount not less than $200,000,000;

I.      Award civil and statutory penalties available under applicable laws, including waiting time penalties;

J.      Order Defendants to make whole the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action by providing them with any other monetary and affirmative relief;

K.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action;

L.      Award Plaintiffs, Members of the Classes, and Members of the EPA Collective all pre-judgment interest and post-judgment interest available under law;

M.      Award Plaintiffs, Members of the Classes, and Members of the EPA Collective Action any other appropriate equitable relief, including reinstatement;

N.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Ogletree has remedied the practices complained of herein and are determined to be in full compliance with the law; and

O.      Award additional and further relief as this Court may deem just and proper.

## IX.    **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated: June 25, 2018                    Respectfully submitted,

/s/ David Sanford
David Sanford (appearance *Pro Hac Vice*)
Jill Sanford (CA Bar No. 185757)
Edward Chapin (CA Bar No. 53287)
Jeremy Heisler (*Pro Hac Vice forthcoming*)
James E. Richardson (*Pro Hac Vice forthcoming*)
Danielle Fuschetti (CA Bar No. 294065)
Leigh Anne St. Charles (appearance *Pro Hac Vice*)
SANFORD HEISLER SHARP, LLP

*Attorneys for Plaintiffs and the Classes*

[*Continued from Caption Page*]

James E. Richardson (NY Bar No. 4810735, *Pro Hac Vice forthcoming*)
jrichardson@sanfordheisler.com
Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

Leigh Anne St. Charles (appearance *Pro Hac Vice*)
lstcharles@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
611 Commerce St., Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020

*Attorneys for Plaintiffs and the Classes*