David Sanford (appearance *Pro Hac Vice*)
dsanford@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1666 Connecticut Ave, NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5200
Facsimile: (202) 499-5199

Jill Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
Edward Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
655 W Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 677-4250

Jeremy Heisler (NY Bar No. 1653484, *Pro Hac Vice forthcoming*)
jheisler@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the America, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651

*Attorneys for Plaintiff and the Classes*
[*Additional Attorneys Listed After Signature Page*]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DISTRICT

| | |
|---|---|
| DAWN KNEPPER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., CHARLES MATTHEW KEEN, and KIM FRANKLIN EBERT,<br><br>Defendants. | Case No. 3:18-cv-00303-WHO<br>Case No. 3:18-cv-00304-WHO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO TRANSFER VENUE** |

1

## <u>TABLE OF CONTENTS</u>

2   I.      INTRODUCTION ............................................................................................1

3   II.     PROCEDURAL HISTORY.............................................................................1

4   III.    FACTUAL COUNTERSTATEMENT ..........................................................3

5   IV.     LEGAL ARGUMENT.....................................................................................4

6           A.      Plaintiff's Signature Was Required to Form a Valid Contract with Ogletree ...................5

7                   i.      A Signature Was Required to Accept the Offer to Arbitrate ..................................5

8                   ii.     A Signature Was Required to Provide the Employee's Knowing Consent to Be

9                           Bound Through Continued Employment.............................................................7

10                  iii.    Alternatively, Ogletree's Language is Ambiguous and Must be Interpreted

11                          Against Ogletree as the Drafter.........................................................................8

12          B.      Silence in the Face of an Offer is Insufficient Absent Some Additional Indicia of

13                  Affirmative Acceptance .................................................................................10

14                  i.      Plaintiff's Continued Employment Did Not Create a Unilateral Implied-in-Fact

15                          Contract .............................................................................................................11

16                  ii.     Plaintiff's Mere Failure to Opt Out Did Not Manifest Knowing Agreement to

17                          Arbitrate ...........................................................................................................13

18                          a.      Ogletree Bears the Burden of Adequately Educating Employees on the

19                                  Details of the Arbitration Program and the Specific Method of Acceptance

20                                  .............................................................................................................14

21                          b.      Ogletree's Actions Were Insufficient as a Matter of Law to Create

22                                  Knowing and Voluntary Acceptance Through Inaction Alone .................17

23                          c.      Ogletree's Evidence Does Not Establish Plaintiff's Agreement to Waive

24                                  Her Rights ............................................................................................20

25          C.      Alternatively, The Motion to Transfer Should be Denied Because the Agreement is

26                  Unconscionable..............................................................................................20

27

28

1          i.      The Alleged Arbitration Agreement Does Not Clearly and Unmistakably

2                  Delegate Questions of Arbitrability to the Arbitrator............................................21

3          ii.     The Alleged Arbitration Agreement is Procedurally Unconscionable .................22

4          iii.    The Alleged Agreement is Also Substantively Unconscionable ..........................23

5    V.   CONCLUSION.................................................................................................................25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**

<u>Federal Cases</u>

*AT&T Mobility Servs. LLC v. Jean-Baptiste*,

    No. CV 17-11962, 2018 WL 3425734 (D.N.J. July 16, 2018) .......................................12

*Ashbey v. Archstone Prop. Mgmt., Inc.*,

    785 F.3d 1320 (9th Cir. 2015) ......................................................................................5, 13

*Bank of Buchanan Cty. v. Cont'l Nat. Bank of Los Angeles*,

    277 F. 385 (8th Cir. 1921) ..............................................................................................10

*Berkley v. Dillard's Inc.*,

    450 F.3d 775 (8th Cir. 2006) ...........................................................................................20

*Castro v. Macy's, Inc.*,

    No. C 16-5991, 2017 WL 344978 (N.D. Cal. Jan. 24, 2017) ..........................................16

*Circuit City Stores, Inc. v. Ahmed*,

    283 F.3d 1198 (9th Cir. 2002) ........................................................................................14

*Circuit City Stores, Inc. v. Najd*,

    294 F.3d 1104 (9th Cir. 2002) ............................................................................... 8, 14-19

*Columbia Malting Co. v. Clausen-Flanagan Corp.*,

    3 F.2d 547 (2d Cir. 1924)................................................................................................10

*Colvin v. NASDAQ OMX Group, Inc.*,

    No. 15-cv-02078-EMC, 2015 WL 6735292 (N.D. Cal. Nov. 4, 2015) ...........................24

*Cox v. Ocean View Hotel Corp.*,

    533 F.3d 1114 (9th Cir. 2008) ...........................................................................................4

*Dixon v. Synchrony Fin.*,

    No. 1:15-CV-406, 2015 WL 12720290 (N.D. Ga. Aug. 18, 2015) ...............................20

*First Options of Chicago, Inc. v. Kaplan*,

    514 U.S. 938 (1995)...........................................................................................................4

*Goodworth Holdings Inc. v. Suh,*
    239 F. Supp. 2d 947 (N.D. Cal. 2002) ..................................................................7

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    561 U.S. 287 (2010)..........................................................................................21

*Hicks v. Macy's Dept. Stores, Inc.,*
    No. C 06-02345, 2006 WL 2595941 (N.D. Cal. Sept. 11, 2006) ......................... 14-18

*Hoffmann-LaRoche, Inc. v. Sperling,*
    493 U.S. 165 (1989).............................................................................................2

*Johnmohammadi v. Bloomingdale's, Inc.,*
    755 F.3d 1072 (9th Cir. 2014) ............................................................................14

*Kilgore v. KeyBank, Nat. Ass'n.,*
    718 F.3d 1052 (9th Cir. 2013) ............................................................................14

*Knutson v. Sirius XM Radio Inc.,*
    771 F.3d 559 (9th Cir. 2014) ..............................................................................18

*Lou v. Ma Labs, Inc.,*
    No. C 12–05409, 2013 WL 2147459 (N.D. Cal. May 15, 2013)............................ 9

*Prudential Ins. Co. of Am. v. Lai,*
    42 F.3d 1299 (9th Cir. 1994) ...............................................................................5

*Mohamed v. Uber Techs., Inc.,*
    848 F.3d 1201 (9th Cir. 2016) .................................................................. 14, 21-22

*Nelson v. Cyprus Bagdad Cooper Corp.*
    119 F.3d 756 (9th. Cir. 1997) ............................................................................13

*Norcia v. Samsung Telecommunications Am., LLC,*
    845 F.3d 1279 (9th Cir. 2017) ............................................................................18

*Rosas v. Macy's, Inc.,*
    No. CV11-7318, 2012 WL 3656274 (C.D. Cal. Aug. 24, 2012)............................15

1   *Schmell v. Morgan Stanley & Co.*,

2       No. 17-13080, 2018 WL 1128502 (D.N.J. Mar. 1, 2018) ............................................19

3   *Stagner v. Luxottica Retail N. Am., Inc.*,

4       No. C 11-02889 CW, 2011 WL 3667502 (N.D. Cal. Aug. 22, 2011) ........................6, 9

5   *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

6       559 U.S. 662 (2010).............................................................................................24

7   *United States v. Westlands Water Dist.*,

8       134 F. Supp. 2d 1111 (E.D. Cal. 2001)...............................................................10

9   *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,

10      489 U.S. 468 (1989).............................................................................................4, 8

11  State Cases

12  *Armendariz v. Found. Health Psychcare Servs., Inc.*,

13      24 Cal. 4th 83 (2000) .......................................................................................23, 25

14  *Avery v. Integrated Healthcare Holdings, Inc.*,

15      218 Cal. App. 4th 50 (Cal. Ct. App. 2013) .....................................................11, 23

16  *Banner Entm't, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*,

17      62 Cal. App. 4th 348 (Cal. Ct. App. 1998). ......................................................4, 7

18  *Boghos v. Certain Underwriters at Lloyd's of London*,

19      36 Cal. 4th 495 (2005) ...........................................................................................6

20  *Commercial Factors Corp. v. Kurtzman Bros.*,

21      131 Cal. App. 2d 133 (Cal. Ct. App. 1955) ............................................................5

22  *County of Contra Costa v. Kaiser Found. Health Plan, Inc.*,

23      47 Cal. App. 4th 237 (Cal. Ct. App. 1996) ...........................................................4

24  *Esparza v. Sand & Sea, Inc.*,

25      2 Cal. App. 5th 781 (Cal. Ct. App. 2016) .............................................................5

26  *Friedman v. Friedman*,

27      20 Cal. App. 4th 876 (Cal. Ct. App. 1993) ..........................................................13

28

*Gorlach v. Sports Club Co.*,

    209 Cal. App. 4th 1497 (Cal. Ct. App. 2012) ..............................................................13

*Herring v. Parking Concepts, Inc.*,

    No. B216008, 2010 WL 1038396 (Cal. Ct. App. Mar. 23, 2010) .................................12

*Iskanian v. CLS Transp. Los Angeles, LLC*,

    59 Cal. 4th 348 (2014) ...............................................................................................24

*Leslie v. Brown Bros. Incorporation*,

    208 Cal. 606 (1929) ................................................................................................8, 10

*Maxwell v. Provident Mut. Life Ins. Co. of Philadelphia*,

    180 Wash. 560 (1935) .................................................................................................10

*McGill v. Citibank, N.A.*,

    2 Cal. 5th 945 (2017) .................................................................................................24

*Mercuro v. Superior Court*,

    96 Cal. App. 4th 167 (Cal. Ct. App. 2002) ................................................................24

*Mitri v. Arnel Mgmt. Co.*,

    157 Cal. App. 4th 1164 (Cal. Ct. App. 2007) ................................................... 4, 11-12

*Olvera v. El Pollo Loco, Inc.*,

    173 Cal. App. 4th 447 (Cal. Ct. App. 2009) ...............................................................22

*Peleg v. Neiman Marcus Group, Inc.*,

    204 Cal. App. 4th 1425 (Cal. Ct. App. 2012) .............................................................23

*Recinos v. SBM Site Servs. LLC*,

    No. A151253, 2018 WL 3801844 (Cal. Ct. App. Aug. 10, 2018)...................................9

*Romo v. Y-3 Holdings, Inc.*,

    87 Cal. App. 4th 1153 (Cal. Ct. App. 2001) .................................................................8

*Sanchez v. Valencia Holding Co., LLC*,

    61 Cal. 4th 899 (Cal. Ct. App. 2015) .........................................................................23

*Victoria v. Superior Court*,

40 Cal. 3d 734 (1985) ...................................................................................9

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,

25 Cal. App. 3d 987 (Cal. Ct. App. 1972) ............................................5, 18

**STATUTES**

Federal Statutes

28 U.S.C. § 1404(a) .......................................................................................1

State Statutes

Cal Civ. Code § 1281.8...............................................................................24

Cal. Civ. Code § 1565 ...................................................................................4

Cal. Civ. Code § 1641 ...................................................................................6

Cal. Civ. Code § 1654 ...................................................................................9

**RULES**

Fed. R. Civ. P. 12(b)(1)..................................................................................2

**OTHER AUTHORITIES**

Restatement (Second) of Contracts, § 206......................................................9

https://ogletree.com/practices/arbitration-and-alternative-dispute-resolution ..........................9

## I.      INTRODUCTION

Arbitration is a matter of mutual consent, not the exercise of power or deception. As in other contexts, waivers of the basic right to bring one's claims in court and before a jury of one's peers must be made knowingly and voluntarily. Except in unusual circumstances, this requires a clear, affirmative manifestation of assent. But Defendant Ogletree, Deakins, Nash, Smoak & Steward, P.C. ("Ogletree" or the "Firm") would make agreement by mere silence the rule rather than the exception and enable companies to extract inadvertent waivers of these rights on a routine basis.

Here, Ogletree disseminated a neutral and misleadingly-titled email to its employees, with a proposed arbitration agreement attached. The Firm's communications about the transaction were ambiguous and inadequate to put employees on notice that failing to act would waive their rights. Yet, it now claims that Plaintiff Knepper's silence in response to its offer binds her to the agreement's terms.

As a matter of law, Ogletree's misleading conduct is not sufficient to create a duty to speak in order to avoid entering a contract. As applied here, Defendants' argument seeks to transform the current state of the law from one that protects individuals against unknowing waivers of their rights, into one that actively incentivizes companies to secure such waiver. The law should not be moved in this direction. Accordingly, the Court should hold that the parties never entered a valid contract to arbitrate their disputes.

Alternatively, the terms of Ogletree's alleged Mutual Arbitration Agreement are unconscionable and render it unenforceable and void as a matter of law.

## II.     PROCEDURAL HISTORY

On January 12, 2018, Plaintiff filed a Class and Collective Action Complaint in Case No. 3:18-cv-00303 WHO (gender discrimination action). Concurrently, Plaintiff brings a Declaratory Judgment Action in Case No. 3:18-cv-00304-WHO, seeking a declaration that she never formed a valid and/ or enforceable agreement to arbitrate disputes with Ogletree.[1] On May 11, 2018, Plaintiff filed an Amended Complaint in the discrimination action, the current operative complaint. (Dkt. 33).

Defendant filed a Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) on April 27, 2018. (Dkt. 28). There, Ogletree argues that a putative Arbitration Agreement requires Plaintiff Knepper to

---

[1] All docket citations refer to the Gender Discrimination Action, unless otherwise specified.

arbitrate her discrimination claims in Orange County, California. (Dkt. 28 at 5-7). Plaintiff filed an opposition to this Motion to Transfer, arguing in relevant part that the formation of a binding contract to arbitrate is actively disputed and cannot serve as a justification for transfer. (Dkt. 34 at 4-5, 6-9).

On June 25, 2018, Plaintiff filed a Motion for Leave to Amend her Complaint to add four new Plaintiffs (three former non-equity shareholders and one former equity shareholder), along with three individual Defendants who exercised significant control over the management of the Firm. (Dkt. 52). Each of the proposed Plaintiffs, who are dispersed across the nation, allege facts that stem from the same systematic discriminatory conduct and practices alleged by Plaintiff Knepper. *See, e.g. id*. at 1-2.[2] This includes Plaintiff Warren, who seeks to represent a new class of equity shareholders. *See id*. at 1.

In its Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint, filed on July 9, 2018, Ogletree reiterated its argument that the action must be arbitrated. (Dkt. 59). In response, Plaintiff again disputed the existence of an arbitration contract, and argued that the mere allegation of such an agreement does not make her proposed amendment futile. (Dkt. 60).

On August 15, 2018, the Court conducted a hearing on Plaintiff's Motion for Leave. Following the hearing, the Court issued a Minute Order suggesting "that defendant move under FRCP 12(b)(1) to determine the existence of the agreement," or alternatively allowing Defendant to "file supplemental briefing on the issue if it asserts that all of the evidence on which it relies has been presented in the motion to transfer." (Dkt. 63). Accordingly, Ogletree filed a Supplemental Brief in Support of its Motion to Transfer Venue ("Supp. Br."). (Dkt. 66).

In the interim, the parties conducted limited discovery on the existence of a binding arbitration agreement. On August 25, 2018, Plaintiff's Counsel requested documents relevant to this issue. Defendants produced certain responsive documents on September 7, 2018.

Plaintiff now files this Response to Defendant's Supplemental Brief. As set forth below, the parties

---

[2] *Cf. Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989): "Congress has stated its policy that [Equal Pay Act] plaintiffs should have the opportunity to proceed collectively. A collective action allows [EPA] discrimination plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."

1  never formed a valid and binding arbitration contract. Consequently, Ogletree's Motion to Transfer should
2  be denied, and Plaintiff's Motion for Leave to Amend should be granted.

3  **III.   FACTUAL COUNTERSTATEMENT**

4  Ogletree asserts that it entered a valid and binding arbitration agreement with Plaintiff Knepper.
5  Defendant primarily bases this contention on a read receipt generated from an email it sent at 4:45 A.M.
6  on Friday January 15, 2016, before a holiday weekend, indicating that she had opened the email. *See, e.g.*,
7  Supp. Br. at 4. The email was presented as an administrative update regarding "Two New Programs for
8  2016." Dkt. 28-1 (Berger Decl.), Ex. A ("January 15 Email"). In reality, however, it included a Mutual
9  Arbitration Agreement. *See id.* at A-5–A-6 ("MAA" or the "Agreement"). Plaintiff has no recollection of
10 receiving either the email or the attached agreement and did not knowingly or voluntarily assent to its
11 terms. *See* Decl. of Dawn Knepper ("Knepper Decl.") ¶¶ 2-6.

12 Defendant claims that there is "irrefutable evidence" that Plaintiff knew about the MAA. Supp.
13 Br. at 4. Ogletree bases this on a January 27, 2016 email forwarding the January 15 email to all original
14 recipients, which Defendants misleadingly claim was Plaintiff's "fourth" notification of the MAA (Supp.
15 Br. at 4). The email directed "[i]f you haven't already done so, please sign and return a copy of the Mutual
16 Arbitration Agreement to me as soon as possible." Dkt. 28-1 (Berger Decl.), Ex. D. Notably, no read
17 receipt or other evidence that this email was read or received by Plaintiff Knepper has been produced.
18 Plaintiff did not sign or return the agreement.

19 In their Supplemental Brief, Defendants rely in particular on a March 1, 2016 email sent by the
20 Orange County office administrator stating, in part, "today is the **deadline to *sign and return*** a copy of
21 the Mutual Arbitration Agreement to" the Orange County office administrator. Dkt. 28-1 (Berger Decl.),
22 Ex. E ("Myers Email") (emphasis added). A few minutes later, Plaintiff Knepper sent the brief response
23 "I will turn mine in tomorrow. Thanks." Dkt. 28-1 (Berger Decl.), Ex. F ("Knepper Email"). She did not
24 specify whether she meant the MAA or opt-out form. She did not sign or return the MAA. Her supposed
25 "assent" to its provisions is ambiguous and never manifested itself in a signed agreement, as demanded
26 by Ogletree. No binding contract was formed by Plaintiff's March 1, 2016 email.

27 Plaintiff has consistently maintained that she has no recollection of receiving the original email or

1   any subsequent email from Myers, nor of shooting off that response. *See* Knepper Decl. ¶¶ 2-4, 6.

2   Ultimately, the evidence upon which Ogletree currently relies is factually and legally insufficient to

3   support the existence of a valid and binding arbitration agreement governing Plaintiff's claims.

4   **IV.    LEGAL ARGUMENT**

5          Plaintiff Dawn Knepper never knowingly agreed to arbitrate disputes with her former employer,

6   Ogletree. Ogletree seeks to characterize two ambiguous documents (an email read receipt and a one-line

7   email from Plaintiff) as indisputable evidence that she assented to its confusingly-worded arbitration

8   contract. But this falls far short of the evidence necessary to carry Ogletree's burden. Ogletree cannot

9   produce a signed agreement, because none exists. And no additional evidence offered by Ogletree triggers

10  the limited exception to the bedrock principle in contract law that silence does not equal assent.

11         The issue of contract formation is a threshold issue for the court to decide, as the FAA "does not

12  require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of*

13  *Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). "Arbitration is consensual in nature. . . A party

14  cannot be compelled to arbitrate a dispute that it has not elected to submit to arbitration." *County of Contra*

15  *Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 244–45 (Cal. Ct. App. 1996).

16         Whether the parties formed an agreement to arbitrate is determined by "ordinary state-law

17  principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938,

18  944 (1995); *see also Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1121 (9th Cir. 2008). Thus, "even

19  if one of the parties contends that the FAA applies to their agreement to arbitrate, the FAA does not apply

20  until the existence of an enforceable arbitration agreement is established under state law principles

21  involving formation, revocation and enforcement of contracts generally." *Banner Entm't, Inc. v. Superior*

22  *Court (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 357 (Cal. Ct. App. 1998).

23         Ogletree, as the party seeking to establish the existence of an arbitration agreement, "bears the

24  burden of proving its existence by a preponderance of the evidence." *Mitri v. Arnel Mgmt. Co.*, 157 Cal.

25  App. 4th 1164, 1169 (Cal. Ct. App. 2007). To satisfy its burden, Ogletree must prove that each element

26  of contract formation has been met. This includes proof of actual consent, which must be "Free; Mutual;

27  and, Communicated by each to the other." Cal. Civ. Code § 1565. "Mutual assent is determined under an

28

objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Esparza v. Sand & Sea, Inc*., 2 Cal. App. 5th 781, 788 (Cal. Ct. App. 2016).

"This principle of knowing consent applies with particular force to provisions for arbitration." *Windsor Mills, Inc. v. Collins & Aikman Corp*., 25 Cal. App. 3d 987, 993 (Cal. Ct. App. 1972). "If a party wishes to bind in writing another to an agreement to arbitrate future disputes, such purpose should be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties thereto." *Commercial Factors Corp. v. Kurtzman Bros*., 131 Cal. App. 2d 133, 136 (1955).

Further, as this case involves claims of federal and state gender discrimination, "not only must there be a valid agreement to arbitrate that encompasses the right at issue, that agreement must also be 'knowing.'" *Ashbey v. Archstone Prop. Mgmt., Inc*., 785 F.3d 1320, 1323–24 (9th Cir. 2015). In California, "a Title VII plaintiff may only be forced to forego her statutory remedies and arbitrate her claims if she has knowingly agreed to submit such disputes to arbitration." *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1305 (9th Cir. 1994). The overriding "congressional concern that Title VII disputes be arbitrated only 'where appropriate,' and only when such a procedure was **knowingly accepted**, reflects our public policy of protecting victims of sexual discrimination and harassment through the provisions of Title VII and analogous state statutes. This is a policy that is at least as strong as our public policy in favor of arbitration." *Id*. (emphasis added) (citations omitted).

As detailed below, Ogletree has failed to meet its burden. Thus, its Motion must be denied.

## A.   Plaintiff's Signature Was Required to Form a Valid Contract with Ogletree

The Mutual Arbitration Agreement at issue here clearly contemplates a signature on the part of the employee. The confusing and contradictory language of the contract gives rise to two plausible interpretations regarding the legal effect of a signature in the agreement. Under both interpretations, the lack of a signature is dispositive to the question of formation.

### i.   A Signature Was Required to Accept the Offer to Arbitrate

The most obvious interpretation is that Ogletree sought acceptance of its offer to arbitrate through

an employee signature. Ample evidence supports this interpretation. *First*, the language of the Agreement itself clearly contemplates a signature. In addition to including signature and date lines at the bottom of the Agreement, the opening paragraph of the Agreement identifies the individual employee as "the undersigned," and the language "by signing below" is included in the final paragraph. *See* MAA. Ogletree's argument that the blank signature line has no significance (Supp. Br. at 8) "runs afoul of rules governing contract interpretation." *Stagner v. Luxottica Retail N. Am.*, Inc., No. C 11-02889 CW, 2011 WL 3667502, at *4 (N.D. Cal. Aug. 22, 2011). Pursuant to Cal. Civ. Code § 1641, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." This rule "disfavor[s] constructions of contractual provisions that would render other provisions surplusage.'" *Stagner*, 2011 WL 3667502, at *4 (quoting *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal.4th 495, 503 (2005)). Ogletree's interpretation would impermissibly render the express language and signature line of the contract purely superfluous, and should be rejected.

*Second*, Ogletree's argument that it "did not seek signatures as manifestation of consent" (Supp. Br. at 8) is belied by its own course of conduct: namely, repeated communications to employees expressly directing them to return a *signed* Agreement. The communication to which the agreement was attached directs employees to "Please **sign and return** a copy of the Mutual Arbitration Agreement to your Office Administrator." January 15 Email (emphasis added). Likewise, subsequent communications from Ogletree state "today is the **deadline to _sign and return_ a copy of the Mutual Arbitration Agreement** to me." Myers Email (emphasis added).

*Finally*, Ogletree's internal communications demonstrate employee signatures were contemplated as a required term of the Agreement. For example, on January 15, 2018, Kay Straky sent an email to all of Ogletree's office administrators, copying, among others, in-house counsel Christopher Mixon, that states "all of our attorneys and staff (except Equity Shareholders) have been asked to return **the signed** Mutual Arbitration Agreement to their local Office Administrator . . . When you receive all of your office's **signed agreements**, please send them directly to me so I can ensure they are put in the employees' personnel files." Ex. A, Email from K. Straky (Jan. 15, 2016), OD-K_00000067 (emphasis added). Ms.

Straky goes on to state "the policy does allow current employees to opt-out of the arbitration program so you may not receive an agreement from every employee." *Id.* Ms. Straky also notes "our Equity Shareholders are NOT being asked to participate or **sign the arbitration agreement** since they are already bound by an arbitration provision in the Firm's Shareholder Agreement." *Id.* (emphasis added).[3] In response to Ms. Straky's email, Ogletree's Human Resources Manager clarified to all office administrators, "We ask for your assistance as you receive the signed Mutual Arbitration Agreements. As they come in **please check the signature line** on the second page. First **to make sure the form is signed** and secondly, if the signature is illegible please print the staff member's name under the signature line." Ex. B, Email from T. Clement (Jan. 20, 2016), at OD_K-00000073 (emphasis added). Indeed, Ogletree's Human Resources Manager dubbed the signed agreements "***completed*** MAA's" in an email following the purported opt-out date. In an email titled "Action requested – return completed MAA's," Mr. Clement asked of all office administrators "if you have not already returned the signed MAA's from your office, please do so as soon as possible." Ex. C, Email from T. Clement (Mar. 21, 2016), OD-K00000104.

     Ogletree sought to collect and maintain signed agreements for a distinct purpose—and not just as an empty gesture: as required manifestation of the employee's consent. No executed agreement, no ***"completed"*** contract. Had the parties contemplated that the operative document for contract formation was not the signed Agreement but the (absence of an) opt-out form, Ogletree would have followed the converse approach of focusing primarily on the opt-out forms.

     Thus, the Agreement itself, as well as Ogletree's internal documents, demonstrate that employees were asked to agree to the MAA, acceptance of which should be manifested by returning a signed Agreement. Where, as here, the "parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created." *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 958 (N.D. Cal. 2002), *aff'd*, 99 F. App'x 806 (9th Cir. 2004); *see also Banner*, 62 Cal. App. 4th at 356 (same).

        **ii.**     **A Signature Was Required to Provide the Employee's Knowing Consent to Be**

---

[3] Critically, Ogletree produced no documents demonstrating any expressed disagreement with Ms. Straky's interpretation that the arbitration agreements must be signed and returned to be effective.

       7      OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO TRANSFER VENUE

1

**Bound Through Continued Employment**

2       The other plausible interpretation is that a signature was necessary to acknowledge receipt and

3 provide informed consent to be bound through continued employment. It is a bedrock principle of the law

4 of contracts that an "offerer cannot prescribe conditions of rejection so as to turn silence on the part of the

5 offeree into acceptance." *Leslie v. Brown Bros. Incorporation,* 208 Cal. 606, 621 (1929); *see also infra* §

6 IV.B. Only in narrow situations "where circumstances or the previous course of dealing between the

7 parties places the offeree under a duty to act or be bound, his silence or inactivity will constitute his

8 assent." *Circuit City Stores, Inc. v. Najd,* 294 F.3d 1104, 1109 (9th Cir. 2002). Here, Ogletree included

9 express language in the MAA which negated the concept of assent by pure inaction:

10        *By signing below, you acknowledge that you understand you have the option to opt out of*

11        *this Agreement by returning an Opt Out form to the Director of Human Resources on or*

12        *before March 1, 2016 and that failure to return an Opt Out form and remaining in the*

13        *employment of the Firm after that date will be deemed an acceptance of the agreement.*

14 In Ogletree's formulation, the employee needed to sign this acknowledgement in order to render the failure

15 to opt out a knowing and voluntary assent by silence. *See, e.g.*, *Romo v. Y-3 Holdings, Inc.*, 87 Cal. App.

16 4th 1153, 1160 (Cal. Ct. App. 2001) (finding that employee did not assent to arbitration provision where

17 she did not sign acknowledgment stating "Employee acknowledges that he or she has carefully read this

18 agreement, that he or she understands its terms, that all understandings between the employee and the

19 company relating to the subjects covered in this agreement are contained in it . . . ."). In a sense, the

20 acknowledgment is a condition precedent to holding the employee's non-opt-out to her detriment; it

21 ensures that she understands and agrees to the meaning and effect of failing to opt out, and is not simply

22 remaining idle, with no intent to agree to anything. Ogletree was not required to impose this provision,

23 yet it is bound by its contractual choices—including its desire for a clear, affirmative signal of the

24 employee's assent. *Cf. Volt*, 489 U.S. 468 (parties agreed to California arbitration rules that operated to

25 preclude arbitration under the circumstances).

26        **iii.    Alternatively, Ogletree's Language is Ambiguous and Must be Interpreted**

27        **Against Ogletree as the Drafter**

28

1    At a minimum, there is uncertainty as to the legal effect of a signature on Ogletree's Arbitration

2    Agreement. Pursuant to the doctrine of *contra proferentem,* such ambiguity must be interpreted against

3    Ogletree as the drafter. Cal. Civ. Code § 1654 ("[i]n cases of uncertainty. . . the language of a contract

4    should be interpreted most strongly against the party who caused the uncertainty to exist."); *Victoria v.*

5    *Superior Court,* 40 Cal. 3d 734, 745 (1985) ("It is a well-settled rule of law that ambiguities in a written

6    contract are to be construed against the party who drafted it.").[4] By way of example, in a recent

7    unpublished decision, the California Court of Appeal had reason to consider this principle as it applied to

8    the inclusion of a signature line, to find that where a form contract "is ambiguous with respect to the

9    meaning and effect of the separate signature block line following the arbitration section, any ambiguity

10   must be construed against the drafter, i.e., [defendant]." *Recinos v. SBM Site Servs. LLC*, No. A151253,

11   2018 WL 3801844, at *7 (Cal. Ct. App. Aug. 10, 2018)(unpublished).

12   Ogletree cannot insert ambiguity into the language of the agreement, and then seek to benefit from

13   its own contradictory contract terms. Any rule to the contrary would perversely incentivize the purposeful

14   introduction of ambiguity into contracts, which could later be exploited to the detriment of the non-drafting

15   party. This type of opportunistic drafting is not countenanced by the law. *See, e.g.*, Restatement (Second)

16   of Contracts, § 206 cmt. a (noting that the drafting party is "more likely than the other party to have reason

17   to know of uncertainties of meaning" and thus may "leave meaning deliberately obscure").[5]

18   Ogletree's professed expertise in the area of arbitration agreements reveals the extent of its

19   opportunism. Ogletree makes much of Plaintiff Knepper being "a seasoned employment attorney" (Supp.

20   Br. at 9); however, Ogletree touts itself as an experienced adviser on arbitration agreements with an entire

21   practice group devoted to arbitration and alternative dispute resolution techniques. *See, e.g.*,

22   https://ogletree.com/practices/arbitration-and-alternative-dispute-resolution (last visited Oct. 2, 2018).

23

24   ---

[4] *See also Stagner*, 2011 WL 3667502, at *5  (Where the plain terms "do not clarify the contract's meaning,

25   the contract must be construed against [drafter].")

[5] *Cf. e.g., Lou v. Ma Labs, Inc.,* No. C 12–05409, 2013 WL 2147459, at *5 (N.D. Cal. May 15, 2013)

26   ("Finally, as a policy matter, to allow such re-drafting would encourage stronger parties to shoot for the

27   moon and then, when caught, negotiate with the court down to something that should have been in there all

      along. This tactic would allow the offending party to reap the benefit of its one-sided contract of adhesion

28   with many others until, if ever, someone takes them to court. Severance will not be indulged here.")

Given its self-promotion as a go-to advisor on arbitration agreements, Defendant cannot now request the benefit of the doubt for poor draftsmanship.

Had Ogletree intended to create an agreement that required no signature, it certainly knew how to do so. Ogletree's insertion of sloppy and imprecise language into its own stock Agreement lacks justification and all resulting ambiguity and confusion must be interpreted strongly against Ogletree. *See United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1122 n. 58 (E.D. Cal. 2001). ("The maxim *omnia praesumuntur contra proferentem* favors that meaning which least benefits the drafter, if it finds one or more provisions are subject to multiple reasonable meanings.") (internal alterations omitted).

Based on the four-corners of the Agreement and all produced extrinsic communications, the Mutual Arbitration Agreement required Plaintiff's signature to be effective. Ogletree's inability to produce an Agreement signed by Plaintiff is fatal to its position.

**B.    Silence in the Face of an Offer Is Insufficient Absent Some Additional Indicia of Affirmative Acceptance**

Even if the agreement did not expressly require a signature, Ogletree still must demonstrate a valid manifestation of assent. In its Supplemental Brief, Ogletree claims that Plaintiff's silence constitutes acceptance because, as the offeror, it designated silence as a method of acceptance. However, it is a fundamental premise of contract law that "an offer made to another, either orally or in writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, **for the offerer cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance**." *Leslie,* 208 Cal. at 621 (quoting 13 Corpus Juris, 276) (emphasis added).[6]

---

[6] *See also Maxwell v. Provident Mut. Life Ins. Co. of Philadelphia*, 180 Wash. 560, 571–72, 41 P.2d 147, 152 (1935) ("Generally speaking, an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer. . . Certainly the offeree has the right to keep silent if he chooses without thereby becoming charged with a contract."); *Columbia Malting Co. v. Clausen-Flanagan Corp.*, 3 F.2d 547, 551 (2d Cir. 1924) ("And the courts hold that, even though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance."); *Bank of Buchanan Cty. v. Cont'l Nat. Bank of Los Angeles*, 277 F. 385, 390 (8th Cir. 1921) ("One to whom an offer is made is under no obligation to do or say anything concerning an offer which he does not accept.").

In the face of Ogletree's offer, Plaintiff was merely silent. At most, she indicated that she would decide—return the agreement or the opt-out form—but then did not do so. As a rule, this alone is insufficient to create a binding contract. Any exception to this bedrock principle should therefore be construed narrowly or risk swallowing the rule in its entirety.

Ogletree maintains that "Knepper demonstrated her intent to be bound by remaining employed and not opting out by the March 1, 2016 deadline." (Supp. Br. at 7-8). However, neither Plaintiff's continued employment, nor her failure to opt out of the Agreement, manifested a knowing and voluntary intent to enter the agreement and thereby forego her rights, as required under the law.

> **i.**   **Plaintiff's Continued Employment Did Not Create a Unilateral Implied-In-Fact Contract**

Continued employment may be sufficient to create an implied-in-fact contract where the employer unilaterally changes the terms and conditions of at-will employment. *See Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 64-66 (Cal. Ct. App. 2013) (discussing cases). In those circumstances, the employee's continued employment in the face of a new condition of employment operates as consideration for the unilateral contract. However, where, as here, an employer unilaterally implements a new policy, and *in addition to* that policy, requires the employee to enter a bilateral arbitration agreement, mere continued employment does not create a binding contract.

For example, in *Mitri v. Arnel Mgmt. Co*., 157 Cal. App. 4th 1164, 1167 (Cal. Ct. App. 2007), the employer circulated an employee handbook that contained an arbitration provision:

> 1.18 Arbitration Agreement, which states: Any dispute arising out of employment with the Company, as allowed by law, will be settled by binding arbitration. As a condition of employment, all employees are required to sign an arbitration agreement . . . To ensure the expeditious and economical resolution to any controversy or dispute arising from, or in any way relating to an offer of employment or the position, work, payment or relationship, or the termination of such employment, will be on the written request by any party, be submitted to and resolved by binding arbitration.

1   *Id.* (internal quotation marks removed). The employee also signed an acknowledgement form stating, "My

2   signature acknowledges that I have read and understood the statements above as well as the contents of

3   the Handbook, and will direct any questions to my supervisor or the Director of Human Resources." *Id.*

4   at 1168. In analyzing this provision, the court acknowledged that "California law permits employers to

5   implement policies that may become unilateral implied-in-fact contracts when employees accept them by

6   continuing their employment." *Id.* at 1171. However, the court found this inapplicable because the set of

7   policies *also* included an "express requirement" that employees return a signed arbitration agreement,

8   which was a bilateral contract distinct from the unilateral rule announced in the handbook. *Id.* at 1172.[7]

9       Here, as in *Mitri*, Ogletree attempted to unilaterally implement new "programs" in its January 15,

10  2016 email—the Open Door Policy, Mutual Arbitration Agreement, and Teledoc Medical Consults. *See*

11  January 15 Email. Additionally, Ogletree directed employees to "sign and return a copy of the Mutual

12  Arbitration Agreement to your Office Administrator." *See id*. The email goes on to describe the Agreement

13  as an "important legal document" and "binding contract." *Id*. Notably, as in *Mitri*, there was no

14  requirement that employees "sign and return" any of the additional policies introduced in the January 15

15  Email. Where, as here, "the core issue . . . is whether the documents prepared by [defendant] show an

16  express *bilateral* contract was entered into through which the parties agreed to arbitrate," case law about

17  creating unilateral implied-in-fact agreement through continued employment is inapplicable. *Mitri*, 157

18  Cal. App. 4th at 1171.

19      Had, Ogletree "wished to make the Arbitration Agreement a condition of [plaintiff's] continued

20  employment, or if it wished to obtain a signature or a simple click that stated 'I agree' or 'I accept,' it was

21  free to do so." *AT&T Mobility Servs. LLC v. Jean-Baptiste*, No. CV 17-11962, 2018 WL 3425734, at *4

22  (D.N.J. July 16, 2018). But, it did not. "Accordingly, [plaintiff's] decision to continue her employment

23  with [Ogletree] simply had nothing to do with her assent to the optional program." *Id*. Because Plaintiff

24

25  _____

    [7] By way of illustration, in an unpublished decision, the California Court of Appeal similarly distinguished
26  between "employers who made offers for unilateral contracts by imposing policy changes that did not
    contemplate an exchange of mutual promises between the employer and employee" and a "bilateral
27  contract with both the company and the employee exchanging mutual promises—a proposal which
    [plaintiff] did not accept." *Herring v. Parking Concepts, Inc*., No. B216008, 2010 WL 1038396, at *3
28  (Cal. Ct. App. Mar. 23, 2010) (unpublished).

could have declined to participate and still remained employed at Ogletree, submitting to arbitration was not a condition of continued employment.

### ii.   Plaintiff's Mere Failure to Opt Out Did Not Manifest Knowing Agreement to Arbitrate

Moreover, the facts present here firmly establish that Plaintiff did not manifest acceptance through continued employment and a failure to affirmatively opt out. "Although an implied in fact contract may be inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an *intent* to promise." *Gorlach v. Sports Club Co*., 209 Cal. App. 4th 1497, 1507 (Cal. Ct. App. 2012) (quoting *Friedman v. Friedman*, 20 Cal. App. 4th 876, 887 (Cal. Ct. App. 1993)). To establish intent, the law requires that "any bargain to waive the right to a judicial forum for civil rights claims in exchange for employment or continued employment must at the least be express: the choice must be **explicitly presented** to the employee and the employee must **explicitly agree** to waive the specific right in question." *Ashbey v. Archstone Prop. Mgmt., Inc*., 785 F.3d 1320, 1324 (9th Cir. 2015) (emphasis added) (quoting *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997)). Because Ogletree never explicitly presented to Plaintiff the choice to arbitrate, and Plaintiff never explicitly agreed to waive her rights, the parties never formed a valid contract.

The court in *Nelson v. Cyprus Bagdad Copper Corporation* confirmed that any waiver of statutory rights must be *actually* "knowing." *Id* at 761. There, the court concluded:

> [T]he unilateral promulgation by an employer of arbitration provisions in an Employee Handbook does not constitute a "knowing agreement" on the part of an employee to waive a statutory remedy provided by a civil rights law. We conclude further that the right to a judicial forum is not waived even though the Handbook is furnished to the employee and the employee acknowledges its receipt and agrees to read and understand its contents. Finally, we hold that the right is not waived even when the employee performs his obligations by commencing or continuing to do his assigned work and accepting a paycheck in return.

*Id*. at 762. Likewise, here the unilateral promulgation of the Agreement as part of an apparently routine

administrative email is insufficient to constitute a knowing waiver of constitutional rights and the remedies provided by civil rights law.

### a.   Ogletree Bears the Burden of Adequately Educating Employees on the Details of the Arbitration Program and the Specific Method of Acceptance

The law is clear. It is Ogletree's express burden to educate employees on the existence of an arbitration agreement under which mere continued employment serves as acceptance. Any alternative interpretation would create a burden on employees to keep on constant guard lest their employer attempt to sneak through a silent waiver of statutory rights, as Ogletree appeared to do here. Ogletree fundamentally failed to sustain its burden. It did nothing to confirm that its employees had actual knowledge that routine conduct—neglecting to affirmatively respond to an administrative email—would bind them to a permanent waiver of their constitutional and statutory rights. Ogletree's failure to adequately inform its employees prohibits the valid formation of a binding contract to arbitrate disputes.

Ogletree's reliance on *Hicks v. Macy's Dept. Stores, Inc.*, No. C 06-02345, 2006 WL 2595941 (N.D. Cal. Sept. 11, 2006) and *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002) for the proposition that failure to opt out of an arbitration program manifests an intent to be bound by it is misplaced, but instructive by comparison.[8] Rather than advance Ogletree's position, both cases highlight the deficiencies in Ogletree's conduct. The law places a high burden on employers to meet the narrow exception to the general rule that contract formation requires affirmative assent. Courts only find acceptance through a failure to opt out in rare circumstances where the employer has taken a far more robust course of conduct to impress upon employees that they must opt out, as well as the consequences for choosing not to do so.

In *Najd*, Circuit City instituted an "Associate Issue Resolution Program" which included an

---

[8] Ogletree curiously cites to *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198 (9th Cir. 2002), *Kilgore v. KeyBank, Nat. Ass'n.*, 718 F.3d 1052 (9th Cir. 2013), and *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016) as additional support for this argument. However, each of these cases involves the issue of unconscionability, not contract formation. Likewise, in *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072 (9th Cir. 2014) the existence of an arbitration agreement was not disputed; rather, the dispute centered on the enforceability of the agreement's class-action waiver. These cases are not authority for propositions neither raised nor considered.

agreement to arbitrate disputes. 294 F.3d at 1106. As part of the program implementation, the employer personally distributed packets of information to each employee within the course of the employee's ordinary business, meaning that the company ensured each employee **actually possessed** a physical copy of the documents. *Id*. Further, the company required each employee to acknowledge receipt of the arbitration agreement affirmatively in a signed writing. *Id*. Ultimately, the court enforced the arbitration agreement *because* "Najd, as employee of Circuit City, acknowledged receipt of the [arbitration agreement] *in writing* and was asked to review it *within the course of his employment*." *Id* at 1109. (emphasis added). This conduct—a signed writing and a required review of the terms of the arbitration agreement within the course of his employment—was deemed sufficient to ensure there was a *clear and express* knowledge and assent by the employee to either opt out of the program by a date certain or accept the terms of the agreement. As set forth above, Ogletree may have attempted to create a similar scenario with its own Acknowledgment form, but Plaintiff—and most other employees—did not sign. Critically, the *Najd* court based its ruling on "the circumstances of this case," rather than creating a new bright-line rule, and specifically acknowledged that **"[i]n other circumstances acceptance by silence may be troubling, and explicit consent indispensable."** *Id*. (emphasis added). Ogletree's actions are not comparable to those taken by Circuit City, and therefore *Najd*'s narrow holding is inapplicable.

Ogletree's argument implies that *Hicks* extends *Najd*'s holding even further by dispensing entirely with the requirement of a signed form acknowledging, and thus expressly assenting to, the "failure to opt-out" as a method of acceptance.[9] (Supp. Br. at 8-9). Not so. In reality, the court in *Hicks* analyzed the specific factual circumstances present there; it found the fundamental hallmarks of meaningful notice and explicit acknowledgement of the method of acceptance to be satisfied only *by the significant additional efforts the employer undertook in that case*. Such vigorous efforts, again, are not present here.

---

[9] Other courts interpreting the same arbitration program have found the acknowledgment form necessary to form a valid and enforceable agreement to arbitrate. *See, e.g.*, *Rosas v. Macy's, Inc.*, No. CV11-7318, 2012 WL 3656274, at *6 (C.D. Cal. Aug. 24, 2012) (finding after a trial that plaintiffs signed the acknowledgment form, and specifically that "Macy's has proved by a preponderance of the evidence that the Plaintiffs attached their electronic signatures to the SIS Acknowledgment Form thus forming a valid and enforceable agreement to arbitrate.").

1        There, Macy's unilaterally implemented an alternative dispute resolution policy called Solutions

2   InSTORE ("SIS"). 2006 WL 2595941 at *1. Macy's took a series of steps to ensure that employees entered

3   the program knowingly and voluntarily. For *two weeks* Macy's "held daily meetings for its employees

4   about SIS," at which it personally "gave all employees two initial documents explaining SIS: a letter and

5   a brochure." *Id*.[10] Then, Macy's hung "posters diagraming each SIS step, including Step 4, binding

6   arbitration," throughout common employee areas. *Id*. Next, it mailed "all employees a [hard copy] packet

7   which included the SIS Plan Document, an Early Dispute Resolution Program Election Form, and a pre-

8   addressed postage-paid return envelope" in which to return the enclosed opt-out form. *Id*. One year after

9   the date to opt out had passed—during which time Macy's kept the posters on prominent display in

10  employee areas—Macy's mailed employees *another* hard-copy "packet of information about SIS,"

11  including a new physical opt-out election form and "pre-addressed postage-paid return envelope" in which

12  to return the form. *Id.* It thus offered *a second* opportunity for employees to opt-out of the program.

13       In sum, each employee personally attended and engaged in multiple daily meetings about the

14  arbitration program and opt-out procedure, was twice personally served with materials explaining the

15  arbitration program and consequences of the failure to opt out, and was given two chances to opt out. *Id*.

16  at *3. Unlike here, Macy's notice procedures were robust and transparent.

17       In *Hicks* and *Najd*, the court found the elements of a valid contract, including acceptance, were

18  present given the employer's extensive and overt efforts to ensure that employees were educated on the

19  details of the arbitration program and the specific method of acceptance. This provided concrete and

20  necessary assurances that the failure to opt out reflected a deliberate decision to choose arbitration. The

21  signed acknowledgement form in *Najd* established that the employee had received the materials explaining

22  the arbitration program and, more importantly, affirmatively consented to the specific method of

23  acceptance. The weeks of meetings in *Hicks* ensured that each employee personally heard, engaged with,

24  and understood the legal effects of the new arbitration program and the specific method of contract

25

---

26  [10] Ogletree also cites to a later opinion, *Castro v. Macy's, Inc.*, No. C 16-5991, 2017 WL 344978 (N.D.

27  Cal. Jan. 24, 2017) which involves a dispute over the same arbitration program and reaffirms the ruling

28  of *Hicks*.

acceptance. And in both cases, the <u>personal</u> delivery of hard-copy documents explaining the program and a form providing an opportunity to opt out, *on top of* the other efforts of the employer, satisfied the court.

### b. *Ogletree's Actions Were Insufficient as a Matter of Law to Create Knowing and Voluntary Acceptance Through Inaction Alone*

The efforts of Macy's and Circuit City stand in glaring contrast to Ogletree's failures to obtain Plaintiff's meaningful agreement to forego her basic rights by assenting to arbitrate her claims. Ogletree cannot seriously contend that it has matched, or even approached, the efforts necessary to break from the "general rule [that] silence or inaction does not constitute acceptance of an offer." *Najd*, 294 F.3d at 1109 (internal quotation marks omitted).

In fact, Ogletree went through exactly *none* of procedures detailed in *Najd* and *Hicks*, and instead refused to engage in a *single* procedural safeguard outlined as sufficient to create a duty to opt out lest one be bound. To the contrary, looking at Ogletree's conduct, it appears that the Firm went out of its way to ensure the opposite result—that employees did **not** clearly and unmistakably understand the significance of inaction. The incredible ease with which Ogletree could have complied with the law, not least given its professed expertise in the area, makes its decision not to do so all the more maddening.

Ogletree could have held meetings to discuss the Mutual Arbitration Agreement. Indeed, approximately two weeks after the email attaching the MAA, the Firm held its annual shareholder retreat at which it would typically address these kinds of administrative programs. *See* Knepper Decl. ¶ 8. Ogletree could have engaged its office administrators to deliver tangible hard-copies of the Agreement and the opt-out form in hard copy to employees, another common method of disseminating administrative items at the Firm. *See id.* ¶ 7. Like Macy's, it could have hung posters in its offices. It could have had employees sign an acknowledgment form consenting to a non-opt-out method of consent. Indeed, Ogletree did adopt this method but scrapped it after it did not get the results it wanted,[11] pivoting and deeming all employees bound regardless of whether they had signed. It has thus shifted the goalposts after the fact to

---

[11] Based on documents produced by Ogletree, only two individuals in the entire Orange County office signed the MAA acknowledgment forms consenting to the opt-out method of acceptance. *See* Ex. D, Signed Mutual Arbitration Agreement by Angel Mojica II, at OD-K_00000143.; Ex. E, Signed Mutual Arbitration Agreement by Lynda A. Rivera, at OD-K_00000165.

1  attempt to secure a get-out-of-jail-free card in this litigation.

2        Instead of simply holding a Firm meeting explaining the agreement, Ogletree emailed it as an

3  attachment at 4:45 AM on the Friday before Martin Luther King, Jr. Day with the subject line

4  "IMPORTANT – Two New Programs for 2016." *See* January 15 Email. Overlooking this information

5  would be as simple as quickly scrolling through emails on a Friday morning before a holiday weekend.

6  Indeed, tucking arbitration agreements within neutrally-titled documents has been routinely admonished

7  in California and found inadequate to create an implied-in-fact contract. *See, e.g.*, *Norcia v. Samsung

8  Telecommunications Am., LLC*, 845 F.3d 1279, 1289 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 203 (2017)

9  ("reasonable person in [plaintiff's] position would not be on notice that the brochure [entitled "Product

10  Safety & Warranty Information"] contained a freestanding obligation [to arbitrate] outside the scope of

11  the warranty."); *Knutson v. Sirius XM Radio Inc*., 771 F.3d 559, 566 (9th Cir. 2014) ("Nothing in the

12  record, however, indicates that [defendant's] offer was clearly and effectively communicated to [plaintiff]

13  by mailing him the Customer Agreement. . . He could not be obligated to act where there was no effective

14  notice that action was required."); *Windsor Mills*, 25 Cal. App. at 993 ("Hence, an offeree, regardless of

15  apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he

16  was unaware, contained in a document whose contractual nature is not obvious.").

17        Similarly, rather than provide a hardcopy of an opt-out form to each employee during work hours,

18  and/or mailing one to employees with a self-addressed pre-paid envelope, Ogletree buried instructions on

19  how to access the opt-out form deep within the body of the email "under the 'Resources' tab on the OD

20  Connect homepage of the Firm's Human Resources Department," putting the burden on the employee to

21  ferret out this information. Rather than follow the examples provided in *Najd* and *Hicks*, which emphasize

22  the burden on the employer to ensure employees fully understand the import of their choices, Ogletree did

23  the exact opposite. It made *no* meaningful effort to ensure that its employees knowingly consented to be

24  bound by an arbitration agreement, and instead hid the ball.[12]

25

26  [12] Ogletree's attempt to argue that Plaintiff Knepper's status as a sophisticated party relieves the Firm of
   its Duty is unpersuasive. *Najd* and *Hicks* show that Ogletree, as the offeror, had an obligation to undertake

27  sufficient action to ensure that the offerees understood the existence and extent of the offer. This obligation

28

1    Ogletree now advocates for a dangerous and dramatic extension of the current line of case law.

2 Instead of a narrow departure from the general rule of contract acceptance by affirmative assent, Ogletree

3 seeks a holding that failure to review and respond to an email, whose subject line has *no* indication that

4 the contents contain an arbitration agreement, constitutes a ***knowing and voluntary*** waiver of rights. This

5 is a bridge too far, and one which recently has been rejected and admonished by another court.

6    In that case, *Schmell* v. *Morgan Stanley & Co*., the "Plaintiff received notice of the Arbitration

7 Agreement Defendant [sought] to enforce via an email to all employees informing them of changes to

8 [CARE, its mandatory resolution program,] and linking the new CARE Guidebook and Arbitration

9 Agreement." No. 17-13080, 2018 WL 1128502, at *4 (D.N.J. Mar. 1, 2018). The defendant employer

10 argued that plaintiff's failure to opt out formed a binding arbitration agreement. *Id.* The court disagreed.

11 The ruling highlighted that relevant case law finding acceptance from a failure to opt-out "involve[d] more

12 than passive acquiescence," and instead required some ***affirmative action*** on the part of the employee, i.e.

13 acknowledgment via signed or electronic means. *Id.* As here, the plaintiff in *Schmell* did not recall

14 "receiving, viewing, or opening" the email containing the link to the arbitration agreement, despite

15 defendant's evidence that the email was delivered and received. *Id.* at *3. Ultimately, the court "found

16 that the email notification and Plaintiff's continued employment cannot constitute notice and assent to the

17 CARE Arbitration Program." *Id*. at *4.

18    At bottom, the requirements of actual knowledge and informed consent—and the burden on

19 employers to ensure that these requirements are met—are not mere formalities, but rather are intended to

20 safeguard against an unknowing forfeiture of statutory and constitutional rights. Ogletree's argument

21 entirely misses this critical point. Ninth Circuit law, as articulated in cases such as *Najd*, plainly does not

22 establish a new rule that allows employers to sneak through a mandatory arbitration program. The factual

23 circumstances present here—including Ogletree's superficial notice process and failure to summon any

24 meaningful efforts to ensure employees' actual knowledge and informed consent—come nowhere close

25 to the few, atypical circumstances found sufficient to create employee acceptance through mere silence.

26

27

28

stands regardless of the sophistication of the offeree.

1

2

        c.    **Ogletree's Evidence Does Not Establish Plaintiff's Knowing and Voluntary Agreement to Waive Her Rights**

3

4

5

6

7

8

9

10

11

      The primary piece of "irrefutable evidence" on which Ogletree relies to establish Plaintiff had actual knowledge of the terms of acceptance for the Agreement is a March 1, 2016 email in which Ms. Knepper states simply "I will turn mine in tomorrow. Thanks." Knepper Email at F-1. However, this evidence cuts *against* Ogletree and does not support its argument. First, Ms. Knepper was responding to an email stating "today is the deadline to sign and return a copy of the Mutual Arbitration Agreement to me*." Id.* As discussed, this implies that it was necessary to **sign and return** an executed arbitration agreement. A response stating merely "I will turn mine in tomorrow," which does not specify whether the employee might return either the agreement or the opt-out form, is insufficient to manifest knowledge of what the agreement entails or knowing consent to be bound through silence.

12

13

14

15

16

17

18

19

20

21

22

      Importantly, Ogletree simply allowed the time to pass and did not follow up on Plaintiff's email with any explanation of the contractual or legal ramifications for delay. Defendant's failure to do so is highly significant under the case law. *Cf., e.g.*, *Berkley v. Dillard's Inc.*, 450 F.3d 775, 777 (8th Cir. 2006) (after plaintiff's failure to sign acknowledgment, employer "informed her that her refusal did not affect the arbitration agreement, which applied automatically to all employees who continued their employment."); *Dixon v. Synchrony Fin.*, No. 1:15-CV-406, 2015 WL 12720290, at *3 (N.D. Ga. Aug. 18, 2015), *adopted* at 2015 WL 12723144 (N.D. Ga. Sept. 10, 2015) (after plaintiff failed to execute form, a "meeting was held to ensure that Plaintiff understood the Solutions procedure and to 'reiterate the point that by virtue of her continued employment, she was subject to the Solutions process.'"). Again, Ogletree's critical omissions suggest that—as a self-professed master on arbitration agreements and jurisprudence— it sought to bait a trap for its own workers.

23

24

25

      On these facts, the Court should reject Ogletree's argument that Plaintiff knowingly and voluntarily waived her rights. In California, Plaintiff's actions cannot, and do not, create a valid and binding contract to arbitrate disputes.

26

27

  **C.**    **Alternatively, the Motion to Transfer Should be Denied Because the Agreement is Unconscionable**

28

1    In the alternative, the Court should deny Defendant's Motion to Transfer because the alleged

2    Agreement is both procedurally and substantively unconscionable and the manifest defects in its

3    provisions are not severable.

4                    i.        **The Alleged Arbitration Agreement Does Not Clearly and Unmistakably**

5                              **Delegate Questions of Arbitrability to the Arbitrator**

6    "[T]he federal policy in favor of arbitration does not extend to deciding questions of arbitrability."

7    *Uber*, 848 F.3d 1208 (internal quotation marks omitted)."[W]hether the court or the arbitrator decides

8    arbitrability is 'an issue for judicial determination unless the parties *clearly and unmistakably provide*

9    *otherwise*." *Id*. As the alleged Agreement does not clearly and unmistakably delegate arbitrability

10   exclusively to the arbitrator, it remains within this Court's jurisdiction to decide the gateway issue of

11   whether this case is arbitrable. Contrary to Defendant's contention, the holding of *Uber* does not dispose

12   of the issues in this Motion because it differs substantially from the case at bar. Supp. Br. at 6.

13   First, unlike *Uber*, contract formation is in serious doubt as set forth above. It simply is neither

14   clear nor unmistakable that continued employment amounts to a binding agreement to arbitrate anything,

15   including threshold questions of arbitrability. Formation is thus a threshold issue for the Court. *See Granite*

16   *Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296-300 (2010) ("our precedents hold that courts should

17   order arbitration of a dispute only where the court is satisfied that neither [1] the formation of the parties'

18   arbitration agreement *nor* [2] (absent a valid provision specifically committing such disputes to an

19   arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both

20   matters, 'the court' must resolve the disagreement.").

21   Ogletree's omission of reference to the delegation provision from communications to employees

22   about the alleged agreement make the claim of a clear and unmistakable delegation agreement even less

23   tenable. None of the emails on which Ogletree relies even hint at the inclusion of a delegation agreement.

24   *See generally* January 15 Email; Myers Email. Ogletree should not benefit from a clause it concealed.

25   Second, unlike in *Uber*, the delegation language of the alleged Agreement here is confusing and

26   contradictory. In *Uber*, the delegation clause clearly delegated exclusive authority to the arbitrator for both

27   underlying substantive disputes <u>and</u> disputes regarding arbitrability. 848 F.3d at 1207-08 (expressly

28

1  including arbitrability in the list of disputes "to be resolved only by an arbitrator"). The agreement in *Uber*

2  also included a broad catch-all statement that "it is intended to apply to the resolution of disputes that

3  otherwise would be resolved in a court of law or before a forum other than arbitration." *Id.* at 1207. Here,

4  Ogletree could have, but did not, include such broad and exclusive delegation language.

5      The MAA lists certain "Covered Claims" subject exclusively to arbitration (MAA ¶2), but the

6  delegation provision simply provides that the Arbitrator "shall have the authority to" decide issues of

7  enforceability (*id.* ¶ 6). Nothing in the MAA makes this authority mandatory and exclusive, such that a

8  court lacks jurisdiction to address and resolve such issues. Further, the Agreement ***exempts*** from

9  arbitration "any dispute relating to the interpretation, applicability, or enforceability, of" the authority of

10  the arbitrator to consolidate claims. MAA ¶ 6. The meaning and enforceability of this provision are

11  actively disputed here. *See* Supp. Br. at 14. Thus, the Agreement does not clearly and unmistakably

12  delegate the questions presently before the Court to the sole and exclusive authority of the arbitrator.

13          ii.     **The Alleged Arbitration Agreement is Procedurally Unconscionable**

14      "Procedural unconscionability focuses on oppression or unfair surprise" resulting from the alleged

15  arbitration agreement. *Olvera v. El Pollo Loco, Inc.*, 173 Cal. App. 4th 447, 454 (Cal. Ct. App. 2009).

16  Unfair surprise typically results from "misleading bargaining conduct or other circumstances indicating

17  that a party's consent was not an informed choice." *Id.* at 455.

18      The purported Agreement is procedurally unconscionable because of the unfair surprise it imposes

19  on employees who neither signed nor opted out. At minimum, the plain language of the Agreement is

20  ambiguous on whether such an employee will be bound. Moreover, Ogletree's method of distributing the

21  agreement, attached to a deceptively titled, 4:45 A.M. email preceding a holiday weekend substantially

22  reduces the chance that employees will notice and read it. Finally, Ogletree's emphasis on obtaining signed

23  copies reinforces the reasonable belief that employees would not be bound to arbitrate, unless they signed

24  the agreement. California courts have found that such ambiguities regarding the formation and nature of

25  the agreement render it procedurally unconscionable. *See e.g.*, *id.* at 455–56.

26      Under these circumstances, it would be manifestly unfair to impose an obligation to arbitrate on

27  employees who never signed the Agreement and do not even recall receiving it.

28

### iii.      The Alleged Agreement is Also Substantively Unconscionable

Where, as here, the Agreement and manner of its implementation impose such significant unfair surprise that employees might reasonably believe they are not bound by it, a relatively low degree of substantive unconscionability will render it unenforceable. Here, the Mutual Arbitration Agreement contains numerous unfair and one-sided terms, and is substantively unconscionable by any measure.

Substantive unconscionability focuses on terms that are "unduly oppressive" or "unreasonably favorable." *Sanchez v. Valencia Holding Co., LLC* 61 Cal. 4th 899, 910-911 (Cal. Ct. App. 2015). Despite Defendant's reliance on *Armendariz v. Foundation Health Psychcare Services, Inc.*, (Supp. Br. at 13), satisfaction of the five minimal criteria articulated in *Armendariz* does not save it. 24 Cal. 4th 83 (2000). Other criteria for finding unconscionability exist and are present in this case.

First, the Mutual Arbitration Agreement expressly sweeps in "all disputes between" the parties, without exempting disputes that arose before the imposition of the Agreement. MAA ¶ 1. Its effect is impermissibly retroactive. The covenant of good faith and fair dealing precludes "unilateral changes to an arbitration agreement that apply retroactively to 'accrued or known' claims because doing so would unreasonably interfere with the employee's expectations regarding how the agreement applied to those claims." *Avery*, 218 Cal. App. 4th at 62 (quoting *Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425, 1465 (2012)). The critical point in time is when the claims accrued, not when a lawsuit was filed. *See id*. This term is particularly unfair under the specific circumstances of this case as Ogletree was on notice of Plaintiff's claims and the challenged discrimination before it circulated the agreement. *See, e.g.*, Am. Compl. ¶¶ 65, 70, 72, 76, 78, 80, 83, 96, 111.[13] Such retroactive agreements unfairly disfavor employees by—as is the case here—forestalling litigation after actual notice of claims and allowing an employer to split up known potential class actions in the face of systemic reports of discrimination and misconduct.

Second, the Agreement's representative action waiver and the prohibition on making any award

---

[13] *See also* Proposed Second Am. Compl. ¶¶ 80, 85, 87, 91, 95, 99-100, 103, 127, 130, 153-61, 169-70, 174-75, 183-84, 190, 198-99, 227-28, 234-35, 241, 258-60, 266, 269-71 (putting Ogletree on notice of systemic claims of gender discrimination). Discovery will likely reveal that other women raised similar issues prior to the effective date of the Mutual Arbitration Agreement.

1  to a person or entity not a party of the arbitration violate public policy for two reasons. *See* MAA ¶ 6.

2  These terms illegally waive and require arbitration of representative actions under the California Private

3  Attorneys General Act ("PAGA"), which would garner penalties to the State of California, a non-party.

4  *See, e.g.*, *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 383 (Cal. 2014) (holding that PAGA

5  waivers violate public policy). Ogletree admits that the PAGA claims in this suit are not arbitrable, as a

6  matter of law. Supp. Br. at 15. These terms also impermissibly prohibit public injunctive relief under the

7  Unfair Competition Law, which prohibition "is contrary to California public policy and is thus

8  unenforceable under California law." *McGill v. Citibank*, *N.A.*, 2 Cal. 5th 945, 952 (Cal. 2017).

9      Third, the Agreement exempts from arbitration the claims Ogletree is most likely to bring against

10  its employees, namely claims for temporary equitable relief prior to the appointment of an arbitrator[14] and

11  actions to enforce the Agreement or compel arbitration. *See* MAA ¶ 2. For example, this clause allows

12  Ogletree to seek injunctions (i) against class arbitration, (ii) restricting speech about arbitration, and (iii)

13  restricting speech about potential violations of trade secrets and other proprietary information. This broad

14  carve-out of temporary equitable relief primarily benefits Ogletree, further rendering the agreement

15  unconscionable. *See Colvin v. NASDAQ OMX Group, Inc.*, No. 15-cv-02078-EMC, 2015 WL 6735292,

16  at *5 (N.D. Cal. Nov. 4, 2015) (Chen, J.) (carve out of equitable relief supported a finding of equitable

17  unconscionability); *Mercuro v. Superior Court*, 96 Cal. App. 4th 167 at 177-78 (same).

18      Fourth, the alleged Agreement advantages Ogletree by exempting disputes regarding the validity

19  of the class waiver. MAA ¶ 6. This carveout substantially favors employers by granting them ideal terms

20  for an appeal on the issue of class arbitration. If a court finds that the class waiver provision is

21  unenforceable, Ogletree will have the right to appeal, which could delay class arbitration for years, and

22  could subject the decision to *de novo* review. By contrast, if an arbitrator were to strike the class waiver,

23  this ruling would most likely be subject to judicial challenge only on a petition to vacate, where it would

24  be immune from review for "errors of fact or law," and the case would likely proceed without interruption

25  as an individual arbitration. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

26

27  _____

28  [14] This particular carve-out is not reasonably justified given that parties subject to arbitration agreements
have access to emergency relief in court under California Code of Civil Procedure § 1281.8.

1  Ogletree receives by far the greater benefit of this bargain.

2   More than enough one-sidedness exists to find the alleged Agreement unconscionable and

3  unenforceable. These numerous defects permeate the Agreement's language and implementation, and

4  "indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation,

5  but as an inferior forum that works to the employer's advantage" which weighs strongly against severance.

6  *Armendariz*, 24 Cal. 4th at 124. Declining enforcement, rather than severing terms, is consistent with

7  concerns of equity: permitting an employer to include whatever unfair provisions it wishes, knowing that

8  it runs no risk of a court declining to enforce arbitration favors employers, eviscerates the doctrine of

9  unconscionability, and, perversely, encourages employers to draft arbitration agreements that *are illegal*.

10  The unconscionable features of the Mutual Arbitration Agreement are simply too numerous and too

11  integrated with the rest of the agreement to be severed. As courts are neither called on nor empowered to

12  redraft defective agreements, the alleged Agreement should be declared void, and the action should remain

13  in this District. *Id*. at 124-25.

14  **V. CONCLUSION**

15   Plaintiff is not bound by any arbitration agreement with Ogletree. Consequently, Plaintiff

16  respectfully requests that Defendant's Motion to Transfer be denied and Plaintiff's Motion for Leave to

17  File a Second Amended Complaint be granted.

18

19

20  Dated: October 2, 2018       Respectfully submitted,

21

22         /s/ David Sanford
       David Sanford (appearance *Pro Hac Vice*)

23         Jill Sanford (CA Bar No. 185757)
       Edward Chapin (CA Bar No. 53287)

24         Jeremy Heisler (*Pro Hac Vice forthcoming*)

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James E. Richardson (*Pro Hac Vice forthcoming*)
Danielle Fuschetti (CA Bar No. 294065)
Leigh Anne St. Charles (appearance *Pro Hac Vice*)
SANFORD HEISLER SHARP, LLP

*Attorneys for Plaintiff and the Class*

[*Continued from Caption Page*]

Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021


Leigh Anne St. Charles (appearance *Pro Hac Vice*)
lstcharles@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
611 Commerce St., Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020


*Attorneys for Plaintiff and the Classes*